## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MICHIGAN

IN RE:  Michael James Baker                    Case No. 08-43175
        Suzie Carmen Baker                    Chapter 7
                   Debtor(s).          Hon. Thomas J. Tucker
_____/

Michael J. Baker
Suzie C. Baker

             Appellant,                    Adv. No. N/A

     v.

Residential Funding Company, LLC
And Orlans

             Appellee.
_____/

### NOTICE OF TRANSMITTAL OF COMPLETE RECORD
### REGARDING MOTION TO STAY PENDING APPEAL

       I hereby certify that the attached documents are transmitted to the United States District Court for the Eastern District of Michigan, which constitutes the Motion for Withdrawal of Reference.

☐    Notice of Appeal                ☐    Appellee's Designation of Record

☐    Bankruptcy Matter Civil Cover Sheet    ☐    Appellee's Statement of Issues

☐    Order on Appeal                ☐    Notice of Deficiency

☐    Appellant's Designation of Record    ☐    Motion for Leave to Appeal

☐    Appellant's Statement of Issues      ☐    Motion to Withdraw the Reference

☒    Other: Ex-Parte Motion to Stay Pending Appeal; Opinion and Order Denying Debtors' Motion for Stay Pending Appeal, Except for a Limited Temporary Stay;  Motion to Extend re: Extension of Temporary Stay Pending Appeal; Order Denying Debtors' Motion for Extension; Emergency Motion for Temporary Restraining Order and Stay to Eastern District Court; Corrected Emergency Motion; Exhibit.

**NOTE:  Items designated as \*\*FILED UNDER SEAL\*\* will be supplied to the District Court Judge by electronic filing as soon as Appellant knows who is assigned to this case and the number.**

☐ There is a previous civil matter in this bankruptcy.  That matter was given civil case number Click here to enter text.

and assigned to District Judge Click here to enter text.

☒ This is a new matter and not previously assigned to a District Court Judge.

☐ The Appellant has not filed the Designation of Record and/or paid the filing fee.

.

Dated:  04/15/15                          Clerk, United States Bankruptcy Court


                                          By:  /s/  LaShonda Moss                    
                                               Deputy Clerk

CONVERTED, REOPENED, APPEAL, TranscriptREQ

## U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 08−43175−tjt

|  |  |
|---|---|
| *Assigned to:* Judge Thomas J. Tucker | *Date filed:* 02/12/2008 |
| Chapter 7 | *Date converted:* 05/11/2008 |
| Previous chapter 13 | *Date reopened:* 11/14/2013 |
| Voluntary | *Debtor discharged:* 08/26/2008 |
| No asset | *Joint debtor discharged:* N/A |
|  | *341 meeting:* 06/24/2008 |
|  | *Deadline for filing claims:* 06/23/2008 |
|  | *Deadline for objecting to* 08/25/2008 |
| *Debtor disposition:* Standard Discharge | *discharge/dischargeability:* |
| *Joint debtor disposition:* Standard Discharge | *Deadline for financial mgmt. course:* 08/08/2008 |

**Debtor**
**Michael James Baker**
5142 North Territorial Road
Dexter, MI 48130
WASHTENAW−MI
SSN / ITIN: xxx−xx−7054

represented by **James P. Frego, II**
Frego &Assc.−The Bankruptcy Law
Office
23843 Joy Road
Dearborn Heights, MI 48127
(313) 724−5088
Fax : (313) 724−5087
Email: fregolaw@aol.com

**Ray G. Tallerday (SUSPENDED)**
107 S. Broad Street
Suite A
Adrian, MI 49221
(734) 476−1048
Fax : 517−920−4929
Email: bankruptcyclinic@gmail.com

**David Samuel Wilkinson**
Frego &Associates, P.L.C.
23843 Joy Road
Dearborn Heights, MI 48127
(313) 724−5088
Fax : (313) 724−5087
Email: fregolaw@aol.com

**Joint Debtor**
**Suzie Carmen Baker**
5142 North Territorial Road
Dexter, MI 48130
WASHTENAW−MI
SSN / ITIN: xxx−xx−8012

represented by **James P. Frego, II**
(See above for address)

**Ray G. Tallerday (SUSPENDED)**
(See above for address)

**David Samuel Wilkinson**
(See above for address)

**Trustee**
**Tammy L. Terry**
Buhl Building
535 Griswold
Suite 2100
Detroit, MI 48226

1

313−967−9857
*TERMINATED: 05/14/2008*

| | |
|---|---|
| ***Trustee*** | represented by **Douglas S. Ellmann** |
| **Douglas Ellmann** | 308 W. Huron |
| 308 West Huron | Ann Arbor, MI 48103−4204 |
| Ann Arbor, MI 48103−4204 | (734) 668−4800 |
| 734−668−4800 | Email: dse@ellmannlaw.com |
| | |
| | **Thomas R. Morris** |
| | Silverman &Morris, P.L.L.C. |
| | 30500 Northwestern Highway |
| | Suite 200 |
| | Farmington Hills, MI 48334 |
| | 248−539−1330 |
| | Email: morris@silvermanmorris.com |
| | |
| | **Melinda B. Oviatt** |
| | 30500 Northwestern Highway |
| | Suite 200 |
| | Farmington Hills, MI 48334 |
| | 248−539−1330 |
| | Email: oviatt@silvermanmorris.com |
| | |
| ***U.S. Trustee*** | represented by **Kelley Callard (UST)** |
| **Daniel M. McDermott** | United States Trustee |
| | 211 West Fort Street |
| | Suite 700 |
| | Detroit, MI 48226 |
| | (313) 226−6773 |
| | Email: Kelley.Callard@usdoj.gov |

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 04/02/2014 | | 147 | Ex Parte Motion To Stay Pending Appeal (related documents 116 Order (Generic)) Filed by Debtor Michael James Baker, Joint Debtor Suzie Carmen Baker (Attachments: # 1 Proposed Order # 2 Exhibit Brief in Support) (Wilkinson, David) (Entered: 04/02/2014) |
| 04/02/2014 | | 149 | Opinion and Order Denying Debtors' Motion For Stay Pending Appeal, Except for a Limited Temporary Stay (Related Doc # 147). (Vozniak, Mary) (Entered: 04/02/2014) |
| 04/11/2014 | | 157 | Motion to Extend Re: EXTENSION OF TEMPORARY STAY PENDING APPEAL; Extend To May 5th, 2014 Filed by Debtor Michael James Baker, Joint Debtor Suzie Carmen Baker (Attachments: # 1 Exhibit Order # 2 Exhibit Brief) (Wilkinson, David) (Entered: 04/11/2014) |
| 04/11/2014 | | 158 | Order Denying Debtors' Motion For Extension But Directing Clerk to Transmit Portions of the Record to the District Court Under Fed.R.Bankr.P. 8007(c) (Related Doc # 157). (KHM) (Entered: 04/11/2014) |
| 04/14/2014 | | 165 | Emergency Motion for Temporary Restraining Order *and Stay to the Eastern District Court pursuant to Dckt #158* Filed by Debtor Michael James Baker, Joint Debtor Suzie Carmen Baker (Attachments: # 1 Brief in Support of Emergency Motion for Stay and Temporary Restraining Order) (Wilkinson, David) (Entered: |

| | | | |
|---|---|---|---|
| | | | 04/14/2014) |
| 04/15/2014 | | <u>168</u> | Corrected Motion (related document(s): <u>165</u> Emergency Motion for Temporary Restraining Order *and Stay to the Eastern District Court pursuant to Dckt #158* filed by Debtor Michael James Baker, Joint Debtor Suzie Carmen Baker) Filed by Debtor Michael James Baker, Joint Debtor Suzie Carmen Baker (Attachments: #<u>1</u> Brief in Support of Emergency Ex−Parte Motion for Stay and Temporary Restraining Order #<u>2</u> Cover Sheet #<u>3</u> Exhibit Part A #<u>4</u> Exhibit Part B #<u>5</u> Exhibit Part C) (Wilkinson, David) (Entered: 04/15/2014) |
| 04/15/2014 | | <u>169</u> | Exhibit *Proposed Order* Filed by Debtor Michael James Baker, Joint Debtor Suzie Carmen Baker (RE: related document(s)<u>168</u> Corrected Motion (related document(s): <u>165</u> Emergency Motion for Temporary Restraining Order *and Stay to the Eastern District Court pursuant to Dckt #158* filed by Debtor Michael James Baker, Joint Debtor Suzie Carmen Baker) ). (Wilkinson, David) (Entered: 04/15/2014) |

3

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:

Michael J. and Suzie C. Baker

CASE NO:  **08-43175**
CHAPTER:  **7**
JUDGE:  **Tucker**

Debtor(s)

_____/

### EMERGENCY EX-PARTE MOTION OF DEBTORS FOR STAY OF ORDER APPROVING REVISED SETTLEMENT AND REQUIRING TURNOVER OF PROPERTY (DKT. #118) PENDING APPEAL AND FOR EXPEDITED CONSIDERATION

**NOW COME** Debtors, Michael J. Baker and Suzie C. Baker, by their attorneys, and pursuant to Fed. R. Bankr. P. 8005, bring their Emergency Ex-Parte Motion For Stay of Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #118) pending Appeal and for Expedited Consideration.   In support of this motion, Debtors state:

1. This motion is timely based on Debtors' motion for reconsideration of this order. (DKT. #123).

2. On March 11, 2014, this Court issued the Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #118).

3. Said Order requires Debtors to turn over their home to the Trustee with only seven days of notice.

4.  Debtors have six children, four of which are still in school.  Having lived in the home for 13 years, and with such a large number of children, the Debtors are having difficulties finding adequate housing, which will not displace the children from their current schools.  They will also need to place many of their belongings in a storage facility.

5.  Debtors are in the process of packing and locating a place to store their belongings, but they need at least 45 days to accomplish this feat.

6.  For the reasons set forth in the supporting Brief attached, each of the factors for a stay is met.

7.  Pursuant to L.B.R. 9014-1 (g), Debtors sought but did not obtain concurrence in this motion.

**WHEREFORE,** Debtors respectfully request that this honorable Court stay the effect of its March 11, 2014 Order (DKT. #118) pending appeal of that Order**.**


Respectfully Submitted,

Dated:  April 2, 2014                    /s/David S. Wilkinson_____
                                         David S. Wilkinson (P65130)
                                         Attorney for Debtor(s)
                                         23843 Joy Road
                                         Dearborn Heights, MI  48127
                                         (313) 724-5088
                                         fregolaw@yahoo.com

.

2

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:
Michael J. and Suzie C. Baker

CASE NO:   **08-43175**
CHAPTER:   **7**
JUDGE:     **Tucker**

                Debtor(s)

_____/

### ORDER TO STAY ORDER APPROVING REVISED SETTLEMENT
### AND REQUIRING TURNOVER OF PROPERTY (DKT. #118)


Debtors' Counsel having filed an Emergency Ex-Parte Motion for Stay of Order Approving Revised

Settlement and Requiring Turnover of Property, entered on March 11, 2014, and the Court being more fully

advised in the premises;


**NOW THEREFORE, IT IS HEREBY ORDERED** that:

The clause in the March 11, 2014, Order Approving Revised Settlement and Requiring Turnover of

Property (DKT. #118) regarding the turnover of the property by Debtors is stayed until

_____

_____.


IT IS FURTHER ORDERED that the Debtors shall serve this Notice and Order on the matrix.


**Signed on:** _____

                                        _____
                                        **Thomas J. Tucker**
                                        **United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:
Michael J. and Suzie C. Baker

CASE NO:   **08-43175**
CHAPTER:  **7**
JUDGE:    **Tucker**

Debtor(s)

_____/

### BRIEF IN SUPPORT OF EMERGENCY EX-PARTE MOTION OF DEBTORS FOR STAY OF ORDER APPROVING REVISED SETTLEMENT AND REQUIRING TURNOVER OF PROPERTY (DKT. #118) PENDING APPEAL AND FOR EXPEDITED CONSIDERATION

The nature of this matter is that the Bankruptcy Court issued an Order on March 11, 2014, and as part of that Order, ruled that the Debtors had to surrender their home to the Trustee within seven days.  Failure to do so entitles the Trustee, with the aid of a US Marshall or a state court officer to forcibly evict the Debtors. Vacating the home with six children, during the coldest winter in Michigan in decades, on such short notice is a physical impossibility, and unreasonable.  In addition, such an Order does not provide Debtors with sufficient time to appeal the Order within the applicable appeal deadlines. Therefore, pursuant to FRBP 8005, Debtors respectfully request that this Court hear this Emergency Motion.

**BRIEF**

**I.   INTRODUCTION**

Debtors are now before this Honorable Court seeking an order to preserve the status quo while the litigation of all the issues are concluded in this Court. That litigation is far from being completed.  Debtors have a motion for relief from the stay and an objection to RFC's proof of claim pending.  In addition, the Trustee, Douglas S. Ellmann, has an

1

objection to Debtors' amended exemptions pending as well. The history of this case has

been detailed in several previous pleadings, and Debtors will spare this Court yet another

rendition.

## II. ARGUMENT

### A.  STANDARD FOR A MOTION TO STAY

The factors this Court considers in determining whether an Order should be stayed

under Fed. R. Bankr. P. 8005 are generally the same factors considered in determining

whether to issue a temporary restraining order or a preliminary injunction: "(1) the

likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the

likelihood that the moving party will be irreparably harmed absent a stay; (3) the

prospect that others will be harmed if the court grants the stay; and (4) the public interest

in granting the stay." *Michigan First Credit Union v Smith* (*In re Smith*), 501 B.R. 332,

335 (Bankr. E.D. Mich. 2013) quoting *Michigan Coalition of Radioactive Material*

*Users, Inc. v.Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991).  The greater the likelihood

of success on the merits, the less the court will require the movant to demonstrate

irreparable harm.  *Family Trust Foundation of Ky., Inc. v. Kentucky Judicial Conduct*

*Comm'n,* 388 F. 3d 224, 227 (6th Cir. 2004).

The Debtors' ability to prove that RFC's claimed interest in their mortgage and

property is based on a fraudulent assignment of mortgage which deprives RFC of

standing to foreclose and to participate in the Debtors' Bankruptcy proceedings.  This

ability would be severely affected if Debtors are removed from their property prior to

being heard on the merits.  In essence, the entire reason behind the lawsuit, keeping

Debtors and their six children in their home, would be defeated.  Any judgment the

Bankruptcy Court renders at some later time would be ineffective and useless if Debtors have been removed from their home, and it has been sold to a third party (in addition to causing chaos).

## B.  APPLICATION OF THE STANDARDS FOR A STAY

### 1. Debtorsare likely to prevail on the merits of this case

Debtors have argued this issue in their motion for reconsideration.  Thus, only a summary of that arguments follows.  No Michigan Court has found fraud where a homeowner challenged a foreclosure.  If such a finding were made no court would then declare that the fraud could be overcome by a showing of prejudice.  Such a ruling would fly in the face of long established principles of equity, as a defrauder cannot be allowed to benefit from his wrongful conduct.  It is one thing to declare that a mere procedural defect in the foreclosure requires a showing of prejudice.  It is quite another to declare that in a foreclosure, achieved through the alteration and forgery of the very document which transfers title to mortgagee, the homeowner must show prejudice.  In short, in every case of alleged fraud in the foreclosure proceedings the homeowner has failed to meet the high standard of fraud required to set aside the foreclosure.  In our case the fraud by RFC and Orlans is beyond dispute and verified by transcript.    As such, there can be no doubt that the Debtors have a likelihood of success in the state courts.  Thus, the Order approving the Trustee's Settlement should not have been granted.

### 2. The danger that Debtors will suffer irreparable injury if they are evicted from their home

At the current stage of this litigation in the Bankruptcy Court, it is illogical to remove Debtors from their home, when at the close of the bankruptcy litigation they will likely be granted a fee simple title to the Property with all of RFC's interests removed. The danger to Debtors in this case is extreme, they will be removed from their home and lose all connection to the property as this Court has ordered them to surrender their home in seven days (April 1, 2014). Debtors will be "on the streets" due to an invalid foreclosure

sale.  Their six children, some of whom have never known another home, range in age from 5 to 22.  To throw these children, (several of whom are in school) out of their home before all relevant issues have been determined by this Court during the harshest winter this state has experienced in decades, all based on a fraudulent assignment of mortgage created by RFC and Orlans, is unspeakable.

There is no remedy at law for the Debtors in this case. This litigation involves property rights that have no monetary value. As such, Debtors' need for a Stay is immediate and banging the gong of justice with alacrity.

**3. Debtors' risk of injury is greater than any risk to RFC**

In the case at bar, there is no risk to RFC that approximates the risk to Debtors.  If they are evicted they will lose all beneficial use of their rightful property.  By granting this stay, this Court is merely preserving the status quo in this matter during the proceedings of this case.  RFC will not lose any rights they have and in fact, if they are successful, will be in the same place in this litigation as they were previously. Thus, RFC's rights will not be prejudiced at all.  However, Debtors contend that RFC does not, in fact, have any rights or interest in Debtors' mortgage or property as has been shown through witness testimony in the 14A-3 District Court.  As such, a stay in this case has no bearing on any harm to RFC whatsoever.

The harm to Debtors without a stay will be substantial.   They will no longer be the fee simple owners of their homestead property, and would be evicted while this matter is still ongoing.   If Debtors are successful in this Bankruptcy litigation, RFC's assignment of mortgage will be declared fraudulent and thus null and void, rendering the sheriff's sale void as well and restoring title to the Debtors.   As a Sheriff's Deed has been recorded on the property, the rights of third parties could also be affected.  An injunction halting the foreclosure sale is the only remedy to proscribe this confusion and chaos.

**4. The public interest would not be harmed but would be preserved by the issuing of a stay**.

It is not in the public interest, while litigation is pending, for an alleged out of state lender to acquire the title to property that it may have to disgorge and return to the previous owner at a future date.  At this point, the public interest is served by maintaining the status quo. As stated, RFC has no right or interest in the Baker mortgage or property, but

4

if it does, none of those rights will be compromised or impaired by the issuance of this injunction.

Furthermore, Orlans and RFC have conspired to create a forged document which was then used as the basis to foreclose on the Baker property, and RFC now seeks possession of said property.  Once their unconscionable scheme was revealed through witness testimony in the 14A-3 District Court, and on the brink of receiving a devastating ruling against them, Orlans orchestrated the reopening of the Baker Bankruptcy case in order to avoid civil, and possibly criminal, liability for their egregious and reprehensible conduct. It is contrary to public policy to aid these conspirators in their quest to forum shop and shield themselves from liability through the Bakers' own Bankruptcy case proceedings. All Debtors seek is to preserve the status quo while this Bankruptcy Court litigation is pending.  By issuing this injunction, this Court is not ruling in favor of on the merits, but merely maintaining the position of the parties until the litigation has been resolved.

## III. CONCLUSION

In summary, the Settlement in this case is far from fair and equitable.  In addition, the Bankruptcy Trustee failed to prove his burden to the contrary in that he did not adequately address the four elements of the fair and equitable standard.  Furthermore, the Settlement includes transfer of the Debtors' home to a party who has not  proven it has an interest in the subject mortgage and property.  RFC is thus without standing to participate in the Baker bankruptcy proceedings, and is not a party in interest.  Finally, the Debtors indeed have a likelihood of success on the merits in the state court proceedings because of the egregious nature of the fraud perpetrated by RFC and Orlans. Such a fraud will no doubt meet the high standard required in Michigan to set aside a foreclosure.

**WHEREFORE**, Debtors respectfully request that this Honorable Court grant their Motion, and stay the Bankruptcy Order entered on March 11, 2014, as well as the

5

Order reinstating it entered on March 25, 2014, until all issues are litigated in the

Bankruptcy Court and all Appeals on said issues are completed.  If this Court is not

inclined to stay the Order until all issues are litigated, Debtors respectfully request 45

days in which to make a transition to a new home with their six children.

Respectfully Submitted,

Dated:  April 2, 2014

/s/David S. Wilkinson
David S. Wilkinson (P65130)
Attorney for Debtor(s)
23843 Joy Road
Dearborn Heights, MI  48127
(313) 724-5088
fregolaw@yahoo.com

### Certificate of Service

I hereby certify that on April 2, 2014,  the forgoing document was electronically filed

with the Clerk of the Court using the ECF system, which will send notification of such filing

to all ECF participants registered in this matter.

Respectfully Submitted,

Dated:  April 2, 2014

/s/David S. Wilkinson
David S. Wilkinson (P65130)
Attorney for Debtor(s)
23843 Joy Road
Dearborn Heights, MI  48127
(313) 724-5088
fregolaw@yahoo.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                  Case No. 08-43175

MICHAEL JAMES BAKER, and                                Chapter 7
SUZIE CARMEN BAKER,
                                                        Judge Thomas J. Tucker
                        Debtors.
_____/

**OPINION AND ORDER DENYING DEBTORS' MOTION
FOR STAY PENDING APPEAL,
EXCEPT FOR A LIMITED TEMPORARY STAY**

**I. Introduction**

On March 11, 2014, the Court entered an order entitled "Order Approving Revised

Settlement and Requiring Turnover of Property" (Docket # 116, the "Revised Settlement

Order"), which, among other things, (1) granted, with modifications, the motion of Douglas S.

Ellmann, Trustee (Docket # 79, the "Motion"), for an order approving a proposed settlement and

requiring the turnover by the Debtors of certain real property known as 5142 N. Territorial Road,

Dexter, Michigan (the "Property") and the settlement and resolution of certain litigation claims

asserted by the Debtors in connection with *Michael Baker and Suzie C. Baker v. Residential*

*Funding Company, LLC and Orlans Associates PC*, Washtenaw Circuit Court Case No.

11-1260-CH and *Residential Funding Company, LLC v. Michael J. Baker and Suzie Baker*,

Michigan District Court 14-A-1, Case No. 08-3-C-235 LT (collectively, the "Litigation Claims");

and (2) approved the settlement described in the Motion, with the revisions stated in the Revised

Settlement Order.

On March 14, 2014, the Trustee filed a motion to modify the Revised Settlement Order

(Docket # 118), which was later withdrawn, as indicated in the Court's Order filed on March 25,

2014 (Docket # 136, the "March 25, 2014 Order").

On March 27, 2014, Debtors filed a notice of appeal (Docket # 137), purporting to appeal to the United States District Court the following orders: (1) an order entered by the Court on March 5, 2011 entitled "Order Regarding Trustee's Motion for Approval of Settlement, and Regarding Further Proceedings on Other Motions" (Docket # 111); (2) the Revised Settlement Order (Docket # 116); and (3) the March 25, 2014 Order (Docket # 136).

On April 2, 2014, Debtors filed an ex parte motion seeking a stay of the effect of the Revised Settlement Order (Docket # 116) pending appeal of that order (Docket # 147, the "Stay Motion").[1]

The Court has reviewed the Stay Motion, and concludes that a hearing is not necessary, and that except for the temporary stay granted by the order below, the Stay Motion should be denied, for the reasons stated in this opinion.

## II. Discussion

### A. The relevant factors

Debtors' Stay Motion is based on Fed.R.Bankr.P. 8005, which states, in pertinent part:

> **A motion for a stay of the judgment, order, or decree of a bankruptcy judge**, for approval of a supersedeas bond, **or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance**. Notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, **the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest.** A motion for such relief, or for modification or termination of relief

---

[1] The Stay Motion erroneously states that the Revised Settlement Order is at Docket # 118.

granted by a bankruptcy judge, may be made to the district court or
the bankruptcy appellate panel, but the motion shall show why the
relief, modification, or termination was not obtained from the
bankruptcy judge. The district court or the bankruptcy appellate
panel may condition the relief it grants under this rule on the filing
of a bond or other appropriate security with the bankruptcy court
. . . .

(emphasis added).  The factors that courts must apply in determining whether to grant a motion

for a stay pending appeal were discussed at length in *Michigan Coalition of RadioActive*

*Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153-54 (6th Cir. 1991).  In *Griepentrog,* the

Sixth Circuit stated, in relevant part:

> In determining whether a stay should be granted under
> Fed.R.Civ.P. 8(a), we consider the same four factors that are
> traditionally considered in evaluating the granting of a preliminary
> injunction.  These well-known factors are: (1) the likelihood that
> the party seeking the stay will prevail on the merits of the appeal;
> (2) the likelihood that the moving party will be irreparably harmed
> absent a stay; (3) the prospect that others will be harmed if the
> court grants the stay; and (4) the public interest in granting the stay.
> These factors are not prerequisites that must be met, but are
> interrelated considerations that must be balanced together.

> Although the factors to be considered are the same for both a
> preliminary injunction and a stay pending appeal, the balancing
> process is not identical due to the different procedural posture in
> which each judicial determination arises. Upon a motion for a
> preliminary injunction, the court must make a decision based upon
> "incomplete factual findings and legal research."  Even so, that
> decision is generally accorded a great deal of deference on
> appellate review and will only be disturbed if the court relied upon
> clearly erroneous findings of fact, improperly applied the
> governing law, or used an erroneous legal standard.

> Conversely, a motion for a stay pending appeal is generally made
> after the district court has considered fully the merits of the
> underlying action and issued judgment, usually following
> completion of discovery. As a result, a movant seeking a stay
> pending review on the merits of a district court's judgment will

3

have greater difficulty in demonstrating a likelihood of success on the merits. In essence, a party seeking a stay must ordinarily demonstrate to a reviewing court that there is a likelihood of reversal. Presumably, there is a reduced probability of error, at least with respect to a court's findings of fact, because the district court had the benefit of a complete record that can be reviewed by this court when considering the motion for a stay.

To justify the granting of a stay, however, a movant need not always establish a high probability of success on the merits. The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent the stay.  Simply stated, more of one excuses less of the other. This relationship, however, is not without its limits; the movant is always required to demonstrate more than the mere "possibility" of success on the merits.  For example, even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the defendant if a stay is granted, he is still required to show, at a minimum, "serious questions going to the merits."

In evaluating the harm that will occur depending upon whether or not the stay is granted, we generally look to three factors: (1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided.  In evaluating the degree of injury, it is important to remember that

> [t]he key word in this consideration is *irreparable*.
> Mere injuries, however substantial, in terms of
> money, time and energy necessarily expended in the
> absence of a stay, are not enough. The possibility
> that adequate compensatory or other corrective
> relief will be available at a later date, in the ordinary
> course of litigation, weighs heavily against a claim
> of irreparable harm.

In addition, the harm alleged must be both certain and immediate, rather than speculative or theoretical.  In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again.

*Id.* (citations omitted); *see also Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 343

4

(6th Cir. 2012)(*per curiam*); *Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002).

Debtors, as the moving parties, bear the burden of establishing by a preponderance of the evidence that they are entitled to the stay. *See Husted*, 698 F.3d at 343; *In re Holstine*, 458 B.R. 392, 394 (Bankr. E.D. Mich. 2011).

"[A] court's decision to [grant or] deny a Rule 8005 stay is highly discretionary." *Id.* (quoting *In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1301 (7th Cir. 1997)).

### B. Consideration of the relevant factors

The Court concludes that Debtors have not satisfied their burden, and that a stay pending appeal should not be granted, except for the temporary stay described below.

### 1. Factor No. 1 — Debtors' likelihood of success on appeal

The Court concludes that it is very unlikely that the district court will reverse, modify, or vacate the this Court's Revised Settlement Order, or either of the other two orders that Debtors are appealing. This Court certainly is not infallible. But the Court strongly believes that it correctly applied well-established law to the facts of this case in entering its orders, for the reasons stated on the record in the Court's bench opinion given on March 5, 2014.[2]

The Court's conclusion about this first stay factor is alone fatal to Debtors' Stay Motion, under the Sixth Circuit's decision in *Griepentrog*, quoted above. There, the Sixth Circuit held, among other things, that "even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the [opposing parties] if a stay is granted, he is still required to show, at a minimum, 'serious questions going to the merits.'" *Griepentrog*, 945 F.2d at 154

---

[2]  A transcript of that bench opinion is on file in this case, at Docket # 119.

5

(citations omitted).  Debtors have not made such a showing, so the Stay Motion must be denied for this reason alone, except for the temporary stay described below.

### 2. Factor No. 2 — irreparable harm to Debtors

The Court will assume, for purposes of ruling on the Stay Motion, that the second stay factor, "the likelihood that the moving party will be irreparably harmed absent a stay," favors a stay pending appeal.

### 3. Factor Nos. 3 and 4 — harm to others and the public interest

The third and fourth stay factors, namely, "the prospect that others will be harmed if the court grants the stay;" and "the public interest in granting the stay," both weigh against granting a stay pending appeal, other than the temporary stay described below.  The Court finds that the Trustee and creditors will be harmed if the Court grants a stay that lasts for the entire time the Debtors' appeal to the district court remains pending.  Such a stay would unduly delay the Trustee in administering the estate for the benefit of the creditors, and will unduly delay payments to creditors.  "Such delay can only harm such creditors; it cannot benefit them."  *See In re McInerney*, 490 B.R. 540, 548 (Bankr. E.D. Mich. 2013).  On the other hand, Debtors have already had an opportunity in this court to litigate their rights in response to the Trustee's settlement motion that led to the Revised Settlement Order.

Finally, there is a public interest in preventing debtors from using the bankruptcy process to unduly delay payments to creditors.

> And the public interest, as expressed by Congress in several ways in the Bankruptcy Code, favors the prompt administration of bankruptcy cases. *See, e.g.*, 11 U.S.C. § 704(a)(1) (requiring Chapter 7 trustees to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as

6

> expeditiously as is compatible with the best interests of parties in
> interest"); 11 U.S.C. § 707(a)(1)(which provides as a ground for
> dismissal of a Chapter 7 bankruptcy case "unreasonable delay by
> the debtor that is prejudicial to creditors").

*Id.*

Overall, the relevant factors weigh strongly against granting a stay pending appeal, other than the temporary stay described below. With that exception, and in the exercise of its discretion under Fed.R.Bankr.P. 8005, the Court will deny Debtors' Stay Motion.

### III.  A temporary stay is warranted.

Considering Factors 1-4 above, and under all the circumstances, the Court concludes that a limited, temporary stay is warranted, so that the Debtors need not surrender the home in which they and their children live to the Trustee until April 16, 2014. This limited, temporary stay will give the Debtors a reasonable time to seek a stay pending appeal in the district court, before they otherwise would have to vacate their home. The Court has discretion under the circumstances to order this limited, temporary stay under Fed.R.Bankr.P. 8005, as an "appropriate order during the pendency of an appeal . . . as will protect the rights of all parties in interest."

### IV.  Conclusion and Order

For the reasons stated in the opinion above,

IT IS ORDERED that the Stay Motion (Docket # 147) is granted to the extent of the limited, temporary stay described below, and otherwise is denied.

IT IS FURTHER ORDERED that the provisions in the Revised Settlement Order (Docket # 116) that requires the Debtors to surrender the "Property" and related provisions (Paragraph nos. 5 and 6-7 of the Revised Settlement Order) are stayed until April 16, 2014. On April 16,

2014, this stay will automatically terminate.

**Signed on April 2, 2014**                                    **/s/ Thomas J. Tucker**
                                                              **Thomas J. Tucker**
                                                              **United States Bankruptcy Judge**

8

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:

Michael J. and Suzie C. Baker

CASE NO:  **08-43175**
CHAPTER:  **7**
JUDGE:    **Tucker**

Debtor(s)

_____/

## EMERGENCY EX-PARTE MOTION BY DEBTORS FOR EXTENSION OF TEMPORARY STAY PENDING APPEAL

**NOW COME** Debtors, Michael J. Baker and Suzie C. Baker, by their attorneys, and pursuant to Fed. R. Bankr. P. 8005, bring their Motion For Extension of Stay Pending Appeal.   In support of this motion, Debtors state:

1. On March 11, 2014, this Court issued the Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #116).

2. Said Order requires Debtors to turn over their home to the Trustee with only seven days of notice.

3. On April 2, 2014, Debtors filed an "Emergency Ex-parte Motion of Debtors for Stay of Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #147) Pending Appeal and for Expedited Consideration."

4. Said Motion was denied, but Debtors were given a limited temporary fourteen day stay in order to be able to appeal.

5. The 14 day period expires on April 16, 2014, but the Appeal will not be transmitted to the Federal District Court until April 28, 2014.

1

6. Only after transmittal of the file to the Federal District Court will the case be given a case number.

7. Without a case number Debtors are not allowed to file their Brief on Appeal, nor and any motion to Stay with the Federal District Court.

8. However, Fed. R. Bankr. P. 8007 (c) states:

   *Record for Preliminary Hearing. If prior to the time the record is transmitted a party moves in the district court …, for a stay pending appeal,…, or for any intermediate order, the clerk at the request of any party to the appeal shall transmit to the clerk of the district court… a copy of the parts of the record as any party to the appeal shall designate*

9. Furthermore, E. D. Mich. LR 83.50 (d) Filing Papers states:

   *(1) While cases or proceedings are pending before a bankruptcy judge, or before entry of an appeal on the district court docket under Fed. R. Bankr. P. 8007(b), all papers …will be filed with the bankruptcy clerk….*

10. Although according to the above rules Debtors have the right to file a Motion to Stay with the Federal District Court via the Bankruptcy Court clerk, Debtors' counsel was informed by said clerk's office that nothing could be filed with the Federal District Court until the file is transmitted by the Bankruptcy Court clerk, and that debtors should instead file a Motion to Extend the Stay with Judge Tucker.

11. As such, the limited temporary stay will expire 12 days before Debtors are allowed to file their Appeal and any other documents with the Federal District Court.

12. Pursuant to L.B.R. 9014-1 (g), Debtors sought but did not obtain concurrence in this motion.

**WHEREFORE,** Debtors respectfully request that this Honorable Court

extend the limited temporary stay until May 5, 2014**.**


Respectfully Submitted,

Dated:  April 11, 2014                    /s/David S. Wilkinson
                                          David S. Wilkinson (P65130)
                                          Attorney for Debtor(s)
                                          23843 Joy Road
                                          Dearborn Heights, MI  48127
                                          (313) 724-5088
                                          fregolaw@yahoo.com

                            .

3

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:
Michael J. and Suzie C. Baker

CASE NO:   **08-43175**
CHAPTER:   **7**
JUDGE:     **Tucker**

Debtor(s)

_____/

### ORDER TO STAY ORDER APPROVING REVISED SETTLEMENT AND REQUIRING TURNOVER OF PROPERTY (DKT. #118)

Debtors' Counsel having filed an Emergency Ex-Parte Motion for Stay of Order Approving Revised Settlement and Requiring Turnover of Property, entered on March 11, 2014, and the Court being more fully advised in the premises;

**NOW THEREFORE, IT IS HEREBY ORDERED** that:

The clause in the March 11, 2014, Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #118) regarding the turnover of the property by Debtors is stayed until May 5, 2014.

IT IS FURTHER ORDERED that the Debtors shall serve this Notice and Order on the matrix.

**Signed on:** _____

_____
**Thomas J. Tucker**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE:
Michael J. and Suzie C. Baker

CASE NO:    **08-43175**
CHAPTER:    **7**
JUDGE:      **Tucker**

Debtor(s)

_____/

### BRIEF IN SUPPORT OF EMERGENCY EX-PARTE MOTION OF DEBTORS FOR STAY OF ORDER APPROVING REVISED SETTLEMENT AND REQUIRING TURNOVER OF PROPERTY (DKT. #118) PENDING APPEAL AND FOR EXPEDITED CONSIDERATION

The nature of this matter is that the Bankruptcy Court issued an Order on March 11, 2014, and as part of that Order, ruled that the Debtors had to surrender their home to the Trustee within seven days.  Failure to do so entitles the Trustee, with the aid of a US Marshall or a state court officer to forcibly evict the Debtors.

On April 2, 2014, Debtors filed an "Emergency Ex-parte Motion of Debtors for Stay of Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #147) Pending Appeal and for Expedited Consideration."  Said Motion was denied, but Debtors were given a limited temporary fourteen day stay in order to be able to appeal. The 14 day period expires on April 16, 2014, but the Appeal will not be transmitted to the Federal District Court until April 28, 2014.  Only after transmittal of the file to the Federal District Court will the case be given a case number.  Without a case number Debtors are not allowed to file their Brief on Appeal, nor and any motion to Stay with the Federal District Court.

However, Fed. R. Bankr. P. 8007 (c) states:

1

*Record for Preliminary Hearing. If prior to the time the record is transmitted a party moves in the district court …, for a stay pending appeal,…, or for any intermediate order, the clerk at the request of any party to the appeal shall transmit to the clerk of the district court… a copy of the parts of the record as any party to the appeal shall designate.*

Furthermore, E. D. Mich. LR 83.50 (d) Filing Papers states:

*While cases or proceedings are pending before a bankruptcy judge, or before entry of an appeal on the district court docket under Fed. R. Bankr. P. 8007(b), all papers …will be filed with the bankruptcy clerk….*

Although according to the above rules Debtors have the right to file a Motion to Stay with the Federal District Court via the Bankruptcy Court clerk, Debtors' counsel was informed by said clerk's office that nothing could be filed with the Federal District Court until the file is transmitted by the Bankruptcy Court clerk, and that Debtors should instead file a Motion to Extend the Stay with Judge Tucker.

Thus, in light of the above concerns, and pursuant to Fed. R. Bankr. P. 8007, Debtors hereby submit this Motion to Extend the Limited Temporary Stay granted on April 2, 2014.

**BRIEF**

**I.  INTRODUCTION**

Debtors are now before this Honorable Court seeking an order to preserve the status quo while Debtors appeal the various Orders in this case.  The history of this case has been detailed in several previous pleadings, and Debtors will spare this Court yet another rendition.  Suffice it to say, that vacating the home with six children, during the coldest winter in Michigan in decades, on such short notice is a physical impossibility, and unreasonable.  In addition, such an Order does not provide Debtors with sufficient

time to appeal the Order within the applicable appeal deadlines.  Therefore, pursuant to

FRBP 8005, Debtors respectfully request that this Court hear this Emergency Motion.

## II. ARGUMENT

### A.  STANDARD FOR A MOTION TO STAY

The factors this Court considers in determining whether an Order should be stayed

under Fed. R. Bankr. P. 8005 are generally the same factors considered in determining

whether to issue a temporary restraining order or a preliminary injunction: "(1) the

likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the

likelihood that the moving party will be irreparably harmed absent a stay; (3) the

prospect that others will be harmed if the court grants the stay; and (4) the public interest

in granting the stay." *Michigan First Credit Union v Smith* (*In re Smith*), 501 B.R. 332,

335 (Bankr. E.D. Mich. 2013) quoting *Michigan Coalition of Radioactive Material

Users, Inc. v.Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991).  The greater the likelihood

of success on the merits, the less the court will require the movant to demonstrate

irreparable harm.  *Family Trust Foundation of Ky., Inc. v. Kentucky Judicial Conduct

Comm'n,* 388 F. 3d 224, 227 (6th Cir. 2004).

The Debtors' ability to prove that RFC's claimed interest in their mortgage and

property is based on a fraudulent assignment of mortgage which deprives RFC of

standing to foreclose and to participate in the Debtors' Bankruptcy proceedings.  This

ability would be severely affected if Debtors are removed from their property prior to

being heard on the merits.  In essence, the entire reason behind the lawsuit, keeping

Debtors and their six children in their home, would be defeated.  Any judgment the

Bankruptcy Court renders at some later time would be ineffective and useless if Debtors

have been removed from their home, and it has been sold to a third party (in addition to causing chaos).

## B.  APPLICATION OF THE STANDARDS FOR A STAY

### 1. Debtorsare likely to prevail on the merits of this case

Debtors have argued this issue in their motion for reconsideration.  Thus, only a summary of that arguments follows.  No Michigan Court has found fraud where a homeowner challenged a foreclosure.  If such a finding were made no court would then declare that the fraud could be overcome by a showing of prejudice.  Such a ruling would fly in the face of long established principles of equity, as a defrauder cannot be allowed to benefit from his wrongful conduct.  It is one thing to declare that a mere procedural defect in the foreclosure requires a showing of prejudice.  It is quite another to declare that in a foreclosure, achieved through the alteration and forgery of the very document which transfers title to mortgagee, the homeowner must show prejudice.  In short, in existent case law,  every case of alleged fraud in the foreclosure proceedings the homeowner has failed to meet the high standard of fraud required to set aside the foreclosure.  In our case the fraud by RFC and Orlans is beyond dispute and verified by transcript.   As such, there can be no doubt that the Debtors have a likelihood of success in the state courts.  Thus, the Order approving the Trustee's Settlement should not have been granted.

### 2. The danger that Debtors will suffer irreparable injury if they are evicted from their home

At the current stage of this litigation in the Bankruptcy Court, it is illogical to remove Debtors from their home, when at the close of the bankruptcy litigation they will likely be granted a fee simple title to the Property with all of RFC's interests removed. The danger to Debtors in this case is extreme, they will be removed from their home and lose all connection to the property as this Court has ordered them to surrender their home in seven days. Debtors will be "on the streets" due to an invalid foreclosure sale.  Their six

4

children, some of whom have never known another home, range in age from 5 to 22.  To throw these children, (several of whom are in school) out of their home before all relevant issues have been determined by this Court during the harshest winter this state has experienced in decades, all based on a fraudulent assignment of mortgage created by RFC and Orlans, is unspeakable.

There is no remedy at law for the Debtors in this case. This litigation involves property rights that have no monetary value. As such, Debtors' need for a Stay is immediate and banging the gong of justice with alacrity.

**3. Debtors' risk of injury is greater than any risk to RFC**

In the case at bar, there is no risk to RFC that approximates the risk to Debtors.  If they are evicted they will lose all beneficial use of their rightful property.  By granting this stay, this Court is merely preserving the status quo in this matter during the proceedings of this case.  RFC will not lose any rights they have and in fact, if they are successful, will be in the same place in this litigation as they were previously. Thus, RFC's rights will not be prejudiced at all.  However, Debtors contend that RFC does not, in fact, have any rights or interest in Debtors' mortgage or property as has been shown through witness testimony in the 14A-3 District Court.  As such, a stay in this case has no bearing on any harm to RFC whatsoever.

The harm to Debtors without a stay will be substantial.   They will no longer be the fee simple owners of their homestead property, and would be evicted while this matter is still ongoing.   If Debtors are successful in this Bankruptcy litigation, RFC's assignment of mortgage will be declared fraudulent and thus null and void, rendering the sheriff's sale void as well and restoring title to the Debtors.   As a Sheriff's Deed has been recorded on the property, the rights of third parties could also be affected.  A Stay halting the foreclosure sale is the only remedy to proscribe this confusion and chaos.

**4. The public interest would not be harmed but would be preserved by the issuing of a stay**.

It is not in the public interest, while an appeal is pending, for an alleged out of state lender to acquire the title to property that it may have to disgorge and return to the previous owner at a future date.  At this point, the public interest is served by maintaining the status quo. As stated, RFC has no right or interest in the Baker mortgage or property,

but if it does, none of those rights will be compromised or impaired by the issuance of this stay.

Furthermore, Orlans and RFC have conspired to create a forged document which was then used as the basis to foreclose on the Baker property, and RFC now seeks possession of said property.  Once their unconscionable scheme was revealed through witness testimony in the 14A-3 District Court, and on the brink of receiving a devastating ruling against them, Orlans orchestrated the reopening of the Baker Bankruptcy case in order to avoid civil, and possibly criminal, liability for their egregious and reprehensible conduct. It is contrary to public policy to aid these conspirators in their quest to forum shop and shield themselves from liability through the Bakers' own Bankruptcy case proceedings. All Debtors seek is to preserve the status quo while this Bankruptcy Court litigation and appeal are pending.  By issuing this stay, this Court is not ruling in favor of on the merits, but merely maintaining the position of the parties until the litigation has been resolved.

### III. CONCLUSION

In summary, the Settlement in this case is far from fair and equitable.  In addition, the Bankruptcy Trustee failed to prove his burden to the contrary in that he did not adequately address the four elements of the fair and equitable standard.  Furthermore, the Settlement includes transfer of the Debtors' home to a party who has not  proven it has an interest in the subject mortgage and property.  RFC is thus without standing to participate in the Baker bankruptcy proceedings, and is not a party in interest.  Finally, the Debtors indeed have a likelihood of success on the merits in the state court proceedings because of the egregious nature of the fraud perpetrated by RFC and Orlans. Such a fraud will no doubt meet the high standard required in Michigan to set aside a foreclosure.

**WHEREFORE**, Debtors respectfully request that this Honorable Court grant their Motion to Extend the Limited Temporary Stay which was granted on April 2, 2014.

6

Respectfully Submitted,

Dated:  April 11, 2014                    /s/David S. Wilkinson
                                          David S. Wilkinson (P65130)
                                          Attorney for Debtor(s)
                                          23843 Joy Road
                                          Dearborn Heights, MI  48127
                                          (313) 724-5088
                                          fregolaw@yahoo.com


## Certificate of Service

I hereby certify that on April 11, 2014, the forgoing document was electronically filed

with the Clerk of the Court using the ECF system, which will send notification of such filing

to all ECF participants registered in this matter.


Respectfully Submitted,

Dated:  April 11, 2014                    /s/David S. Wilkinson
                                          David S. Wilkinson (P65130)
                                          Attorney for Debtor(s)
                                          23843 Joy Road
                                          Dearborn Heights, MI  48127
                                          (313) 724-5088
                                          fregolaw@yahoo.com


7

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

IN RE:
Michael J. and Suzie C. Baker

CASE NO:   **08-43175**
CHAPTER:   **7**
JUDGE:     **Tucker**

Debtors.
_____/

### ORDER *DENYING* DEBTORS' MOTION FOR EXTENSION
### OF TEMPORARY STAY PENDING APPEAL,
### BUT DIRECTING CLERK TO TRANSMIT PORTIONS OF THE RECORD TO
### THE DISTRICT COURT UNDER FED.R.BANKR.P. 8007(c)

On April 11, 2014, the Debtors filed a motion entitled "Emergency Ex-Parte Motion by Debtors for Extension of Temporary Stay Pending Appeal" (Docket # 157, the "Emergency Motion"). In light of the provisions in this Order, below, the relief requested by the Emergency Motion is not necessary. Nor is such relief warranted. Accordingly,

**IT IS ORDERED** that:

1.  The Emergency Motion is denied.

2.  If the Debtors file a motion asking the district court for a stay pending appeal, and such motion is filed before the appeal is docketed in the district court, then Debtors must file such motion in this Court, as required by L.D.R. 83.50(d)(1). Upon the filing of such a motion in this Court, the Clerk of this Court is directed to immediately transmit such motion to the district court clerk, and to transmit to the district court clerk a copy of any other parts of the record in this case as the Debtors and any other party to the appeal shall designate in writing, promptly after any party makes such a request in writing. *See* Fed.R.Bankr.P. 8007(c).

.

**Signed on April 11, 2014**

_____
/s/ **Thomas J. Tucker**
**Thomas J. Tucker**
**United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION – DETROIT

Michael J. Baker and
Suzie C. Baker,  Appellants/Debtors,

Case No:

V                                       Hon.

Filed as Case No. 08-43175-tjt in the U.S. Bankruptcy Court for
the Eastern District of Michigan, Southern Division-Detroit
Hon. Thomas J. Tucker (P33794)

RESIDENTIAL FUNDING
COMPANY, LLC, and ORLANS           Filed As Case No: 11-1260-CH in the ASSOCIATES, P.C.,
        Appellees/Defendants              State of Michigan 22nd Circuit Court
                                    Hon. David S. Swartz (P22850)

Filed as Case No. 2:11-cv-15169-DML-PJK
US District Court, ED Southern Michigan
Hon. David M. Lawson (P27097)

_____/

Beatriz H. Coleman (P40188)            Deanna Swisher (P38341)
TILA Attorney Group, PLLC              Foster, Swift, Collins & Smith, PC
Attorney for Appellants/ Debtors       Attorney for Appellee/Residential Funding Company, LLC
3662 Vorhies Rd.                       313 South Washington Square
Ann Arbor, MI 48105                    Lansing, MI  48933
Phone:  734.429.1346                   Phone: 517-371-8133
bhcoleman@myexcel.com                  dswisher@fosterswift.com

David S. Wilkinson (P65130)            I. W. Winsten  (P30528)
Frego & Associates                     Honigman, Miller, Schwartz and Cohn, LLP
Attorney for Appellants/Debtors        Attorneys for Appellee/Orlans Associates, PC
23843 Joy Road                         2290 First National Building
Dearborn Heights, MI 48127             Detroit, MI  48226
Phone: 313-724-5088                    Phone: 313-465-7608
fregolaw@aol.com                       Fax: 313-465-7609
                                       iww@honigman.com

                                       Thomas R. Morris (P39141)
                                       Silverman & Morris
                                       Special Counsel for Trustee
                                       30500 Northwestern Highway, Suite 200
                                       Farmington Hills, MI 48334
                                       Phone: (248) 539-1330
                                       Fax: (248) 539-1355
                                       morris@silvermanmorris.com

_____/

## EMERGENCY EX-PARTE MOTION TO STAY ORDER APPROVING REVISED SETTLEMENT  AND REQUIRING TURNOVER OF PROPERTY (DKT. #116), AND FOR TEMPORARY RESTRAINING ORDER

**NOW COME** Appellants/Debtors, Michael J. Baker and Suzie C. Baker, by their attorneys, and pursuant to Fed. R. Bankr. P. 8007 and FRCP 65, state their Emergency Ex-Parte Motion to Stay Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #116) and for Temporary Restraining Order.   Appellants/Debtors filed an action in the 22nd Circuit Court which would rescind a foreclosure sale, and thus directly affect all parties to this case and their interests in real property located in the State of Michigan in Washtenaw County. Said action, although filed on November 15, 2011, was removed to the Bankruptcy Court by Appellee/Defendant Orlans Associates, PC (Orlans) 2 years later when Orlans orchestrated the reopening of the Baker bankruptcy case (then having been closed for over 5 years).

The reason for Orlans' action was that Orlans was about to receive a devastating ruling in the 14A-3 District Court that Orlans had committed a fraud upon the court.  Such a ruling was virtually guaranteed based on devastating witness testimony in the 14A-3 District Court and an admission against interest made by Orlans Attorney Timothy B. Myers confirming the existence of a pervasive, unscrupulous and unconscionable scheme in place in the Orlans organization.  Said scheme involved the systematic policy at Orlans of altering assignments of mortgage after said documents were previously executed and notarized (most often in other states), and then submitting those assignments to the Registers of Deeds throughout the state of Michigan.  The evidence has therefore established that the assignment of mortgage upon which the foreclosure of the Appellants'/Debtors' home was conducted was based on fraud and forgery and was therefore void.

   Appellants/Debtors will rely upon their accompanying brief, the Federal Rules of Civil Procedure, and any other authority upon which this Honorable Court wishes to rely in support of their Motion.

**WHEREFORE,** Appellants/Debtors pray this Honorable Court grant their  Emergency Ex-Parte Motion for Stay of Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #116), and for

Temporary Restraining Order, and further award Appellants/Debtors their costs and fees so wrongfully incurred in having to bring this Motion.  A Proposed Order is attached.  **(EXH A Attached).**


Respectfully Submitted,


Dated:  April 14, 2014                          By:/s/David S. Wilkinson _____
                                               David S. Wilkinson (P65130)
                                               Co-Counsel for Appellants/Debtor(s)
                                               23843 Joy Road
                                               Dearborn Heights, MI  48127
                                               (313) 724-5088
                                               fregolaw@yahoo.com


Dated: April 14, 2014                           By: /s/ Beatriz H. Coleman
                                               Beatriz H. Coleman (P40188)
                                               Co-Counsel for Appellants/Debtors
                                               3662 Vorhies Rd.
                                               Ann Arbor, MI 48105
                                               bhcoleman@myexcel.com

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION – DETROIT

Michael J. Baker and
Suzie C. Baker,  Appellants/Debtors,

Case No:

V                                                                    Hon.

Filed as Case No. 08-43175-tjt in the U.S. Bankruptcy Court for
the Eastern District of Michigan, Southern Division-Detroit
Hon. Thomas J. Tucker (P33794)

RESIDENTIAL FUNDING
COMPANY, LLC, and ORLANS              Filed As Case No: 11-1260-CH in the ASSOCIATES, P.C.,
         Appellees/Defendants              State of Michigan 22nd Circuit Court
Hon. David S. Swartz (P22850)

Filed as Case No. 2:11-cv-15169-DML-PJK
US District Court, ED Southern Michigan
Hon. David M. Lawson (P27097)

_____/

Beatriz H. Coleman (P40188)                Deanna Swisher (P38341)
TILA Attorney Group, PLLC                  Foster, Swift, Collins & Smith, PC
Attorney for Appellants/ Debtors           Attorney for Appellee/Residential Funding Company, LLC
3662 Vorhies Rd.                           313 South Washington Square
Ann Arbor, MI 48105                        Lansing, MI  48933
Phone:  734.429.1346                       Phone: 517-371-8133
bhcoleman@myexcel.com                      dswisher@fosterswift.com

David S. Wilkinson (P65130)                I. W. Winsten  (P30528)
Frego & Associates                         Honigman, Miller, Schwartz and Cohn, LLP
Attorney for Appellants/Debtors            Attorneys for Appellee/Orlans Associates, PC
23843 Joy Road                             2290 First National Building
Dearborn Heights, MI 48127                 Detroit, MI  48226
Phone: 313-724-5088                        Phone: 313-465-7608
fregolaw@aol.com                           Fax: 313-465-7609
                                           iww@honigman.com

                                           Thomas R. Morris (P39141)
                                           Silverman & Morris
                                           Special Counsel for Trustee
                                           30500 Northwestern Highway, Suite 200
                                           Farmington Hills, MI 48334
                                           Phone: (248) 539-1330
                                           Fax: (248) 539-1355
                                           morris@silvermanmorris.com

_____/

**APPELLANTS'/DEBTORS' BRIEF IN SUPPORT OF EMERGENCY  EX-PARTE MOTION TO STAY ORDER APPROVING REVISED SETTLEMENT AND REQUIRING TURNOVER OF PROPERTY (DKT. #116), AND FOR TEMPORARY RESTRAINING ORDER**

## ISSUES PRESENTED

1. Are Appellants/Debtors entitled to a stay of the above Order pursuant to Fed. R. Bankr. P 8007 and a temporary restraining order pursuant to FRCP 65, where said Order includes surrender of the Appellants'/Debtors' home to Appellee/Defendant  Residential Funding Company, LLC, (RFC) where:

   a. The Bankruptcy Court made a determination that an assignment of mortgage, proven in the State of Michigan14A-3 District Court to be altered and forged, transferred title to RFC.

   b. The Bankruptcy Judge stated twice on the record that he did not read the transcript of the 14A-3 District Court in Appellants'/Debtors' pleadings, which clearly showed that the assignment of mortgage was fraudulent and void.  (This rendered RFC without standing to participate in the Bakers' Bankruptcy case since it does not own an interest in the subject mortgage or property.)

   c. The Bankruptcy Court deemed RFC a good faith purchaser at sheriff's sale, despite clear evidence to the contrary, as proven by the transcript of the 14A-3 District Court which the Bankruptcy Judge did not read.

   d. The issue of the validity of Appellee/RFC's interest in the Baker mortgage and property, which is the genesis of the Order to surrender the property, is in dispute and where allowing the surrender terms of the Bankruptcy Order dated March 11, 2014, to continue before the Appellants'/Debtors' Appeal to this Court can be heard, and before this Honorable Court has ruled on Appellants'/Debtors' Appeal creates chaos and a threat to public order as it relates to the underlying property, its ownership and its occupancy.  (The March 11, 2014 Order was stayed by the Bankruptcy Court on March 20, 2014, and was reinstated on March 25, 2014, in the Bankruptcy's order entitled , "Further Order Regarding the Trustee's March 14, 2014 Motion for Modification of the March 11, 2014 Settlement Order dated March 25, 2014").

Appellants'/Debtors' answers: "YES" to the above question

Appellees' and Trustee Ellmann's answers: "NO" to the above question

2.  Is the approved Settlement Agreement fair and equitable where:

a. The Trustee did not meet his burden in proving the four elements of a fair and equitable settlement, especially in light of the fact that the 14A-3 District Court transcript reveals the malfeasance of both Orlans and RFC?

b.  The Appellee/ RFC has failed to show it owns any interest in the subject note or mortgage which would entitle it to status as an interested party in the Appellants'/Debtors' Bankruptcy case, or to a right to participate in the Settlement.

Appellants'/Debtors' answers: "NO" to the above question

Appellees' and Trustee Ellmann's answers: "Yes" to the above question

## CONTROLLING AUTHORITY

The Controlling Authority is Fed. R. Bankr. P 8007 and FRCP 65, and the applicable standards as cited in this Brief.

## BRIEF

## I.  INTRODUCTION

Appellants/Debtors are now before this Honorable Court seeking an order to preserve the status quo during the Appeal process.  It would only create chaos if the Appellants/ Debtors were removed from their home only to have it restored on Appeal by either this Court or the 6th Circuit Court of Appeals. The Bakers' home, located at 5142 N. Territorial Rd., Dexter, MI 48130, was foreclosed on February 22, 2007.  The redemption period was to expire on February 22, 2008.  Just prior to that, the Bakers filed a chapter 13, on February 12, 2008, thereby extending the redemption period until April 12, 2008.

The Bakers did not include in their bankruptcy schedules any claims challenging the foreclosure, since they knew of none until March 2009.  They received a discharge on August 26, 2008.  On October 23, 2008, Appellee /RFC filed an action for possession against the Bakers, and obtained a Consent Judgment on November 14, 2008, which the Bakers' prior attorney (now suspended) entered into without authorization, and despite objections from the Bakers.

On March 20, 2009, the Bakers filed a complaint against RFC and others, but as it was based on the inapplicable Michigan Consumer Protection Act, that case was dismissed.  Appellants/Debtors then obtained new counsel and filed a complaint in the 22nd Circuit Court on November 15, 2011.  It was immediately removed to the Federal District Court with Judge David M. Lawson presiding.  After a year, it was remanded back to the 22nd Circuit Court.

Because Appellants made allegations of fraud on the court (both in the 14A-3 and the 22nd Circuit Court), Judge Timothy P. Connors, of the 22nd Circuit Court, immediately remanded the case to the 14A-3 District Court for a determination as to whether Judge Simpson felt that a fraud had been perpetrated upon his Court. On October 28, 2013, a hearing was held in the 14A-3 District Court which produced devastating testimony by past and present Orlans employees.  **(EXH A of DKT. 87-1 through 87-2)**.  They testified that they routinely received assignments of mortgage from lender clients which had been previously executed and notarized (usually in other states), with several blanks devoid of information.  They further revealed that it was common

practice for these employees to insert the missing information and then submit the assignments to the appropriate Register of Deeds for recording, and that this was the method used in the Baker assignment of mortgage.  See a copy of the assignment which is a representation of how it would have appeared when Orlans received it from the lender, **(EXH C of DKT. 87-2)**, as well as a copy of how it appeared after it was altered and recorded by Orlans employees.  **(EXH D of DKT. 87-2).**  This act of altering the previously executed assignment of mortgage served to create a forgery, and was in violation of notary laws and various Michigan statutes.  At that same hearing, Orlans attorney Timothy B. Myers made an admission against interest when he stipulated to the 14A-3 District Court that the above practice was the standing policy at Orlans at that time. **(EXH A of DKT. 87-1 through 87-2).**

Each of the parties rested their witness testimony, and all that remained was for Judge Simpson to issue a final ruling.  Alarmed at what was clearly the writing on the wall, and desperate to avoid a ruling of fraud on the court at all costs, Orlans hired new counsel who came up with the idea of reopening the Baker Bankruptcy case, since the Bakers had not listed their state court claims on their schedules (because they had no knowledge of their existence at that time).

In mid- 2009, the Bakers had inquired as to any requirements to file anything with the bankruptcy court regarding their state action.  Their then bankruptcy counsel, Ray G. Tallerday, had informed the Bakers that there was nothing to file with the Bankruptcy Court.  In addition, the Bakers called the chapter 13 Bankruptcy Trustee's office, and were told the same thing by a staff person named Wendy. **(EXH C of Dkt. #72-3)**.  Both Orlans and RFC have been involved in the Baker foreclosure, the Baker  Bankruptcy case, the eviction action, the first circuit court action and this current state action, all covering a period of  6 years.  Not once did Orlans or RFC ever indicate to the Bakers that they needed to reopen their Bankruptcy case and amend their schedules to include their state court action.  Although RFC and Orlans were under no duty to make such a revelation, the fact that they failed to do so served to satisfy the Bakers that no action was required on their part with regard to their Bankruptcy Court case.

A hearing was held in the Bankruptcy Court on March 5, 2014.  The three Orders appealed herein followed after that hearing **(Dkt. #110, Dkt. #116 and Dkt# 136).**

## II. ARGUMENT

### A. STANDARD FOR A MOTION UNDER FED. R. BANKR. P. 8005 and F. R. C. P. 65

The factors this Court considers in determining whether an Order should be stayed under Fed. R. Bankr. P. 8005 are generally the same factors considered in determining whether to issue a temporary restraining order or a preliminary injunction under FRCP 65: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Michigan First Credit Union v Smith* (*In re Smith*), 501 B.R. 332, 335 (Bankr. E.D. Mich. 2013) quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991). The greater the likelihood of success on the merits, the less the court will require the movant to demonstrate irreparable harm. *Family Trust Foundation of Ky., Inc. v. Kentucky Judicial Conduct Comm'n,* 388 F. 3d 224, 227 (6th Cir. 2004).

The Appellants'/Debtors' ability to disprove RFC's claimed interest in their mortgage and property is based on a fraudulent assignment of mortgage which deprives RFC of standing to foreclose and to participate in the Debtors' Bankruptcy proceedings. This ability would be severely affected if Appellants/Debtors are removed from their property prior to being heard on the merits on appeal. In essence, the entire reason behind the lawsuit, keeping Appellants/Debtors and their six children in their home, would be defeated. Any judgment the Bankruptcy Court or this Court renders at some later time in favor of Appellants/Debtors would be ineffective and useless if they have been removed from their home, and it has been sold to a third party (in addition to causing chaos).

### B. APPLICATION OF THE STANDARD

**1. Appellants/Debtors are likely to prevail on the merits of their case**

**a. The Settlement is not fair and equitable**

In making his determination at the bankruptcy hearing held on March 5, 2014, Judge Tucker stated that although he had read all the pleadings, he did not read the transcript from the 14A-3 District Court. Although

the sheer magnitude of the transcript is understandably daunting, justice requires that all evidence presented to the court should be read thoroughly and given full consideration.  Judge Tucker failed to acquaint himself with the evidence as established in the underlying state court action by failing to read the transcript in that state court action which was attached to Appellants'/Debtors' pleadings.  This negatively impacted his ability to objectively assess the merits and likelihood of success in the wrongful foreclosure claims. As aptly concluded in *In re Peoples*, 485 B.R. 478 (B.A.P. 6th Cir. 2013), "There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated …", *quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25, 88 S. Ct. 1157 (1968).

That 14A-3 District Court transcript clearly proved that the assignment of mortgage was fraudulent and void. Despite this, in his second Order, dated March 11, 2014, Judge Tucker finds that title to the Baker home transferred to RFC via the Sheriff's deed.  This despite the fact that the sheriff's deed was based on an assignment of mortgage now proven to be fraudulent.  As to the assignment of mortgage and foreclosure, he deemed them, "solely for purposes of approval and implementation of the Settlement, to be proper and of full force and effect".   Judge Tucker also deemed RFC to be a good faith purchaser despite clear evidence to the contrary in the 14A-3 District Court transcript of the October 28, 2013 hearing.

Judge Tucker's ruling contradicted the facts presented.  Surely the principles in favor of approving a Settlement do not outweigh the existence of fraudulent conduct.  Especially where the fraudulent and unconscionable conduct is perpetrated on such a wide scale basis, and is the admitted practice of at least one of the parties.  If Appellants/Debtors prevail, the note and mortgage would be extinguished, accruing to the benefit of the creditors.  As such, the Settlement was not "fair and equitable".  In addition, the Trustee's briefs on the matter were virtually bereft of substantive arguments on the issues. (Dkt. #79-3 and Dkt. # 101).

**b. Appellants/Debtors are likely to succeed on the merits.**

**i.  The Redemption Period Never Began to Run Due to the Fraud in the Assignment of Mortgage**

At the March 5, 2014, hearing regarding approval of the Settlement, Judge Tucker denied the Trustee's motion for approval, but indicated that he would approve a Settlement which did not include the fraud on the court claims.  His primary reason for that was that he did not believe the Appellants/Debtors had a likelihood of success in the state courts as to the wrongful foreclosure claims.  This opinion was based on what he perceived as the prevailing case law, which holds that a homeowner has no standing to challenge a foreclosure after the expiration of the redemption period, because he is divested of all right, interest and title to the property, absent a clear showing of fraud or irregularity.

However, the prevailing case law all deals with mere procedural defects in the foreclosure process which only render the foreclosures voidable.  It is this voidability which requires a showing of prejudice to the homeowner.  Nowhere has any Michigan court ruled that prejudice must be found where fraud is involved, since fraud vitiates a fraudulent document and any proceedings that follow from it. Nonetheless, if a showing of prejudice is required of Appellants/Debtors, it is shown in that they lost their rights in the home to RFC based on a void, fraudulent document, they have fought for 5 ½ years to right this wrong, their family life has been disrupted by this immoral and illegal conduct, Suzie Baker has lost an opportunity to earn an income because all of her energies have been focused on waging this war against Orlans and RFC,  and the family has suffered severe emotional and mental distress.

There is not one Michigan case anywhere in which fraud was found in the foreclosure process (which would allow the setting aside of the sheriff's sale).  Moreover, the facts in our own case do not involve mere procedural defects in the Baker foreclosure.  To the contrary, the fraudulent, unconscionable and reprehensible conduct of both Orlans and RFC has been documented and memorialized in the 14A-3 District Court transcript.

Thus, Appellants/Debtors, based on the strength of these facts, have a high likelihood of succeeding on their wrongful foreclosure case.  Below is a discussion as to why the prevailing case law is not dispositive here, and why, since the sheriff's sale was based on a fraudulent assignment of mortgage it is void *ab initio*.  **Thus, the redemption period never began to run.**

First, what appears to be the prevailing case law must be addressed.  *Overton v. Mortg. Elec. Registration Sys.*, No 284950, 2009 WL 1507342, (Mich. Ct. App. May 28, 2009) (unpubl.), has been cited as

the leading precedential case holding that a homeowner has no standing where he attempts to assert claims or defenses to a foreclosure after the expiration of the redemption period, in the absence of a clear showing of fraud or irregularity.  It must first be noted that *Overton* is viewed more as a merits case rather than a standing case, because the trial court below heard the fraud allegations and deemed them meritless.  *See Rishoi v. Deutsche Bank National Trust Company*, No. 13-1119 (6th Cir. Dec. 17, 2013).  *Overton* concerned allegations by the homeowner of fraud by the lender in conducting foreclosure proceedings against his property. The lender argued that Overton had no standing to challenge the foreclosure, because the complaint (filed less than a month before the redemption period expired) did not toll the redemption period, and once the redemption period expired they lost all title and interest in the property, and therefore lacked standing to challenge the foreclosure.

The trial court below in *Overton* did in fact hear the homeowner's arguments  and determined that they provided no basis for setting aside the summary disposition.  The Court in *Overton* quoted *Schulties v. Barron*, 16 Mich. App. 246, 247-248; 167 NW 2nd 784 (1969), stating, "The law in Michigan does not allow an equitable extension of the period to redeem from a statutory foreclosure sale in connection with a mortgage foreclosed by advertisement and posting of notice in the absence of a clear showing of fraud, or irregularity".  *Overton* cites *Piotrowski v. State Land Office Bd.*., 4 N.W. 2d 514, 517 (Mich.1942) and *Mission of Love v. Evangelist Hutchinson Ministries*, No. 266219, 2007 WL 1094424, at 4-5 (Mich. Ct. App. Apr. 12, 2007) (unpubl.).

All the Michigan case law regarding standing to challenge a foreclosure after the expiration of the redemption period either involved no allegations of fraud or situations where fraud was not found to be sufficient to set aside the foreclosure.  In others, the fraud was simply not alleged with the requisite specificity. The cases are summarized as follows:

a). *Piotrowski.*: In this Michigan Supreme Court case, the homeowner failed to redeem the property after foreclosure.  He was subsequently barred from bidding at the scavenger sale, since he had lost all right, title and interest in and to said premises.  There were no allegations of fraud nor the slightest hint of the word fraud anywhere in the language of that opinion. It therefore is no indicator of the projected results in our case of fraud on the court.

b). *Schulties*: Plaintiff's suit to set aside the foreclosure was denied.  She believed she had 1 year to redeem instead of 6 months.  There were no allegations of fraud.

c). *Jackson Investment Corp. v. Pittsfield Products, Inc.*, 413 N.W.2d 99, 162 Mich. App. 750 (Ct. App. 1987):  This case involved a foreclosure sale which occurred 5 days before the 4 week publication period had expired, contrary to the statutory requirements.  The court declined to set aside the foreclosure.  It found that the sale was defective, but that such a defect only rendered the sale voidable. The court noted, "Such a holding allows for an examination of whether any harm was caused by the defect.  In situations where it is evident that no harm was suffered, in that the mortgagor would have been in no better position had notice been fully proper and the mortgagor lost no potential opportunity to preserve some or any portion of interest in the property, we see little merit in the rule of law which Jackson advocates".  There were no allegations of fraud in *Jackson*.

In our case, without the altered/forged assignment of mortgage, the Bakers would not have lost any of their interest in the subject property to begin with!  Thus, they would be in a much better position but for the altered/forged assignment of mortgage.  However, because fraud was involved prejudice need not even be shown.

d). *Davenport v. HSBC Bank USA,* 275 Mich. App. 344, 739 N.W.2d 383 (2007):  As stated above *Davenport* also involved a mere procedural defect which only rendered the sheriff's sale voidable, as was later determined by the Michigan Supreme Court in *Kim v. JPMorgan Chase Bank, NA*, 825 N.W.2d 329, 493 Mich. 98 (2012).  *Davenport* involved allegations that the lender published the foreclosure days before actually acquiring an interest in the indebtedness and involved no allegations of fraud.

e). *Sweet Air Inv., Inc. v. Kenney*, 739 N.W.2d 656, 275 Mich. App. 492 (Ct. App. 2007):  This case involved an assertion by the homeowner that the property should have been sold at foreclosure sale as two parcels instead of one, and that each adjournment of the sale was not published.  There are no allegations of fraud that, if proven, would overcome the lack of standing to challenge the foreclosure after the expiration of the redemption period.  Specifically, the court noted that, "This Court has held

that a defect in notice renders a sale voidable".

f). *Overton.*:  The plaintiff in *Overton* did make allegations of fraud.  However, because plaintiff failed to appear at defendants' motion for summary disposition and was not heard on the merits, defendants' motion was granted.  After filing a motion to vacate that order, the trial heard plaintiff's arguments, but concluded that they provided no basis for setting aside the summary disposition.  In our own case, the Bakers have not only alleged fraud, but have proven it, as evidenced by the state district court transcript of October 28, 2013.  **(EXH A of DKT. 87-1 through 87-2).**

g). *Sagmani v. Lending Associates, LLC*, No. 302865 (Mich. Ct. App. Aug. 7, 2012):  In *Sagmani,* the plaintiff challenged her foreclosure after the redemption period expired, alleging that the required notice under MCL 600.3205 (b) regarding loan modification was not sent to her.  However, that statute was not yet in effect when her foreclosure was commenced.  She also alleged fraudulent misrepresentation because the lender had told her that she was approved for a loan modification, and that the foreclosure would be stopped.  The court held that she failed to plead fraud with the requisite specificity.  Unlike *Sagmani*, the Bakers not only pleaded their fraud claims with specificity, but obtained proof of the fraud through witness testimony and the admission against interest in the 14A-3 District Court.

h). *Kim*:  First, this Michigan Supreme Court Case did not involve any allegations of fraud.  It concerns a foreclosing entity which failed to record an assignment of mortgage, contrary to the foreclosure statute requirements.  Instead, the foreclosing entity relied on its belief that it obtained an interest in the mortgage through the operation of law when it received said interest from the FDIC.  The court held that it did not obtain an interest in the mortgage by operation of law.  However, it also concluded that, "We have long held that defective foreclosures are voidable".  This is very different from the court saying, "We have long held that fraudulent foreclosures are voidable".  In the Baker's case a fraud was committed.  Fraud is a far more serious matter than the type of procedural defect in *Kim,* and involves conduct which is contrary to public policy.

12

As noted in *Mitan v. Fed. Home Loan Mortg. Corp.,* 703 F.3d 949, 951 (6th Cir.2012), Michigan law is more complicated than the magistrate judge believed in that case. **(EXH L of Dkt. #123-1).** The homeowner in *Mitan* argued that the lender's violation of the loan modification statute rendered the foreclosure void, and that the redemption period never began. The *Mitan* court agreed with Mitan's interpretation of the law, noting that Michigan law distinguishes between foreclosures with notice defects and those with "structural defect[s] that go [] to the very heart of defendant's ability to foreclose by advertisement in the first instance", such as the defect in *Davenport.* The Plaintiff in *Mitan* argued that the property in question was foreclosed without statutory authority, and thus the foreclosure was void *ab initio*. He relied on *Davenport*, which involved a situation where the foreclosing entity issued the first publication several days before being assigned the mortgage.

In ruling in favor of the homeowner, the court in *Davenport* made a distinction between a notice defect versus a structural defect which "… goes to the very heart of the defendant's ability to foreclose by advertisement in the first instance". The court in *Davenport* determined that the failure to hold a mortgagee status at the time of the first publication was a structural defect. Since *Mitan, Kim* has held that a defect such as the one in *Davenport* is merely a procedural defect which only renders the foreclosure sale voidable, and requiring a showing of prejudice. Nonetheless, *Davenport* is still sound case law for the principal that defects which are deemed to be structural render the foreclosure void *ab initio,* as opposed to voidable.

In our own case, because the assignment of mortgage is fraudulent (a structural defect), it is void and fails to convey any interest. As such, RFC had no chain of title in place, divesting RFC of any statutory standing to foreclose and rendering the foreclosure sale void *ab initio*. Such a defect does not require a showing of prejudice, and no Michigan or Federal case law has held to the contrary. Because the assignment and foreclosure sale are void *ab initio,* the redemption period never began to run, and Appellants/Debtors did not lose their right, title and interest in the property. They therefore have standing to challenge the foreclosure.

### ii. Clean Hands Doctrine favors Appellants/ Debtors

RFC claims it was a good faith purchaser at the sheriff's sale on the Debtors' property. However, the Michigan Supreme Court has held that, "There can be no such thing as a bona fide holder under a forgery, whose good faith gives him any rights against the party whose name has been forged". *Horvath v. National*

*Mortgage Co.*.213 N.W. 202, 202-203 (Mich. 1927).   *See also, Special Property VI LLC v. Woodruff*, 730 N.W.2d 753, 273 Mich. App. 586 (Ct. App. 2007). (The recording of an instrument cannot, of itself, make an invalid grant valid).

It was held in *Cook v. Wolverine Stockyards Co.*, 73 N.W.2d 902, 344 Mich. 207 (1955),  that an illegal contract against public policy was pleaded, and that under such circumstances courts will not enforce it or grant relief thereunder, but leave the parties where they have placed themselves.  See also, *Ammori v. Nafso*, No. 312498 (Mich. Ct. App. Jan. 28, 2014), ("An agreement between two parties to defraud a third party obviously contradicts public policy.  Just as courts will not enforce a contract designed to harm a third party, courts will deny equitable relief when the misconduct is directed at unrelated third parties, if the claims made by plaintiff are inextricably tied to the plaintiff's wrongdoing").   As in *Ammori,* Appellee/RFC should be denied equitable relief where, the misconduct was directed at unrelated third parties (the Bakers).  Just as in *Ammori*, the claim of possession made by RFC is inextricably tied to its wrongdoing.

In *Paulen v. Peters,* No.222659  (Mich. Ct. App. Nov. 16, 2001) (Unpubl), Plaintiff's realtor took real estate sale proceeds, forged the plaintiff's name on the warranty deed, kept the sales proceeds, and pretended to the seller that a land contract had occurred instead of an outright sale.  The plaintiff later discovered the forgery and sued to quiet title.  The court in *Paulen* held, "We conclude, as a matter of law, that defendant's claim of title to the subject property cannot be superior to plaintiff's claim of title to the subject property. Forged papers cannot be made the basis of a recovery, either at law or in equity, against the supposed maker".  In our case, the altered/forged assignment cannot serve as the basis of a recovery of possession of the Baker home.

In *Stachnik v. Winkel*, 230 N.W.2d 529, 394 Mich. 375 (1975)*,* the plaintiffs purchased land from an older couple, saying that they were authorized to make the purchase on behalf of their employer.  After sellers issued a warranty deed to the employer upon learning of the fraud, the court denied plaintiffs' request for specific performance due to the clean hands doctrine.

A case much closer to home on the facts is a 6th Circuit Court of Appeals case involving a Michigan foreclosure.  *In re Sutter*, 665 F.3d 722 (6th Cir. 2012), deals with a forged mortgage (the victims signed a

document they were told was a different kind of document).  In that case, just as in our own, the lender filed a proof of claim that was based on a forged document.  *Sutter* ruled that those who acquire an interest under a forged instrument are in no better position as to title than if they had purchased with notice.  *Sutter* cited the Michigan Supreme Court in *Horvath v. National Mortgage Co.*213 N.W. 202, 202-203 (Mich. 1927), which held that under Michigan law, a forged mortgage is void *ab initio*.  After holding that there was no "distinction between the act of simulating a signature and procuring the signature [by trickery]," the Michigan Supreme Court in *Horvath* concluded that the deed in question was void.  The debtors filed an objection to the proof of claim and sought a judgment to extinguish and expunge all of the lender's claimed interest in the property. They prevailed despite that the fact that they did not deny they voluntarily took out the loan.  The court further denied a request by the lender for the declaration of an equitable mortgage.

In our own case, the alterations made to the assignment of mortgage amount to a forgery by trickery as discussed in *Horvath.*  The trickery in this case  was aimed at the Bakers.  The executor of the assignment, Matt Favorite, signed one document…the one with 9-10 pieces of missing information.  Yet, the intent of RFC and Orlans, by having Orlans employees insert the additional information, was to deceive the world at large into believing that Matt Favorite signed the document, which contained both the original information as well as the subsequently added information.  Indeed, a reasonable observer, upon glimpsing the recorded assignment with the additional information, would understandably assume that the entire document contents were all contained in the document at the time Matt Favorite executed it and had it notarized.  The effect of the alteration was to forge Matt Favorite's signature onto those pieces of information which he never saw on the document at the time he signed it (because they did not exist).

Thus, the Bakers are justified in their reliance on Michigan case law that they stand an excellent chance of having the RFC assignment of mortgage and mortgage extinguished.  The success of the Bakers' case will yield, at a minimum, the full value of their home, which is estimated to be worth $525,000.00. The Settlement approved by the Bankruptcy Court is .065% of this amount.

In Summary, no Michigan court has found fraud where a homeowner challenged a foreclosure.  If such a

finding were made no court would then declare that the fraud could be overcome by a showing of prejudice. Such a ruling would fly against long established principles of equity, as a defrauder cannot be allowed to benefit from his wrongful conduct.  It is one thing to declare that a mere procedural defect in the foreclosure requires a showing of prejudice.  It is quite another thing to declare that in a foreclosure achieved through the alteration and forgery of the very document which transfers title to mortgagee, the homeowner must show prejudice.  In short, in every case of alleged fraud in the foreclosure proceedings, the homeowner has failed to meet the high standard of fraud required to set aside the foreclosure, or has not alleged the fraud with requisite specificity.  In our case, the fraud by RFC and Orlans is beyond dispute and verified by transcript.   As such, there can be no doubt that the Appellants /Debtors have a likelihood of success in the state courts.  Thus, the Order approving the Trustee's Settlement should not have been granted.

## 2. The danger that Appellants/Debtors will suffer irreparable injury if they are evicted from their home

At the current stage of this litigation in the Bankruptcy Court, it is illogical to remove Appellants/Debtors from their home if at the close of the bankruptcy litigation and appeal process they are granted a fee simple title to the Property with all of RFC's interests removed. The danger to Appellants/Debtors in this case is extreme, they will be removed from their home and lose all connection to the Property as the Bankruptcy Court has ordered them to surrender their home in 7 days.  Appellants/Debtors will be "on the streets" due to an invalid foreclosure sale.  Their six children, some of whom have never known another home, range in age from 5 to 22.  To throw these children, (several of whom are in school) out of their home before all relevant issues have been determined through the appeal process, all based on a fraudulent assignment of mortgage created by RFC and Orlans, is unspeakable.

There is no remedy at law for the Appellants/Debtors in this case. This litigation involves property rights that have no monetary value. As such, Appellants'/Debtors' need for a stay and temporary restraining order is immediate and banging the gong of justice with alacrity.

## 3. Appellants'/Debtors' risk of injury is greater than any risk to RFC

In the case at bar, there is no risk to RFC that approximates the risk to Appellants/Debtors.  If they are evicted they will lose all beneficial use of their rightful property.  By granting a stay and temporary restraining

order, this Court is merely preserving the status quo in this matter during the proceedings of the Bankruptcy

case and any appeals.  RFC will not lose any rights they have and in fact, if they are successful, will be in the

same place in this litigation as they were previously. Thus, RFC's rights will not be prejudiced at all.  However,

because RFC does not, in fact, have any rights or interest in Appellants'/Debtors' mortgage or property, as has

been shown through witness testimony in the 14A-3 District Court, it cannot suffer any harm from a stay and

temporary restraining order.  As such, a stay and temporary restraining order in this case has no bearing on any

harm to RFC whatsoever.

The harm to Appellants/Debtors without a stay and temporary restraining order will be substantial.

They will no longer be the fee simple owners of their homestead property, and will be evicted while this matter

is still ongoing.   If Appellants/Debtors are successful in their appeals, RFC's assignment of mortgage will be

declared fraudulent and thus null and void, rendering the sheriff's sale void as well and restoring title to the

Appellants/Debtors.   As a Sheriff's Deed has been recorded on the Property, the rights of third parties could

also be affected.  A stay and temporary restraining order halting the foreclosure sale is the only remedy to

proscribe this confusion and chaos.

**4. The public interest would not be harmed but would be preserved by the issuance of a stay and temporary restraining order**

It is not in the public interest, while litigation is pending, for an alleged out of state lender to acquire the

title to property that it may have to disgorge and return to the previous owner at a future date. At this point, the

public interest is served by maintaining the status quo. Because in fact RFC has no right or interest in the Baker

mortgage or property,  none of its rights will be compromised or impaired by the issuance of a stay and

temporary restraining order.

Furthermore, Orlans and RFC have conspired to create a forged document which was then used as the

basis to foreclose on the Baker property, and RFC now seeks possession of said property.  Once their

unconscionable scheme was revealed through witness testimony in the 14A-3 District Court, and on the brink of

receiving a devastating ruling against them, Orlans orchestrated the reopening of the Baker Bankruptcy case in

order to avoid civil, and possibly criminal, liability for their egregious and reprehensible conduct.  It is contrary

to public policy to aid these conspirators in their quest to forum shop and shield themselves from liability through the Bakers' own Bankruptcy case proceedings.

All Appellants/Debtors seek is to preserve the status quo while the Bankruptcy Court litigation and appeals are pending. By issuing a stay and temporary restraining order, this Court is not ruling in favor of Appellants/Debtors on the merits, but merely maintaining the position of the parties until the litigation has been resolved.

### III. CONCLUSION

In summary, the Settlement in this case is far from fair and equitable.  In addition, the Bankruptcy Trustee failed to prove his burden to the contrary in that he did not adequately address the four elements of the fair and equitable standard.  Furthermore, the Settlement includes transfer of the Appellants'/Debtors' home to a party who has not proven it has any interest in the subject mortgage and property.  RFC is thus without standing to participate in the Baker bankruptcy proceedings, and is not a party in interest.  Finally, the Appellants/ Debtors indeed have a likelihood of success on the merits in the state court proceedings because of the proven egregious nature of the fraud perpetrated by RFC and Orlans.  Such a fraud will no doubt meet the high standard required in Michigan to set aside a foreclosure.

**WHEREFORE**, Appellants/Debtors respectfully request that this honorable Court grant their Motion, to Stay the Bankruptcy Order entered on March 11, 2014, as well as the Order reinstating it entered on March 25, 2014, until all issues are fully litigated in the Bankruptcy Court and all Appeals on said issues are completed.  Furthermore, Appellants/Debtors respectfully request a temporary restraining order to prevent Appellee/ RFC and Trustee Douglass S. Ellmann from taking any action to remove Appellants/Debtors from their home.

Respectfully Submitted,

Dated:  April 14, 2014

/s/David S. Wilkinson
David S. Wilkinson (P65130)
Co-Counsel Appellants/Debtor(s)
23843 Joy Road
Dearborn Heights, MI  48127

(313) 724-5088
fregolaw@yahoo.com

Dated: April 14, 2014                    By: /s/ Beatriz H. Coleman
                                         Beatriz H. Coleman (P40188)
                                         Co-Counsel for Appellants/Debtors
                                         3662 Vorhies Rd.
                                         Ann Arbor, MI 48105
                                         bhcoleman@myexcel.com

### Certificate of Service

   I hereby certify that on April 14, 2014, the forgoing document was electronically filed with the Clerk of the

Court using the ECF system, which will send notification of such filing to all ECF participants registered in this

matter.

                                         Respectfully Submitted,

Dated:  April 14, 2014                   /s/David S. Wilkinson
                                         David S. Wilkinson (P65130)
                                         Attorney for Debtor(s)
                                         23843 Joy Road
                                         Dearborn Heights, MI  48127
                                         (313) 724-5088
                                         fregolaw@yahoo.com

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION – DETROIT

Michael J. Baker and
Suzie C. Baker,  Appellants/Debtors,

                     Case No:

V                      Hon.

                     Filed as Case No. 08-43175-tjt in the U.S. Bankruptcy Court for
                     the Eastern District of Michigan, Southern Division-Detroit
                     Hon. Thomas J. Tucker (P33794)

RESIDENTIAL FUNDING
COMPANY, LLC, and ORLANS     Filed As Case No: 11-1260-CH in the ASSOCIATES, P.C.,
        Appellees/Defendants        State of Michigan 22nd Circuit Court
                     Hon. David S. Swartz (P22850)

                     Filed as Case No. 2:11-cv-15169-DML-PJK
                     US District Court, ED Southern Michigan
                     Hon. David M. Lawson (P27097)

                                                    /

---

Beatriz H. Coleman (P40188)
TILA Attorney Group, PLLC
Attorney for Appellants/ Debtors
3662 Vorhies Rd.
Ann Arbor, MI 48105
Phone:  734.429.1346
bhcoleman@myexcel.com

David S. Wilkinson (P65130)
Frego & Associates
Attorney for Appellants/Debtors
23843 Joy Road
Dearborn Heights, MI 48127
Phone: 313-724-5088
fregolaw@aol.com

Deanna Swisher (P38341)
Foster, Swift, Collins & Smith, PC
Attorney for Appellee/Residential Funding Company, LLC
313 South Washington Square
Lansing, MI  48933
Phone: 517-371-8133
dswisher@fosterswift.com

I. W. Winsten  (P30528)
Honigman, Miller, Schwartz and Cohn, LLP
Attorneys for Appellee/Orlans Associates, PC
2290 First National Building
Detroit, MI  48226
Phone: 313-465-7608
Fax: 313-465-7609
iww@honigman.com

Thomas R. Morris (P39141)
Silverman & Morris
Special Counsel for Trustee
30500 Northwestern Highway, Suite 200
Farmington Hills, MI 48334
Phone: (248) 539-1330
Fax: (248) 539-1355
morris@silvermanmorris.com

                                                    /

---

**EMERGENCY EX-PARTE MOTION TO STAY ORDER APPROVING REVISED SETTLEMENT  AND REQUIRING TURNOVER OF PROPERTY (DKT. #116), AND FOR TEMPORARY RESTRAINING ORDER**

     **NOW COME** Appellants/Debtors, Michael J. Baker and Suzie C. Baker, by their attorneys, and pursuant to Fed. R. Bankr. P. 8007 and FRCP 65, state their Emergency Ex-Parte Motion to Stay Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #116) and for Temporary Restraining Order.   Appellants/Debtors filed an action in the 22nd Circuit Court which would rescind a foreclosure sale, and thus directly affect all parties to this case and their interests in real property located in the State of Michigan in Washtenaw County. Said action, although filed on November 15, 2011, was removed to the Bankruptcy Court by Appellee/Defendant Orlans Associates, PC (Orlans) 2 years later when Orlans orchestrated the reopening of the Baker bankruptcy case (then having been closed for over 5 years).

     The reason for Orlans' action was that Orlans was about to receive a devastating ruling in the 14A-3 District Court that Orlans had committed a fraud upon the court.  Such a ruling was virtually guaranteed based on devastating witness testimony in the 14A-3 District Court and an admission against interest made by Orlans Attorney Timothy B. Myers confirming the existence of a pervasive, unscrupulous and unconscionable scheme in place in the Orlans organization.  Said scheme involved the systematic policy at Orlans of altering assignments of mortgage after said documents were previously executed and notarized (most often in other states), and then submitting those assignments to the Registers of Deeds throughout the state of Michigan.  The evidence has therefore established that the assignment of mortgage upon which the foreclosure of the Appellants'/Debtors' home was conducted was based on fraud and forgery and was therefore void.

    Appellants/Debtors will rely upon their accompanying brief, the Federal Rules of Civil Procedure, and any other authority upon which this Honorable Court wishes to rely in support of their Motion.

     **WHEREFORE,** Appellants/Debtors pray this Honorable Court grant their  Emergency Ex-Parte Motion for Stay of Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #116), and for

Temporary Restraining Order, and further award Appellants/Debtors their costs and fees so wrongfully incurred in having to bring this Motion.  A Proposed Order is attached.  **(EXH A Attached).**


Respectfully Submitted,


Dated:  April 14, 2014                        By:/s/David S. Wilkinson _____
                                              David S. Wilkinson (P65130)
                                              Co-Counsel for Appellants/Debtor(s)
                                              23843 Joy Road
                                              Dearborn Heights, MI  48127
                                              (313) 724-5088
                                              fregolaw@yahoo.com


Dated: April 14, 2014                         By: /s/ Beatriz H. Coleman
                                              Beatriz H. Coleman (P40188)
                                              Co-Counsel for Appellants/Debtors
                                              3662 Vorhies Rd.
                                              Ann Arbor, MI 48105
                                              bhcoleman@myexcel.com

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – DETROIT**

Michael J. Baker and
Suzie C. Baker,  Appellants/Debtors,

Case No:

V                                                     Hon.

Filed as Case No. 08-43175-tjt in the U.S. Bankruptcy Court for
the Eastern District of Michigan, Southern Division-Detroit
Hon. Thomas J. Tucker (P33794)

RESIDENTIAL FUNDING
COMPANY, LLC, and ORLANS           Filed As Case No: 11-1260-CH in the ASSOCIATES, P.C.,
                  Appellees            State of Michigan 22nd Circuit Court
                                       Hon. David S. Swartz (P22850)

Filed as Case No. 2:11-cv-15169-DML-PJK
US District Court, ED Southern Michigan
Hon. David M. Lawson (P27097)
                                                                          /

Beatriz H. Coleman (P40188)              Deanna Swisher (P38341)
TILA Attorney Group, PLLC                Foster, Swift, Collins & Smith, PC
Attorney for Appellants/ Debtors         Attorney for Appellee/Residential Funding Company, LLC
3662 Vorhies Rd.                         313 South Washington Square
Ann Arbor, MI 48105                      Lansing, MI  48933
Phone:  734.429.1346                     Phone: 517-371-8133
bhcoleman@myexcel.com                    dswisher@fosterswift.com

David S. Wilkinson (P65130)              I. W. Winsten  (P30528)
Frego & Associates                       Honigman, Miller, Schwartz and Cohn, LLP
Attorney for Appellants/Debtors          Attorneys for Appellee/Orlans Associates, PC
23843 Joy Road                           2290 First National Building
Dearborn Heights, MI 48127               Detroit, MI  48226
Phone: 313-724-5088                      Phone: 313-465-7608
fregolaw@aol.com                         Fax: 313-465-7609
                                         iww@honigman.com

                                         Thomas R. Morris (P39141)
                                         Silverman & Morris
                                         Special Counsel for Trustee
                                         30500 Northwestern Highway, Suite 200
                                         Farmington Hills, MI 48334
                                         Phone: (248) 539-1330
                                         Fax: (248) 539-1355
                                         morris@silvermanmorris.com
                                                                          /

**APPELLANTS'/DEBTORS' BRIEF IN SUPPORT OF EMERGENCY  EX-PARTE MOTION TO STAY ORDER APPROVING REVISED SETTLEMENT AND REQUIRING TURNOVER OF PROPERTY (DKT. #116), AND FOR TEMPORARY RESTRAINING ORDER**

### ISSUES PRESENTED

1. Are Appellants/Debtors entitled to a stay of the above Order pursuant to Fed. R. Bankr. P 8007 and a temporary restraining order pursuant to FRCP 65, where said Order includes surrender of the Appellants'/Debtors' home to Appellee/Defendant  Residential Funding Company, LLC, (RFC) where:

   a. The Bankruptcy Court made a determination that an assignment of mortgage, proven in the State of Michigan14A-3 District Court to be altered and forged, transferred title to RFC.

   b. The Bankruptcy Judge stated twice on the record that he did not read the transcript of the 14A-3 District Court in Appellants'/Debtors' pleadings, which clearly showed that the assignment of mortgage was fraudulent and void.  (This rendered RFC without standing to participate in the Bakers' Bankruptcy case since it does not own an interest in the subject mortgage or property.)

   c. The Bankruptcy Court deemed RFC a good faith purchaser at sheriff's sale, despite clear evidence to the contrary, as proven by the transcript of the 14A-3 District Court which the Bankruptcy Judge did not read.

   d. The issue of the validity of Appellee/RFC's interest in the Baker mortgage and property, which is the genesis of the Order to surrender the property, is in dispute and where allowing the surrender terms of the Bankruptcy Order dated March 11, 2014, to continue before the Appellants'/Debtors' Appeal to this Court can be heard, and before this Honorable Court has ruled on Appellants'/Debtors' Appeal creates chaos and a threat to public order as it relates to the underlying property, its ownership and its occupancy.  (The March 11, 2014 Order was stayed by the Bankruptcy Court on March 20, 2014, and was reinstated on March 25, 2014, in the Bankruptcy's order entitled , "Further Order Regarding the Trustee's March 14, 2014 Motion for Modification of the March 11, 2014 Settlement Order dated March 25, 2014").

Appellants'/Debtors' answers: "YES" to the above question

Appellees' and Trustee Ellmann's answers: "NO" to the above question

2.  Is the approved Settlement Agreement fair and equitable where:

a. The Trustee did not meet his burden in proving the four elements of a fair and equitable settlement, especially in light of the fact that the 14A-3 District Court transcript reveals the malfeasance of both Orlans and RFC?

b.  The Appellee/ RFC has failed to show it owns any interest in the subject note or mortgage which would entitle it to status as an interested party in the Appellants'/Debtors' Bankruptcy case, or to a right to participate in the Settlement.

Appellants'/Debtors' answers: "NO" to the above question

Appellees' and Trustee Ellmann's answers: "Yes" to the above question

**CONTROLLING AUTHORITY**

The Controlling Authority is Fed. R. Bankr. P 8007 and FRCP 65, and the applicable standards as cited in this Brief.

## BRIEF

## I.  INTRODUCTION

Appellants/Debtors are now before this Honorable Court seeking an order to preserve the status quo during the Appeal process.  It would only create chaos if the Appellants/ Debtors were removed from their home only to have it restored on Appeal by either this Court or the 6th Circuit Court of Appeals. The Bakers' home, located at 5142 N. Territorial Rd., Dexter, MI 48130, was foreclosed on February 22, 2007.  The redemption period was to expire on February 22, 2008.  Just prior to that, the Bakers filed a chapter 13, on February 12, 2008, thereby extending the redemption period until April 12, 2008.

The Bakers did not include in their bankruptcy schedules any claims challenging the foreclosure, since they knew of none until March 2009.  They received a discharge on August 26, 2008.  On October 23, 2008, Appellee /RFC filed an action for possession against the Bakers, and obtained a Consent Judgment on November 14, 2008, which the Bakers' prior attorney (now suspended) entered into without authorization, and despite objections from the Bakers.

On March 20, 2009, the Bakers filed a complaint against RFC and others, but as it was based on the inapplicable Michigan Consumer Protection Act, that case was dismissed.  Appellants/Debtors then obtained new counsel and filed a complaint in the 22nd Circuit Court on November 15, 2011.  It was immediately removed to the Federal District Court with Judge David M. Lawson presiding.  After a year, it was remanded back to the 22nd Circuit Court.

Because Appellants made allegations of fraud on the court (both in the 14A-3 and the 22nd Circuit Court), Judge Timothy P. Connors, of the 22nd Circuit Court, immediately remanded the case to the 14A-3 District Court for a determination as to whether Judge Simpson felt that a fraud had been perpetrated upon his Court.  On October 28, 2013, a hearing was held in the 14A-3 District Court which produced devastating testimony by past and present Orlans employees.  **(EXH A of DKT. 87-1 through 87-2)**.  They testified that they routinely received assignments of mortgage from lender clients which had been previously executed and notarized (usually in other states), with several blanks devoid of information.  They further revealed that it was common

practice for these employees to insert the missing information and then submit the assignments to the appropriate Register of Deeds for recording, and that this was the method used in the Baker assignment of mortgage.  See a copy of the assignment which is a representation of how it would have appeared when Orlans received it from the lender, **(EXH C of DKT. 87-2)**, as well as a copy of how it appeared after it was altered and recorded by Orlans employees.  **(EXH D of DKT. 87-2).**  This act of altering the previously executed assignment of mortgage served to create a forgery, and was in violation of notary laws and various Michigan statutes.  At that same hearing, Orlans attorney Timothy B. Myers made an admission against interest when he stipulated to the 14A-3 District Court that the above practice was the standing policy at Orlans at that time.

**(EXH A of DKT. 87-1 through 87-2).**

Each of the parties rested their witness testimony, and all that remained was for Judge Simpson to issue a final ruling.  Alarmed at what was clearly the writing on the wall, and desperate to avoid a ruling of fraud on the court at all costs, Orlans hired new counsel who came up with the idea of reopening the Baker Bankruptcy case, since the Bakers had not listed their state court claims on their schedules (because they had no knowledge of their existence at that time).

In mid- 2009, the Bakers had inquired as to any requirements to file anything with the bankruptcy court regarding their state action.  Their then bankruptcy counsel, Ray G. Tallerday, had informed the Bakers that there was nothing to file with the Bankruptcy Court.  In addition, the Bakers called the chapter 13 Bankruptcy Trustee's office, and were told the same thing by a staff person named Wendy. **(EXH C of Dkt. #72-3)**.  Both Orlans and RFC have been involved in the Baker foreclosure, the Baker  Bankruptcy case, the eviction action, the first circuit court action and this current state action, all covering a period of  6 years.  Not once did Orlans or RFC ever indicate to the Bakers that they needed to reopen their Bankruptcy case and amend their schedules to include their state court action.  Although RFC and Orlans were under no duty to make such a revelation, the fact that they failed to do so served to satisfy the Bakers that no action was required on their part with regard to their Bankruptcy Court case.

A hearing was held in the Bankruptcy Court on March 5, 2014.  The three Orders appealed herein followed after that hearing **(Dkt. #111, Dkt. #116 and Dkt# 136).**

## II. ARGUMENT

### A.  STANDARD FOR A MOTION UNDER FED. R. BANKR. P. 8005 and F. R. C. P. 65

The factors this Court considers in determining whether an Order should be stayed under Fed. R. Bankr. P. 8005 are generally the same factors considered in determining whether to issue a temporary restraining order or a preliminary injunction under FRCP 65: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Michigan First Credit Union v Smith* (*In re Smith*), 501 B.R. 332, 335 (Bankr. E.D. Mich. 2013) quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991).  The greater the likelihood of success on the merits, the less the court will require the movant to demonstrate irreparable harm.  *Family Trust Foundation of Ky., Inc. v. Kentucky Judicial Conduct Comm'n,* 388 F. 3d 224, 227 (6th Cir. 2004).

The Appellants'/Debtors' ability to disprove RFC's claimed interest in their mortgage and property is based on a fraudulent assignment of mortgage which deprives RFC of standing to foreclose and to participate in the Debtors' Bankruptcy proceedings.  This ability would be severely affected if Appellants/Debtors are removed from their property prior to being heard on the merits on appeal.  In essence, the entire reason behind the lawsuit, keeping Appellants/Debtors and their six children in their home, would be defeated.  Any judgment the Bankruptcy Court or this Court renders at some later time in favor of Appellants/Debtors would be ineffective and useless if they have been removed from their home, and it has been sold to a third party (in addition to causing chaos).

### B.  APPLICATION OF THE STANDARD

**1. Appellants/Debtors are likely to prevail on the merits of their case**

**a.  The Settlement is not fair and equitable**

In making his determination at the bankruptcy hearing held on March 5, 2014, Judge Tucker stated that although he had read all the pleadings, he did not read the transcript from the 14A-3 District Court.  Although

the sheer magnitude of the transcript is understandably daunting, justice requires that all evidence presented to the court should be read thoroughly and given full consideration.   Judge Tucker failed to acquaint himself with the evidence as established in the underlying state court action by failing to read the transcript in that state court action which was attached to Appellants'/Debtors' pleadings.   This negatively impacted his ability to objectively assess the merits and likelihood of success in the wrongful foreclosure claims. As aptly concluded in *In re Peoples*, 485 B.R. 478 (B.A.P. 6th Cir. 2013), "There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated …", *quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25, 88 S. Ct. 1157 (1968).

That 14A-3 District Court transcript clearly proved that the assignment of mortgage was fraudulent and void. Despite this, in his second Order, dated March 11, 2014, Judge Tucker finds that title to the Baker home transferred to RFC via the Sheriff's deed.  This despite the fact that the sheriff's deed was based on an assignment of mortgage now proven to be fraudulent.  As to the assignment of mortgage and foreclosure, he deemed them, "solely for purposes of approval and implementation of the Settlement, to be proper and of full force and effect".   Judge Tucker also deemed RFC to be a good faith purchaser despite clear evidence to the contrary in the 14A-3 District Court transcript of the October 28, 2013 hearing.

Judge Tucker's ruling contradicted the facts presented.  Surely the principles in favor of approving a Settlement do not outweigh the existence of fraudulent conduct.  Especially where the fraudulent and unconscionable conduct is perpetrated on such a wide scale basis, and is the admitted practice of at least one of the parties.  If Appellants/Debtors prevail, the note and mortgage would be extinguished, accruing to the benefit of the creditors.  As such, the Settlement was not "fair and equitable".  In addition, the Trustee's briefs on the matter were virtually bereft of substantive arguments on the issues. (Dkt. #79-3 and Dkt. # 101).

**b. Appellants/Debtors are likely to succeed on the merits.**

**i.  The Redemption Period Never Began to Run Due to the Fraud in the Assignment of Mortgage**

At the March 5, 2014, hearing regarding approval of the Settlement, Judge Tucker denied the Trustee's motion for approval, but indicated that he would approve a Settlement which did not include the fraud on the court claims.  His primary reason for that was that he did not believe the Appellants/Debtors had a likelihood of success in the state courts as to the wrongful foreclosure claims.  This opinion was based on what he perceived as the prevailing case law, which holds that a homeowner has no standing to challenge a foreclosure after the expiration of the redemption period, because he is divested of all right, interest and title to the property, absent a clear showing of fraud or irregularity.

However, the prevailing case law all deals with mere procedural defects in the foreclosure process which only render the foreclosures voidable.  It is this voidability which requires a showing of prejudice to the homeowner.  Nowhere has any Michigan court ruled that prejudice must be found where fraud is involved, since fraud vitiates a fraudulent document and any proceedings that follow from it. Nonetheless, if a showing of prejudice is required of Appellants/Debtors, it is shown in that they lost their rights in the home to RFC based on a void, fraudulent document, they have fought for 5 ½ years to right this wrong, their family life has been disrupted by this immoral and illegal conduct, Suzie Baker has lost an opportunity to earn an income because all of her energies have been focused on waging this war against Orlans and RFC,  and the family has suffered severe emotional and mental distress.

There is not one Michigan case anywhere in which fraud was found in the foreclosure process (which would allow the setting aside of the sheriff's sale).  Moreover, the facts in our own case do not involve mere procedural defects in the Baker foreclosure.  To the contrary, the fraudulent, unconscionable and reprehensible conduct of both Orlans and RFC has been documented and memorialized in the 14A-3 District Court transcript.

Thus, Appellants/Debtors, based on the strength of these facts, have a high likelihood of succeeding on their wrongful foreclosure case.  Below is a discussion as to why the prevailing case law is not dispositive here, and why, since the sheriff's sale was based on a fraudulent assignment of mortgage it is void *ab initio*.  **Thus, the redemption period never began to run.**

First, what appears to be the prevailing case law must be addressed.  *Overton v. Mortg. Elec. Registration Sys.*, No 284950, 2009 WL 1507342, (Mich. Ct. App. May 28, 2009) (unpubl.), has been cited as

the leading precedential case holding that a homeowner has no standing where he attempts to assert claims or defenses to a foreclosure after the expiration of the redemption period, in the absence of a clear showing of fraud or irregularity.  It must first be noted that *Overton* is viewed more as a merits case rather than a standing case, because the trial court below heard the fraud allegations and deemed them meritless.  *See Rishoi v. Deutsche Bank National Trust Company*, No. 13-1119 (6th Cir. Dec. 17, 2013).  *Overton* concerned allegations by the homeowner of fraud by the lender in conducting foreclosure proceedings against his property. The lender argued that Overton had no standing to challenge the foreclosure, because the complaint (filed less than a month before the redemption period expired) did not toll the redemption period, and once the redemption period expired they lost all title and interest in the property, and therefore lacked standing to challenge the foreclosure.

The trial court below in *Overton* did in fact hear the homeowner's arguments  and determined that they provided no basis for setting aside the summary disposition.  The Court in *Overton* quoted *Schulties v. Barron*, 16 Mich. App. 246, 247-248; 167 NW 2nd 784 (1969), stating, "The law in Michigan does not allow an equitable extension of the period to redeem from a statutory foreclosure sale in connection with a mortgage foreclosed by advertisement and posting of notice in the absence of a clear showing of fraud, or irregularity". *Overton* cites *Piotrowski v. State Land Office Bd.*., 4 N.W. 2d 514, 517 (Mich.1942) and *Mission of Love v. Evangelist Hutchinson Ministries*, No. 266219, 2007 WL 1094424, at 4-5 (Mich. Ct. App. Apr. 12, 2007) (unpubl.).

All the Michigan case law regarding standing to challenge a foreclosure after the expiration of the redemption period either involved no allegations of fraud or situations where fraud was not found to be sufficient to set aside the foreclosure.  In others, the fraud was simply not alleged with the requisite specificity. The cases are summarized as follows:

a). *Piotrowski.*: In this Michigan Supreme Court case, the homeowner failed to redeem the property after foreclosure.  He was subsequently barred from bidding at the scavenger sale, since he had lost all right, title and interest in and to said premises.  There were no allegations of fraud nor the slightest hint of the word fraud anywhere in the language of that case opinion. It therefore is no indicator of the projected results in our case of fraud on the court.

b). *Schulties*: Plaintiff's suit to set aside the foreclosure was denied.  She believed she had 1 year to redeem instead of 6 months.  There were no allegations of fraud.

c). *Jackson Investment Corp. v. Pittsfield Products, Inc.*, 413 N.W.2d 99, 162 Mich. App. 750 (Ct. App. 1987):  This case involved a foreclosure sale which occurred 5 days before the 4 week publication period had expired, contrary to the statutory requirements.  The court declined to set aside the foreclosure.  It found that the sale was defective, but that such a defect only rendered the sale voidable.  The court noted, "Such a holding allows for an examination of whether any harm was caused by the defect.  In situations where it is evident that no harm was suffered, in that the mortgagor would have been in no better position had notice been fully proper and the mortgagor lost no potential opportunity to preserve some or any portion of interest in the property, we see little merit in the rule of law which Jackson advocates".  There were no allegations of fraud in *Jackson*.

In our case, without the altered/forged assignment of mortgage, the Bakers would not have lost any of their interest in the subject property to begin with!  Thus, they would be in a much better position but for the altered/forged assignment of mortgage.  However, because fraud was involved prejudice need not even be shown.

d). *Davenport v. HSBC Bank USA,* 275 Mich. App. 344, 739 N.W.2d 383 (2007):  As stated above *Davenport* also involved a mere procedural defect which only rendered the sheriff's sale voidable, as was later determined by the Michigan Supreme Court in *Kim v. JPMorgan Chase Bank, NA*, 825 N.W.2d 329, 493 Mich. 98 (2012).  *Davenport* involved allegations that the lender published the foreclosure days before actually acquiring an interest in the indebtedness and involved no allegations of fraud.

e). *Sweet Air Inv., Inc. v. Kenney*, 739 N.W.2d 656, 275 Mich. App. 492 (Ct. App. 2007):  This case involved an assertion by the homeowner that the property should have been sold at foreclosure sale as two parcels instead of one, and that each adjournment of the sale was not published.  There are no allegations of fraud that, if proven, would overcome the lack of standing to challenge the foreclosure after the expiration of the redemption period.  Specifically, the court noted that, "This Court has held

that a defect in notice renders a sale voidable".

f). *Overton.*:  The plaintiff in *Overton* did make allegations of fraud.  However, because plaintiff failed to appear at defendants' motion for summary disposition and was not heard on the merits, defendants' motion was granted.  After filing a motion to vacate that order, the trial heard plaintiff's arguments, but concluded that they provided no basis for setting aside the summary disposition.  In our own case, the Bakers have not only alleged fraud, but have proven it, as evidenced by the state district court transcript of October 28, 2013.  **(EXH A of DKT. 87-1 through 87-2).**

g). *Sagmani v. Lending Associates, LLC*, No. 302865 (Mich. Ct. App. Aug. 7, 2012):  In *Sagmani,* the plaintiff challenged her foreclosure after the redemption period expired, alleging that the required notice under MCL 600.3205 (b) regarding loan modification was not sent to her.  However, that statute was not yet in effect when her foreclosure was commenced.  She also alleged fraudulent misrepresentation because the lender had told her that she was approved for a loan modification, and that the foreclosure would be stopped.  The court held that she failed to plead fraud with the requisite specificity.  Unlike *Sagmani*, the Bakers not only pleaded their fraud claims with specificity, but obtained proof of the fraud through witness testimony and the admission against interest in the 14A-3 District Court.

h). *Kim*:  First, this Michigan Supreme Court Case did not involve any allegations of fraud.  It concerns a foreclosing entity which failed to record an assignment of mortgage, contrary to the foreclosure statute requirements.  Instead, the foreclosing entity relied on its belief that it obtained an interest in the mortgage through the operation of law when it received said interest from the FDIC.  The court held that it did not obtain an interest in the mortgage by operation of law.  However, it also concluded that, "We have long held that defective foreclosures are voidable".  This is very different from the court saying, "We have long held that fraudulent foreclosures are voidable".  In the Baker's case a fraud was committed.  Fraud is a far more serious matter than the type of procedural defect in *Kim,* and involves conduct which is contrary to public policy.

12

As noted in *Mitan v. Fed. Home Loan Mortg. Corp.,* 703 F.3d 949, 951 (6th Cir.2012), Michigan law is more complicated than the magistrate judge believed in that case. **(EXH L of Dkt. #123-1).** The homeowner in *Mitan* argued that the lender's violation of the loan modification statute rendered the foreclosure void, and that the redemption period never began. The *Mitan* court agreed with Mitan's interpretation of the law, noting that Michigan law distinguishes between foreclosures with notice defects and those with "structural defect[s] that go [] to the very heart of defendant's ability to foreclose by advertisement in the first instance", such as the defect in *Davenport.* The Plaintiff in *Mitan* argued that the property in question was foreclosed without statutory authority, and thus the foreclosure was void *ab initio*. He relied on *Davenport*, which involved a situation where the foreclosing entity issued the first publication several days before being assigned the mortgage.

In ruling in favor of the homeowner, the court in *Davenport* made a distinction between a notice defect versus a structural defect which "… goes to the very heart of the defendant's ability to foreclose by advertisement in the first instance". The court in *Davenport* determined that the failure to hold a mortgagee status at the time of the first publication was a structural defect. Since *Mitan, Kim* has held that a defect such as the one in *Davenport* is merely a procedural defect which only renders the foreclosure sale voidable, and requiring a showing of prejudice. Nonetheless, *Davenport* is still sound case law for the principal that defects which are deemed to be structural render the foreclosure void *ab initio,* as opposed to voidable.

In our own case, because the assignment of mortgage is fraudulent (a structural defect), it is void and fails to convey any interest. As such, RFC had no chain of title in place, divesting RFC of any statutory standing to foreclose and rendering the foreclosure sale void *ab initio*. Such a defect does not require a showing of prejudice, and no Michigan or Federal case law has held to the contrary. Because the assignment and foreclosure sale are void *ab initio,* the redemption period never began to run, and Appellants/Debtors did not lose their right, title and interest in the property. They therefore have standing to challenge the foreclosure.

**ii. Clean Hands Doctrine favors Appellants/ Debtors**

RFC claims it was a good faith purchaser at the sheriff's sale on the Debtors' property. However, the Michigan Supreme Court has held that, "There can be no such thing as a bona fide holder under a forgery, whose good faith gives him any rights against the party whose name has been forged". *Horvath v. National*

*Mortgage Co.*213 N.W. 202, 202-203 (Mich. 1927).    *See also, Special Property VI LLC v. Woodruff*, 730 N.W.2d 753, 273 Mich. App. 586 (Ct. App. 2007). (The recording of an instrument cannot, of itself, make an invalid grant valid).

It was held in *Cook v. Wolverine Stockyards Co.*, 73 N.W.2d 902, 344 Mich. 207 (1955),  that an illegal contract against public policy was pleaded, and that under such circumstances courts will not enforce it or grant relief thereunder, but leave the parties where they have placed themselves.  See also, *Ammori v. Nafso*, No. 312498 (Mich. Ct. App. Jan. 28, 2014), ("An agreement between two parties to defraud a third party obviously contradicts public policy.  Just as courts will not enforce a contract designed to harm a third party, courts will deny equitable relief when the misconduct is directed at unrelated third parties, if the claims made by plaintiff are inextricably tied to the plaintiff's wrongdoing").   As in *Ammori,* Appellee/RFC should be denied equitable relief where, the misconduct was directed at unrelated third parties (the Bakers).  Just as in *Ammori*, the claim of possession made by RFC is inextricably tied to its wrongdoing.

In *Paulen v. Peters,* No.222659  (Mich. Ct. App. Nov. 16, 2001) (Unpubl), Plaintiff's realtor took real estate sale proceeds, forged the plaintiff's name on the warranty deed, kept the sales proceeds, and pretended to the seller that a land contract had occurred instead of an outright sale.  The plaintiff later discovered the forgery and sued to quiet title.  The court in *Paulen* held, "We conclude, as a matter of law, that defendant's claim of title to the subject property cannot be superior to plaintiff's claim of title to the subject property. Forged papers cannot be made the basis of a recovery, either at law or in equity, against the supposed maker".  In our case, the altered/forged assignment cannot serve as the basis of a recovery of possession of the Baker home.

In *Stachnik v. Winkel*, 230 N.W.2d 529, 394 Mich. 375 (1975)*,* the plaintiffs purchased land from an older couple, saying that they were authorized to make the purchase on behalf of their employer.  After sellers issued a warranty deed to the employer upon learning of the fraud, the court denied plaintiffs' request for specific performance due to the clean hands doctrine.

A case much closer to home on the facts is a 6th Circuit Court of Appeals case involving a Michigan foreclosure.  *In re Sutter*, 665 F.3d 722 (6th Cir. 2012), deals with a forged mortgage (the victims signed a

document they were told was a different kind of document).  In that case, just as in our own, the lender filed a proof of claim that was based on a forged document.  *Sutter* ruled that those who acquire an interest under a forged instrument are in no better position as to title than if they had purchased with notice.  *Sutter* cited the Michigan Supreme Court in *Horvath v. National Mortgage Co.*213 N.W. 202, 202-203 (Mich. 1927), which held that under Michigan law, a forged mortgage is void *ab initio*.  After holding that there was no "distinction between the act of simulating a signature and procuring the signature [by trickery]," the Michigan Supreme Court in *Horvath* concluded that the deed in question was void.  The debtors filed an objection to the proof of claim and sought a judgment to extinguish and expunge all of the lender's claimed interest in the property.  They prevailed despite that the fact that they did not deny they voluntarily took out the loan.  The court further denied a request by the lender for the declaration of an equitable mortgage.

In our own case, the alterations made to the assignment of mortgage amount to a forgery by trickery as discussed in *Horvath*.  The trickery in this case  was aimed at the Bakers.  The executor of the assignment, Matt Favorite, signed one document…the one with 9-10 pieces of missing information.  Yet, the intent of RFC and Orlans, by having Orlans employees insert the additional information, was to deceive the world at large into believing that Matt Favorite signed the document, which contained both the original information as well as the subsequently added information.  Indeed, a reasonable observer, upon glimpsing the recorded assignment with the additional information, would understandably assume that the entire document contents were all contained in the document at the time Matt Favorite executed it and had it notarized.  The effect of the alteration was to forge Matt Favorite's signature onto those pieces of information which he never saw on the document at the time he signed it (because they did not exist).

Thus, the Bakers are justified in their reliance on Michigan case law that they stand an excellent chance of having the RFC assignment of mortgage and mortgage extinguished.  The success of the Bakers' case will yield, at a minimum, the full value of their home, which is estimated to be worth $525,000.00. The Settlement approved by the Bankruptcy Court is .065% of this amount.

In Summary, no Michigan court has found fraud where a homeowner challenged a foreclosure.  If such a

finding were made no court would then declare that the fraud could be overcome by a showing of prejudice. Such a ruling would fly against long established principles of equity, as a defrauder cannot be allowed to benefit from his wrongful conduct.  It is one thing to declare that a mere procedural defect in the foreclosure requires a showing of prejudice.  It is quite another thing to declare that in a foreclosure achieved through the alteration and forgery of the very document which transfers title to mortgagee, the homeowner must show prejudice.  In short, in every case of alleged fraud in the foreclosure proceedings, the homeowner has failed to meet the high standard of fraud required to set aside the foreclosure, or has not alleged the fraud with requisite specificity.  In our case, the fraud by RFC and Orlans is beyond dispute and verified by transcript.    As such, there can be no doubt that the Appellants /Debtors have a likelihood of success in the state courts.  Thus, the Order approving the Trustee's Settlement should not have been granted.

## 2. The danger that Appellants/Debtors will suffer irreparable injury if they are evicted from their home

At the current stage of this litigation in the Bankruptcy Court, it is illogical to remove Appellants/Debtors from their home if at the close of the bankruptcy litigation and appeal process they are granted a fee simple title to the Property with all of RFC's interests removed. The danger to Appellants/Debtors in this case is extreme, they will be removed from their home and lose all connection to the Property as the Bankruptcy Court has ordered them to surrender their home in 7 days.  Appellants/Debtors will be "on the streets" due to an invalid foreclosure sale.  Their six children, some of whom have never known another home, range in age from 5 to 22.  To throw these children, (several of whom are in school) out of their home before all relevant issues have been determined through the appeal process, all based on a fraudulent assignment of mortgage created by RFC and Orlans, is unspeakable.

There is no remedy at law for the Appellants/Debtors in this case. This litigation involves property rights that have no monetary value. As such, Appellants'/Debtors' need for a stay and temporary restraining order is immediate and banging the gong of justice with alacrity.

## 3. Appellants'/Debtors' risk of injury is greater than any risk to RFC

In the case at bar, there is no risk to RFC that approximates the risk to Appellants/Debtors.  If they are evicted they will lose all beneficial use of their rightful property.  By granting a stay and temporary restraining

order, this Court is merely preserving the status quo in this matter during the proceedings of the Bankruptcy

case and any appeals.  RFC will not lose any rights they have and in fact, if they are successful, will be in the

same place in this litigation as they were previously. Thus, RFC's rights will not be prejudiced at all.  However,

because RFC does not, in fact, have any rights or interest in Appellants'/Debtors' mortgage or property, as has

been shown through witness testimony in the 14A-3 District Court, it cannot suffer any harm from a stay and

temporary restraining order.  As such, a stay and temporary restraining order in this case has no bearing on any

harm to RFC whatsoever.

   The harm to Appellants/Debtors without a stay and temporary restraining order will be substantial.

They will no longer be the fee simple owners of their homestead property, and will be evicted while this matter

is still ongoing.   If Appellants/Debtors are successful in their appeals, RFC's assignment of mortgage will be

declared fraudulent and thus null and void, rendering the sheriff's sale void as well and restoring title to the

Appellants/Debtors.   As a Sheriff's Deed has been recorded on the Property, the rights of third parties could

also be affected.  A stay and temporary restraining order halting the foreclosure sale is the only remedy to

proscribe this confusion and chaos.

**4. The public interest would not be harmed but would be preserved by the issuance of a stay and
temporary restraining order**

   It is not in the public interest, while litigation is pending, for an alleged out of state lender to acquire the

title to property that it may have to disgorge and return to the previous owner at a future date. At this point, the

public interest is served by maintaining the status quo. Because in fact RFC has no right or interest in the Baker

mortgage or property,  none of its rights will be compromised or impaired by the issuance of a stay and

temporary restraining order.

   Furthermore, Orlans and RFC have conspired to create a forged document which was then used as the

basis to foreclose on the Baker property, and RFC now seeks possession of said property.  Once their

unconscionable scheme was revealed through witness testimony in the 14A-3 District Court, and on the brink of

receiving a devastating ruling against them, Orlans orchestrated the reopening of the Baker Bankruptcy case in

order to avoid civil, and possibly criminal, liability for their egregious and reprehensible conduct.  It is contrary

to public policy to aid these conspirators in their quest to forum shop and shield themselves from liability through the Bakers' own Bankruptcy case proceedings.

All Appellants/Debtors seek is to preserve the status quo while the Bankruptcy Court litigation and appeals are pending. By issuing a stay and temporary restraining order, this Court is not ruling in favor of Appellants/Debtors on the merits, but merely maintaining the position of the parties until the litigation has been resolved.

### III. CONCLUSION

In summary, the Settlement in this case is far from fair and equitable.  In addition, the Bankruptcy Trustee failed to prove his burden to the contrary in that he did not adequately address the four elements of the fair and equitable standard.  Furthermore, the Settlement includes transfer of the Appellants'/Debtors' home to a party who has not proven it has any interest in the subject mortgage and property.  RFC is thus without standing to participate in the Baker bankruptcy proceedings, and is not a party in interest.  Finally, the Appellants/ Debtors indeed have a likelihood of success on the merits in the state court proceedings because of the proven egregious nature of the fraud perpetrated by RFC and Orlans.  Such a fraud will no doubt meet the high standard required in Michigan to set aside a foreclosure.

**WHEREFORE**, Appellants/Debtors respectfully request that this honorable Court grant their Motion, to Stay the Bankruptcy Order entered on March 11, 2014, as well as the Order reinstating it entered on March 25, 2014, until all issues are fully litigated in the Bankruptcy Court and all Appeals on said issues are completed.  Furthermore, Appellants/Debtors respectfully request a temporary restraining order to prevent Appellee/ RFC and Trustee Douglass S. Ellmann from taking any action to remove Appellants/Debtors from their home.

Respectfully Submitted,

Dated:  April 14, 2014

/s/David S. Wilkinson
David S. Wilkinson (P65130)
Co-Counsel Appellants/Debtor(s)
23843 Joy Road
Dearborn Heights, MI  48127

(313) 724-5088
fregolaw@yahoo.com

Dated: April 14, 2014

By: /s/ Beatriz H. Coleman
Beatriz H. Coleman (P40188)
Co-Counsel for Appellants/Debtors
3662 Vorhies Rd.
Ann Arbor, MI 48105
bhcoleman@myexcel.com

**Certificate of Service**

I hereby certify that on April 14, 2014, the forgoing document was electronically filed with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants registered in this matter.

Respectfully Submitted,

Dated:  April 14, 2014

/s/David S. Wilkinson
David S. Wilkinson (P65130)
Attorney for Debtor(s)
23843 Joy Road
Dearborn Heights, MI  48127
(313) 724-5088
fregolaw@yahoo.com

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

County in which action arose _Washtenaw_

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Michael J. Baker and Suzie C. Baker, Appellants/Debtors

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff   _Washtenaw, MI_
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Beartriz H. Coleman (P40188), TILA Attorney Group, PLLC, 3662 Vorhies Road, Ann Arbor, MI 48105  734-429-1346  David S. Wilkiinson (P65130), Frego and Associates, 23843 Joy Road, Dearborn Heights, MI 48127 313-724-5088

Attorneys *(If Known)*

Thomas R. Morris (P39141), Deanna Swisher (P38341), I. W. Winsten (P30528)

| **II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)* | | **III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff* |
|---|---|---|

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☒ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☒ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | **PERSONAL INJURY** | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | ☐ 367 Health Care/ Pharmaceutical | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | Liability | Personal Injury | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Product Liability | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 345 Marine Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 890 Other Statutory Actions |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 891 Agricultural Acts |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | **IMMIGRATION** | ☐ 950 Constitutionality of State Statutes |
| | | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | |
| | | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding

☐ 2   Removed from State Court

☐ 3   Remanded from Appellate Court

☐ 4   Reinstated or Reopened

☐ 5   Transferred from Another District *(specify)*

☐ 6   Multidistrict Litigation

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Fed. R. Bankr. P 8007 and FRCP 65

Brief description of cause:
Motion for Stay and Temporary Restraining Order

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions):*

JUDGE   Hon. Thomas J. Tucker

DOCKET NUMBER   08-43175

DATE
April 14, 2014

SIGNATURE OF ATTORNEY OF RECORD
_David S. Wilkinson w/permission_

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.  Is this a case that has been previously dismissed?

☐ Yes
☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.  Other than stated above, are there any pending or previously
    discontinued or dismissed companion cases in this or any other
    court, including state court? (Companion cases are matters in which
    it appears substantially similar evidence will be offered or the same
    or related parties are present and the cases arise out of the same
    transaction or occurrence.)

☒ Yes
☐ No

If yes, give the following information:

Court: East Dist - Mich South   MI 22nd Circuit   MI 22nd Circuit   MI 14A-3 District

Case No.: 2:11-15169   09-336 CK   11-1260 CH   308-2351 LT

Judge: Hon David Lawson   Hon. T Connors   Hon David Swartz   Hon Simpson

Notes : emergency filing due to eviction order

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT**

INDEX OF EXHIBITS TO EMERGENCY MOTION FOR STAY AND TEMPORARY
RESTRAINING ORDER

A: 87-1, 87-2, EXH A: Transcript of State of Mich 14A-3, Oct 28, 2013 hearing

B: 87-2, Exh C: Baker assignment of mortgage as received by Orlans, prior to alteration

C: 87-2, Exh D: Baker assignment of mortgage as altered and recorded by Orlans

D: 72-3, Exh C: Affidavit of Suzie Baker, December 19, 2013

E: 111: Bankruptcy Order March 5, 2013

F: 116: Bankruptcy Order March 11, 2013

G: 136: Bankruptcy Order March 25, 2014

H: 79-3: Brief in Support of Trustee's Motion for Approval of Settlement and Order
Requiring Turnover of Property

I: 101: Reply Brief in Support of Trustee's Motion for Approval of Settlement and for
Order Requiring Turnover of Property

J: 123-1, Exh L: *Mitan v. Fed. Home Loan Mortg. Corp.,* 703 F.3d 949, 951 (6th
Cir.2012)

# EXHIBIT A

# COPY

1          STATE OF MICHIGAN

2       IN THE TRIAL COURT FOR THE COUNTY OF WASHTENAW

3   RESIDENTIAL FUNDING COMPANY, LLC,
                    Plaintiff,

4   -VS-                              Case No.: 08-3-C-235 LT

5   MICHAEL J. BAKER, SUZIE BAKER, and
    all other Occupants at 5142 North

6   Territorial Road, Dexter, MI 48130,
                    Defendants.

7   _____/

8             HEARING AND MOTION TO WITHDRAW
                    AND BENCH TRIAL

9

10      BEFORE THE HONORABLE J. CEDRIC SIMPSON, TRIAL COURT JUDGE

11      Ann Arbor, Michigan, Monday, October 28, 2013

    APPEARANCES:
12
    For the Plaintiff:        MS. DEANNA SWISHER, (P38341)
13                            313 South Washington Square
                              Lansing, MI  48933
14                            (517) 371-8136

15  For Orlans Law Firm:      MR. TIMOTHY B. MYERS, (P48152)
                              1650 West Big Beaver Road
16                            Troy, MI  48084
                              (248) 502-1362

17
    For Defendant:            MS. BEATRIZ H. COLEMAN, (P40188)
18                            9464 North Platt Road
                              Milan, MI  48160
19                            (734) 429-1346

20                            MS. SUSAN PAYNE WOODROW, (P29844)
                              3631 Dorothy Lane
21                            Waterford, MI  48329
                              (248) 623-1818

22
                              MR. GILBERT BORMAN, (P37642)
23                            30600 Telegraph Road, Suite 1200
                              Bingham Farms, MI  48025
24                            (248) 353-5555
    RECORDED &
25  TRANSCRIBED BY:           MS. JACQUELINE A. REED, (CER-0536)
                              Certified Electronic Reporter
                              (734) 973-4516

TABLE OF CONTENTS

WITNESSES:    PLAINTIFF:                                    PAGE:

PETER KNAPP

        Direct Examination by Ms. Swisher               155
        Cross-Examination by Ms. Woodrow                159


WITNESSES:    DEFENDANT:

RENEE HIVELEY

        Direct Examination by Ms. Woodrow                14
        Cross-Examination by Mr. Myers                   49
        Cross-Examination by Ms. Swisher                 54
        Redirect Examination by Ms. Woodrow              55
        No Recross-Examination by Mr. Myers              57
        Recross-Examination by Ms. Swisher               57
        No Recross-Examination by Mr. Myers              59
        Recross-Examination by Mr. Myers                 65
        Redirect Examination by Ms. Woodrow              66

BECKY ERTMAN

        Direct Examination by Ms. Woodrow                71
        Cross-Examination by Ms. Swisher                 86
        Cross-Examination by Mr. Myers                   86
        Recross-Examination by Ms. Swisher               93
        Redirect Examination by Ms. Woodrow

MELISSA HALL

        Direct Examination by Ms. Woodrow                98
        No Cross-Examination by Mr. Myers               102
        No Cross-Examination by Ms. Swisher             102


SUZIE BAKER

        Direct Examination by Ms. Woodrow               111
        Cross-Examination by Ms. Swisher                124
        Cross-Examination by Mr. Myers                  131

TABLE OF CONTENTS (CONTINUING

| EXHIBITS: | IDENTIFIED: | RECEIVED: |
|---|---|---|
| PX# 1 - Letter | 5 | |
| PX# 2 - Dept. of Licensing & Regulatory document | 5 | |
| PX# 3 - Dept. of Licensing & Regulatory document | 5 | |
| PX# 4 - Lender summary | 5 | |
| PX# 5 - Central Title | 5 | |
| PX# 6 - Waiver of escrow | 5 | |
| PX# 7 - Homeowner/fire insurance requirements | 5 | |
| PX# 8 - Insurance binder | 5 | |
| PX# 9 - Binder terms | 5 | |
| PX# 10 - USAA Casualty Insurance documents | 5 | |
| PX# 11 - Homecoming financial account details | 5 | |
| PX# 12 - Letter dated 10/16/06 | 5 | |
| PX# 13 - Email from Dexter Title | 5 | 131 |
| PX# 14 - Email dated 10/20/11 | 5 | |
| PX# 15 - Yahoo email | 5 | |
| PX# 16 - Washtenaw County case report copy | 6 | |
| PX# 17 - Promissory Note | 6 | |
| DX# A - Washtenaw County case report copy | 6 | |
| DX# B - Corporate resolution | 6 | |
| DX# C - Email | 6 | |
| DX# D - Clerk Register's Certified copy | 6 | 33 |

1

2

TABLE OF CONTENTS (CONTINUING)

| EXHIBITS: | | IDENTIFIED: | RECEIVED: |
|---|---|---|---|
| DX# | E - Copy of Corporation Assignment of Mortgage | 6 | |
| DX# | F - Assignment of Mortgage | 6 | 40 |
| DX# | G - Assignment of Mortgage | 6 | 40 |
| DX# | H - Email message | 6 | |
| DX# | I - Email message | 6 | |
| DX# | J - Assignment of Mortgage | 6 | 44 |
| DX# | K - Assignment of Mortgage | 6 | 44 |
| DX# | L - Assignment of Mortgage | 6 | |
| DX# | M - Assignment of Mortgage | 6 | |
| DX# | N - Assignment of Mortgage | 7 | 46 |
| DX# | O - Assignment of Mortgage | 7 | |
| DX# | P - Assignment of Mortgage | 7 | |
| DX# | Q - Assignment of Mortgage | 7 | 83 |
| DX# | R - Assignment of Mortgage | 7 | |
| DX# | S - Assignment of Mortgage | 7 | |
| DX# | T - Practice Master Snapshot | 7 | |
| DX# | U - Assignment of Mortgage | 7 | 85 |
| DX# | V - Assignment of Mortgage | 7 | |
| DX# | W - Sheriff's Deed | 7 | |
| DX# | X - Mortgage | 7 | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              Ann Arbor, Michigan 48107
 2              Monday, October 28, 2013 - 9:37 a.m.
 3              (At 9:37 a.m., PX# 1 marked - Letter)
 4              (At 9:38 a.m., PX# 2 marked - Department of
 5              Licensing and Regulatory Affairs document)
 6              (At 9:39 a.m., PX# 3 marked - Copy of Department of
 7              Licensing and Regulatory Affairs document)
 8              (At 9:41 a.m., PX# 4 marked - Lender summary)
 9              (At 9:42 a.m., PX# 5 marked - Central Title)
10              (At 9:43 a.m., PX# 6 marked - Waiver of escrow)
11              (At 9:44 a.m., PX# 7 marked - Homeowner/fire
12              insurance requirements)
13              (At 9:44 a.m., PX# 8 marked - Insurance binder)
14              (At 9:45 a.m., PX# 9 marked - Binder terms)
15              (At 9:346 a.m., PX# 10 marked - USAA Casualty
16              Insurance company documents)
17              (At 9:47 a.m., PX# 11 marked - Homecoming financial
18              account details)
19              (At 9:48 a.m., PX# 12 marked - Letter dated
20              10/16/06)
21              (At 9:48 a.m., PX# 13 marked - Email from Dexter
22              Title)
23              (At 9:49 a.m., PX# 14 marked - Email dated 10/20/11)
24              (At 9:50 a.m., PX# 15 marked - Yahoo email)
25
```

```
1          (At 9:51 a.m., PX# 16 marked - Washtenaw County case
2     report copy)
3          (At 9:52 a.m., PX# 17 marked - Promissory Note)
4          (At 9:54 a.m., DX# A marked - Washtenaw County case
5     report)
6          (At 9:55 a.m., DX# B marked - Corporate resolution)
7          (At 9:55 a.m., DX# C marked - Email)
8          (At 9:55 a.m., DX# D marked - Clerk Register's
9     Certified copy)
10          (At 9:56 a.m., DX# E marked - Copy of Corporation
11     Assignment of mortgage)
12          (At 9:56 a.m., DX# F marked - Assignment of
13     mortgage)
14          (At 9:57 a.m., DX# G marked - Assignment of
15     mortgage)
16          (At 9:57 a.m., DX# H marked - Email message)
17          (At 9:58 a.m., DX# I marked - Email message)
18          (At 9:58 a.m., DX# J marked - Assignment of
19     mortgage)
20          (At 9:58 a.m., DX# K marked - Assignment of
21     mortgage)
22          (At 10:00 a.m., DX# L marked - Assignment of
23     mortgage)
24          (At 10:00 a.m., DX# M marked - Assignment of
25     mortgage)
```

```
 1              (At 10:01 a.m., DX# N marked - Assignment of
 2         mortgage)
 3              (At 10:01 a.m., DX# O marked - Assignment of
 4         mortgage)
 5              (At 10:01 a.m., DX# P marked - Assignment of
 6         mortgage)
 7              (At 10:01 a.m., DX# Q marked - Assignment of
 8         mortgage)
 9              (At 10:02 a.m., DX# R marked - Assignment of
10         mortgage)
11              (At 10:02 a.m., DX# S marked - Assignment of
12         mortgage)
13              (At 10:02 a.m., DX# T marked - Practice master
14         snapshot)
15              (At 10:02 a.m., DX# U marked - Assignment of
16         mortgage)
17              (At 10:03 a.m., DX# V marked - Assignment of
18         mortgage)
19              (At 10:03 a.m., DX# W marked - Sheriff's deed)
20              (At 10:04 a.m., DX# X marked - Mortgage)
21              (At 10:04 a.m., brief pausing)
22              (At 10:13 a.m., above matter on record)
23              THE COURT: The Court calls the case of Residential
24         Funding versus Michael Baker and Suzie Baker.
25              Counsel, please state your appearances for the
```

1    record.

2               MS. SWISHER: Deanna Swisher on behalf of the

3    Plaintiff, Residential Funding.

4               MR. MYERS:  Timothy Myers appearing on behalf non-

5    party Orlans Associates, P.C.

6               MS. COLEMAN: Beatriz Coleman on behalf of the

7    Defendants, Your Honor.

8               MS. WOODROW: Susan Payne Woodrow on behalf of the

9    Defendants.

10              MR. BORMAN: Gilbert Borman on behalf of the

11   Defendants.

12              THE COURT: And, I believe, the first order of

13   business is--Mr. Borman, I believe, you have a motion for the

14   Court.

15              MR. BORMAN: Good morning.  Gilbert Borman, P37642.

16              Your Honor, now is the time and date set for my

17   Motion to Withdraw from this case.  I would state that I was

18   in a meeting afterwards of the last hearing--We decided we had

19   --three (3) attorneys was just too many to be working together

20   --and I was requested to withdraw as counsel--I filed my

21   motion.

22              I believe that my counsel--my client would suffer no

23   negative impact as a result of my withdrawal, as she has

24   excellent counsel for her.  And I do respectfully request this

25   Court to grant this motion.

```
 1                    THE COURT: Any response from the Plaintiff's side or
 2          Orlans?
 3                    MS. SWISHER: No, Your Honor.
 4                    MR. MYERS: No, Your Honor.
 5                    THE COURT: Any response from--
 6                    MS. COLEMAN: No, Your Honor.  We concur.
 7                    MS. WOODROW: No, Your Honor.
 8                    THE COURT: All right.  I'll grant your Motion to
 9          Withdraw--
10                    MR. BORMAN: Thank you, Your Honor.
11                    THE COURT: Do you have an Order?
12                    MR. BORMAN: May I approach?
13                    THE COURT: Yes.
14                    (At 10:15 a.m., brief pausing)
15                    THE COURT: All right.  We'll process it out for you.
16                    MR. BORMAN: Thank you--(INDISCERNIBLE)--
17                    THE COURT: Thank you.  You do the same.
18                    (At 10:15 a.m., brief pausing - continuing)
19                    THE COURT: Okay, folks.  Was there any other
20          preliminary matters?  I almost hate to ask the question, but
21          is (sic) there any other preliminary matters we need to take
22          care of before we begin?
23                    MS. SWISHER: No, Your Honor.
24                    THE COURT: Anything from Orlans?
25                    MR. MYERS: No, Your Honor.
```

1          THE COURT: Anything from Ms.--

2          MS. COLEMAN: I believe--I believe, Your Honor,

3     Plaintiff's have a Motion to Increase the Escrow.

4          MS. WOODROW: Yes, Your Honor--

5          THE COURT: My understanding is that was a request

6     that they wished to be heard after the hearing?

7          MS. SWISHER: That's correct, Your Honor.

8          MS. COLEMAN: Ah, okay.

9          MS. SWISHER: Yes. Thank you, Your Honor.

10         THE COURT: All right.  The Defendants may proceed.

11         MS. COLEMAN: Your Honor, as you know, we are here on

12    remand from the Twenty-second (22nd) Circuit Court, where the

13    Defendants filed an independent action against the Plaintiffs

14    and Orlans, pursuant to MCR 2.612(C)(3), based on newly

15    discovered evidence and fraud upon the Court.

16         Both of my opposing counsels have repeatedly stated

17    that Defendants were not able to point to a single Orlans

18    attorney for their allegations of fraud upon the Court.

19         However, no specific attorney need be named as it is

20    the systematic scheme of fraud of the Orlans' Law Firm,

21    itself, which perpetrated the fraud upon this Court.  And all

22    attorneys within that organization are, therefore, liable.

23         As far as the elements of fraud, we have Matley--B.

24    Matley (sic), Court of Appeals, 2000 case--Michigan Court of

25    Appeals, where it held that a fraud is to be perpetrated on a

1   court when some material fact is concealed from the court or

2   some material misrepresentation is made to the court.

3        Also, in Kiefer v Kiefer, 1995; Michigan Court of

4   Appeals case.  It stands for the proposition that fraud occurs

5   on the court when a party has set in motion some

6   unconscionable scheme calculated to interfere with impartial

7   adjudication.

8        We have, also, a Six (6) Circuit Court of Appeals

9   case that sets out five (5) elements of fraud upon the Court.

10   That is Demjanjuk v Petrovsky, and that is a 1993 case.  It

11   states that,

12        "Fraud upon the court consists of conduct on

13        the part of an officer of the court directed to the

14        judicial machinery itself, intent--which is

15        intentionally false and willfully blind (sic) to the

16        truth, or is reckless disregard for the truth.  That

17        is a positive averment or is a concealment when one

18        is under a duty to disclose and which deceives the

19        court."

20        The Defendants intend to show that a fraud was

21   perpetrated on this court, whether it is concealment of

22   material fact under Matley (sic); an unconscionable scheme

23   under Kiefer, or the five (5) elements of Demjanjuk.

24        At this time foreclosure--At the time of this

25   foreclosure, Orlans had in place a business model, which

1    systematically created fraudulent documents primarily assigned

2    with the mortgages for filing with the Register of Deeds in

3    various court systems.   The purpose of this system was to

4    collect debts through foreclosure.

5           In our case, specifically, Plaintiff and Orlans

6    conspired to create an assignment of mortgage, executed by

7    Matt Favorite, who was clearly not an authorized MERS

8    certifying officer.

9           Renee Hiveley altered said previously executed

10   assignment of mortgage on December second (2nd), 2006.   Orlans

11   then filed the assignment of mortgage with the Washtenaw

12   County Register of Deeds in order to foreclose on Defendant's

13   property on December seventh (7th), 2006.

14          Orlans then fraudulently created--Used a

15   fraudulently created assignment of mortgage to foreclose on

16   Defendant's property.   Without such fraudulent documents and

17   without Plaintiff's collusion with Orlans in aiding and

18   abetting in the creation, execution and alteration of

19   fraudulent--of the fraudulent assignment of mortgage (sic),

20   they would be unable to foreclose.

21          Finally, Orlans used the resulting wrongfully

22   obtained Sheriff's Deed, which was obtained with the use of

23   the fraudulent assignment of mortgage as the basis of its

24   eviction action in this court against the Defendants.

25          We will show through witness testimony that this

1    scheme by Orlans is long-standing, consistent, intentional,

2    and pervasive.  In other words, this was a habitual and

3    routine practice of this firm under MRE 406.  That is evidence

4    of the habit of a person of the routine practice of an

5    organization.

6         Respondents (sic) superior applies here.  The master

7    is responsible for the acts of his servants (sic).

8    Examination of the witnesses today will reveal that the

9    conduct of Orlans as an on-going--as an organization during

10   the creation and alteration of the subject assignment of

11   mortgage, was in conformity with the habits and routine

12   practices of Orlans' employees.  And that said employees were

13   or should have been under the supervision of Orlans' attorney.

14        My co-counsel will be questioning the witnesses,

15   Your Honor.

16        THE COURT: All right--Very good.  Any--I guess,

17   we'll do it in the form of an Opening Statement--Or was there

18   anything you'd like to say--?

19        MS. SWISHER: Your Honor, yes, Ms. Swisher on behalf

20   of the Plaintiff.  I would prefer to reserve my Opening

21   Statement for the presentation of my proofs.

22        THE COURT: Okay.  Anything from--

23        MR. MYERS: I--I would, also, appreciate the

24   opportunity to reserve my--my Opening.

25        THE COURT: All right--Very good.

```
 1                You may call your first witness.

 2                (At 10:20 a.m., brief pausing)

 3                MS. WOODROW: The Defendant would call Renee Hiveley.

 4                THE COURT: Ma'am, please come forward and be sworn.

 5                (At 10:21 a.m., brief pausing)

 6                THE BAILIFF: Raise your right hand.

 7                Do you solemnly swear or affirm to tell the truth,

 8        the whole truth, and nothing but the truth, so help you God?

 9                MS. HIVELEY:  I do.

10                THE BAILIFF: Have a seat.  State your first and last

11        name and spell them both for the record, please?

12                THE WITNESS: Renee Hiveley.  R-e-n-e-e; H-i-v-e-l-e-

13        y.

14                          RENEE HIVELEY

15                (At 10:21 a.m., called by Ms. Woodrow, as a hostile

16                witness, sworn by the Bailiff, testified as follows)

17                MS. WOODROW: Your Honor?

18                THE COURT: You--You may inquire.

19                MS. WOODROW: Thank you.  We'd like to call this

20        witness as a hostile witness under Rule 611.

21                THE COURT: All right--Very good.

22                          DIRECT EXAMINATION

23    BY MS. WOODROW:

24    Q    Ms. Hiveley, are you feeling okay today?

25    A    Yes.
```

```
 1   Q   Did you take any prescriptions or anything that would
 2       interfere with your testimony?
 3   A   No.
 4   Q   Very well.  Are you now employed?
 5   A   Yes.
 6   Q   And where are you employed now?
 7   A   I work at Saint John Macomb Hospital in the ER.  I'm an RN.
 8   Q   As an RN; did you say?
 9   A   Yes--Yes.
10   Q   Congratulations.
11   A   Thank you.
12   Q   Were you previously employed with the Orlans Law Firm?
13   A   Yes.  Well, I was actually an E-Title employee.
14   Q   An E-Title employee?
15   A   Yes.
16   Q   And did E-Title do work for Orlans?
17   A   Yes.
18   Q   And it was all in the same facility?
19   A   Yes.
20   Q   Same building?
21   A   Yes.
22   Q   Same floor?
23   A   No, not the same floor.
24   Q   So, was (sic)--E-Title have its' own floor or were offices
25       kind of scattered and mixed in with them?
```

```
1   A    It kind of got moved around a little bit.  But at one point, I
2        was downstairs; Orlans was upstairs.
3   Q    And did you go upstairs?
4            MR. MYERS: Your Honor, I'm going to object.  What
5        time period are we talking about?  The--The offices have moved
6        over the years--
7            THE COURT: Well--All right--
8            MR. MYERS: My understanding is we're here to talk--
9            THE COURT: If you'd like a clarification; that's
10       fine.
11  Q    (MS. WOODROW CONTINUING) And what time period was this?  Or
12       what--When did you work there for--When to when?
13  A    I haven't--Okay.  I started in November of 2006 and then I
14       worked there until--I think, in the office, it was 2010--Until
15       2010.  And then I had my daughter.  And then I started working
16       from home.  But by that time, it was--You know--It kind of
17       changed positions.
18  Q    Did you work five (5) days a week?
19  A    Up until probably--
20           MR. MYERS: Your Honor, I'm going to object, again.
21       I--I think that we're asking some vague and ambiguous
22       questions here of this witness.  We're--We're here to discuss
23       the--
24           THE COURT: Well, you can clarify that on Cross-
25       Examination, if you'd like, Counsel.  Objection is overruled.
```

```
 1          To ahead--

 2                   MS. WOODROW: Thank you, Your Honor.

 3    Q   (MS. WOODROW CONTINUING) Did you work a forty (40) hour week,

 4        roughly--

 5    A   I did, when I first started--

 6    Q   Prior to the birth of your child?  Let's confine it to before

 7        2010?

 8    A   Well, then about 2009, I started nursing school, so then I

 9        went down to part-time--You know what I mean?  So, up until--

10        From 2006 to 2009, I worked full time; forty (40) hours a

11        week.

12    Q   And what office did you work in?

13    A   I worked with E-Title--What do you mean, what office?

14    Q   I'm sorry.  What was the location?  What city?

15    A   In Troy.

16    Q   And the address?

17    A   1650, I believe--

18    Q   1650 Big Beaver--

19    A   --Beaver--Yeah, Big Beaver--

20    Q   --Road?

21    A   Yes.

22    Q   And when you worked with the office with Orlans, how many

23        offices did they have in--in--within the State of Michigan? If

24        you know?

25    A   Just the one (1), as far as I know.
```

```
 1   Q    Did they have offices in other states?

 2   A    No, not that I'm aware of.  I--Well, they had--

 3   Q    Massachusetts--

 4   A    Yeah--

 5   Q    Massachusetts?

 6   A    They had merged with--

 7   Q    Rhode Island?

 8   A    --I don't know about Rhode Island.

 9   Q    That was Orlans, Moran in Massachusetts?  Is that correct?

10   A    Yes--Yes.

11   Q    And what was your job title?

12   A    When I first started, it was Recording Specialist.  And then I

13        got changed to update--Like Title Updates--You know--I got

14        moved around a little bit (sic)--

15   Q    Recording Specialist--

16   A    Yes--

17   Q    --And then it became what now?

18   A    Update Specialist.

19   Q    Update Specialist.

20   A    For title work--

21   Q    Pardon?

22   A    For titles--Doing titles.

23   Q    Okay--For titles?

24   A    Yes.

25   Q    Now what were your duties as an Update Specialist?
```

```
 1   A   Basically, updating title work.  This was more on--I can't
 2       even remember exactly--Like on the closing side of--with E-
 3       Title, like--You know--new homes that were being bought, I
 4       guess--I don't even really remember, honestly.
 5   Q   In December 2006, were you an Update Specialist?
 6   A   No.  I was recording.  I did recording up until--When I worked
 7       there full time.  And then about 2009, that's when I kind of
 8       moved more into doing title work.
 9   Q   What was--All right--When--Did you work in a group--As a
10       Recording Specialist?
11   A   On--Well, there were two (2) of us--Two (2) Recording
12       Specialist.
13   Q   Who were--Who did you work with?
14   A   Becky Ertman.
15   Q   And who was your supervisor?
16   A   I'm--
17   Q   Let's--
18   A   --I think the first one was Joann Currier, was my first.
19   Q   And was she your supervisor in 2000--At the end--In the winter
20       of 2006?
21   A   Yes.
22   Q   Were you allowed to ask her questions about your work?
23   A   Yeah.
24   Q   Did you ask her questions about your work?
25   A   Ah, no; not really.  I--
```

```
 1  Q   Did she explain to you what your work duties were?
 2  A   Yeah.  I mean, she oversaw like title--I don't even remember--
 3      honestly, I don't remember.  But--Yeah--I mean I could ask her
 4      questions.  But mostly--You know--I would just ask Becky,
 5      because she trained me--you know--
 6  Q   She trained you?
 7  A   Yes.
 8  Q   Okay.  And did she ever correct what you were doing?
 9  A   Well, yeah.  If I was doing something wrong--Yeah.
10  Q   What kind of corrections would she make?
11  A   Well, just--you know--if we--Just our process.  Like if I
12      wasn't doing something right--'Oh, no, you can't do this;
13      you've got to do that.'  'Okay.'
14  Q   Did any--Any supervisor--Excuse me--Did any of the attorneys
15      ever supervise you?
16  A   No.
17  Q   Did you ever talk with any of the attorneys?
18  A   No.  I didn't really have a reason to.
19  Q   So--And you never had any questions of the attorneys?
20  A   No.
21  Q   And they never informed you that you were doing anything you
22      shouldn't be doing?
23  A   No.
24  Q   And Ms. Currier didn't ever inform you that there was anything
25      you shouldn't be doing?  Is that correct?
```

```
 1 | A    Right.

 2 | Q    Do you know Linda Orlans?

 3 | A    I know who she is; yes.

 4 | Q    Did she ever--Did you ever have any communication with her?

 5 | A    Ah, no.

 6 | Q    How about Joe Pascoe?

 7 | A    No.  Not--I never have to--You know what I mean?  Directly,

 8 |      like speak with him, I guess.

 9 | Q    On the--Would you tell me a little bit about the details of

10 |      your job when you were a Recording Specialist?

11 | A    Yeah.  We would get documents, such as assignment of

12 |      mortgages--You know--just--

13 | Q    Pardon me--Please speak up.  I have a hearing problem--

14 | A    (CONTINUING)--Okay--Sorry.  We would receive documents--All

15 |      kinds of documents--But--You know--Assignments (sic) of

16 |      mortgage, being one (1) of them.  And we would get them on our

17 |      desks in our 'To be recorded' bin.  We'd have to look at the

18 |      documents, verify that the information was correct on them.

19 |      And then send them off to the County to be recorded.  And if

20 |      things were rejected from the County, we would get them back.

21 |      You know--make whatever corrections we had to make and send

22 |      them back to the County.

23 | Q    How did the work get to your desk?  Do you know?

24 | A    Some of it came by mail and like--UPS.  And then some of it

25 |      came from--You know--internally, inside the office.
```

```
 1  Q    So, somehow, the desk would magically--The work would
 2       magically--
 3  A    Right--
 4  Q    --appear in your inbox--
 5  A    Yes--
 6  Q    --on your desk?  Is that it?
 7  A    Huh huh.
 8  Q    Okay, great.  How--Did it--Did it arrive at your desk
 9       frequently during the day?  Or just early in the morning?
10  A    Usually, early morning.  But, sometimes, throughout the day. I
11       mean, usually, by--I'd say, say by lunchtime, we would have
12       like everything--You know what I mean?--for the day.
13  Q    And when you say, everything for the day, how much would
14       everything be?  Can you maybe show me with your hands?
15  A    I mean--
16  Q    How much of a stack of work you would have--
17  A    --I mean, sometimes, it'd be a lot.  Like probably--You know,
18       this much--
19  Q    Would that--Okay--Would that be about three inches (3")?
20       Maybe, two (2)--Would it be appropriate to two (2) reams of
21       paper?
22  A    Ah, it just depended on the day; it varied.  Do you know what
23       I mean?  But yeah.  Let's just say a ream of paper; maybe--You
24       know--
25  Q    A ream of paper every day--
```

```
 1   A    Yeah--

 2   Q    --And a ream has about five hundred (500) sheets; doesn't it?

 3   A    I'm not sure.  I have no idea.

 4   Q    And what type of documents did you say they were?

 5   A    Well, varying.  You know, it could be assignments of mortgages

 6        and--

 7   Q    Of what now?

 8   A    Assignments of mortgages--

 9   Q    Okay--

10   A    --title--like closing documents--like on the E-Title side of

11        things; as far as, you know, mortgages or--You know of people

12        that were re-purchasing homes.  I can't remember--(PAUSING)--

13        Quit Claim Deeds; sometimes.

14   Q    How many--

15   A    Anything that needed to go to the County to be recorded.

16   Q    Okay.  And what proportion of them do you believe were

17        assignments of mortgage?

18   A    Ah--(PAUSING)--Probably, about fifty percent (50%) of it.

19   Q    Okay.  And the documents were they always for Michigan?

20   A    Ah, yeah--

21   Q    If you--

22   A    Yes--

23   Q    --Okay--

24   A    Yes.

25   Q    Various counties within the state?
```

1   A   Yes--Yes.

2   Q   Did your other co-workers work for other parts of the country?

3       For Massachusetts or Rhode Island or New Hampshire?

4   A   Ah--(PAUSING)--

5   Q   If you know.

6   A   --Like--Maybe on like--the title side of things, but not for

7       recording.

8   Q   As far as you know?

9   A   Yeah--Yeah.

10  Q   Did you believe that these assignments of mortgage affected an

11      interest in real property?

12  A   Affected an interest in real property?  What do you--What do

13      you mean?

14  Q   Well, did they deal with real--The assignment of mortgage--

15      Isn't it true that it was a document related to real property?

16  A   Yeah--Yeah--Yes.

17  Q   And did the assignment of mortgage have something to do with

18      the interest in the real property?

19  A   Yes--Yes.

20  Q   And during the years that you worked there, no one ever told

21      you, you were doing anything improper?

22  A   No.

23  Q   And no one ever told you, you were doing anything illegal?

24  A   No.

25  Q   What is a Scribner's error?

1       MR. MYERS: Your Honor, I would object to this. I

2   don't think that this witness has been qualified to--to answer

3   this particular question.  Nothing that she's answered so far

4   regarding job description would lead to--would lead anyone to

5   indicate that she had anything to do with any Scribner's

6   error.

7       THE COURT: Overruled.  If she can answer it; she can

8   answer it.

9   A   (CONTINUING)--What?  You're asking--

10  Q   (MS. WOODROW CONTINUING) Do you know what a Scribner--Do you

11      know what a Scribner's error is?

12  A   I remember the name, but honestly I don't remember--

13  Q   So, you never executed any Scribner's error as docket (sic)--?

14  A   Executed?  No.  I--

15  Q   Okay--

16  A   --I never executed anything--

17  Q   That's great.  Now on your desk you had a lot of usual items,

18      tools, and so forth?  Is that correct?

19  A   Yeah--Yes.

20  Q   You had staplers, scissors, staple remover--

21  A   Yes--

22  Q   --phone--

23  A   Yes.

24  Q   Did you have a computer?

25  A   Yes.

```
 1   Q   And how did you use your computer during the day?
 2   A   Well, on--On our system that we use--
 3   Q   Huh huh--
 4   A   --do you know what I mean?  Just--I would use it to look at
 5       the information, such as recording, Liber and Page--You know--
 6       of the--Details of the mortgage.  You know what I mean?  To
 7       make sure that it match up to the document we had--make sure
 8       it matched--You know--Like doing that kind of stuff.
 9       Verifying like the system to the document--To make sure it was
10       correct--
11   Q   So--All right--Let's say you had an assignment of mortgage on
12       your desk--
13   A   Yes--
14   Q   --Then you would look on the computer?
15   A   Huh huh.
16   Q   And tell me--Explain a little more?
17   A   Look on the computer, as far as, looking to see the Liber and
18       Page of the original--you know--mortgage--the recording
19       information.
20   Q   So, you accessed the County's Register Recording--
21   A   No.  This information would be in our system.
22   Q   So, you don't know how that information got there?
23   A   It was another department, probably that put all of that stuff
24       in.  And then when we got it to our desk, we just look and
25       say, okay, Liber and Page is correct.  Or if it's--you know--
```

```
 1        blank, we fill it in and send it out.
 2    Q   Okay.  So--
 3    A   (CONTINUING)--And verify the information.
 4    Q   What other information do you verify other than the Liber and
 5        Page?
 6    A   The name like of the mortgagors; make sure that's on the--you
 7        know--
 8    Q   Okay--
 9    A   --matches what we have in the system to the document.  And
10        then, also, like for an assignment, we would look at who the
11        company was--Like the first company and then who they're
12        assigning it to--You know what I mean?  Like the first and
13        then the--
14    Q   Okay.  The from and to--?
15    A   --the assignee and the assignor--
16    Q   --so to speak?
17    A   Yeah--Yeah--
18    Q   Okay.  And that would be information that was put on your
19        computer in the system--
20    A   Yes--
21    Q   --somehow that you could access--
22    A   Yes--
23    Q   --of someone else within either--
24    A   Right--
25    Q   --Within some of--one (1) of the Orlans' companies?
```

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | Did you use--Did you have any other system of verification? |
| 3 | | Anything else you would verify? |
| 4 | A | No.  I mean we did have access to like County of Deeds (sic)-- |
| 5 | Q | To what? |
| 6 | A | For--Like the County of Register-- |
| 7 | Q | Huh huh-- |
| 8 | A | --I'm sorry--Register of Deeds for--like--counties, if we |
| 9 | | needed to--you know--look anything else up or whatever--like-- |
| 10 | | you know-- |
| 11 | Q | But there was-- |
| 12 | A | --we did have access to those.  But-- |
| 13 | Q | Okay.  Was there anything else that you had access to in your |
| 14 | | computer that you could use to verify information-- |
| 15 | A | No-- |
| 16 | Q | --on these assignments of mortgages? |
| 17 | A | No. |
| 18 | Q | Okay--Very well.  Did you have stamps and stamp pads? |
| 19 | A | Yes.  But I'm trying to remember.  I think they were for--I |
| 20 | | think we-- |
| 21 | Q | Did you have a 'Receive' stamp? |
| 22 | A | (NO AUDIBLE RESPONSE) |
| 23 | Q | A date stamp? |
| 24 | A | Honestly, I don't remember that. |
| 25 | Q | Did you have any title agency stamp? |

```
 1  A   Yes.
 2  Q   Did you have an address stamp for Mortgage Electronic
 3      Registration Systems?
 4  A   Yes--Yeap.
 5  Q   And did that--Had the address?  Is that correct?
 6  A   I believe so--I think so.
 7  Q   Can you think of any other stamps that you might have had?
 8  A   Ah, honestly, I can't.  Like I--Like I said this was--
 9  Q   Pardon?
10  A   Like this was probably five (5) years ago--How long was it
11      now?
12  Q   I know it was a long time ago--
13  A   Or four (4) years ago--
14  Q   --I appreciate your help.  Are you--Were you with Mortgage
15      Electronic Registration Systems, Inc. (sic)?
16  A   I know the name.
17  Q   Okay.  You don't know what it does?
18  A   No.
19  Q   They call it MERS?  You've heard that?  You've heard them
20      refer to it as MERS?
21  A   Just the name.  I don't like know it's for them.
22  Q   Did you have any--Did you have any stickers on your desk?
23  A   Yeah.  We would have like stickers with our E-Title--like our
24      address.
25  Q   Okay.  Anything else on the desk that you used to work with
```

```
 1        these assignments of mortgage?  Other than pen--
 2  A     No.
 3  Q     Okay--
 4  A     That's about it.
 5  Q     All right.  Do you know who Marshall Isaacs is?
 6  A     Yes.
 7  Q     And do you know whether or not he's the vice president of
 8        MERS?
 9  A     I--Not that I'm aware of.
10  Q     Okay--
11                 THE COURT REPORTER: Could I get the spelling--
12                 THE COURT: Counsel, could you spell that name for
13        the recorder?
14                 MS. WOODROW: Yes, I can.  M-a-r-s-h-a-l-l; I-s-a-a-
15        c-s.
16  Q     (MS. WOODROW CONTINUING) Did you have a list of MERS personnel
17        on your computer?
18  A     No.
19  Q     On your desk?
20  A     No.
21  Q     Anywhere in your work area?
22  A     No.
23  Q     Did you--Was--Did one exist, as far as you knew?
24  A     Not that--Not that I'm aware of.
25  Q     I'm going to show you Proposed Exhibit D.
```

```
 1              MS. WOODROW: I have some copies.  Your Honor, would
 2       you like a copy to look at?
 3              THE COURT: Yes, I would.
 4              MS. WOODROW: Thank you.
 5              THE COURT: Have the parties gone through regarding
 6       the admission of any exhibits and stipulation to those
 7       exhibits or not?
 8              MS. SWISHER: No, Your Honor, we have not--
 9              THE COURT: All right.
10              (At 10:37 a.m., brief pausing)
11   Q   (MS. WOODROW CONTINUING) Do you--Please--Would you describe
12       that document to me?
13   A   It's an assignment of mortgage.  It looks like it's been
14       recorded.
15   Q   Is it certified--A certified copy?
16   A   Ah--
17   Q   On the top, is there a certification--
18   A   Yes--Yes--
19   Q   Okay.  Very well.  And do you know who prepared that document?
20   A   I don't know who prepared it.  But I know that we recorded
21       this and--
22   Q   Why don't you review the document a little closer.
23   A   It was signed by Matt Favorite.
24   Q   Okay.  And look at page two (2).  Perhaps, that would assist
25       you.
```

```
 1  A    This--Are you referring to the legal description--

 2  Q    Yes?  Is that--

 3  A    --That was printed by me.

 4  Q    So, that means that that was a docu--one (1) of the documents

 5       that crossed your desk?

 6  A    Yes.

 7  Q    Okay--Very well.

 8              MS. WOODROW: Your Honor, at this time, I would--

 9       Because it's a certified copy--I would like to move for its

10       admission?

11              THE COURT: Any objection of Voir Dire?

12              MR. MYERS: Your Honor, I'm not sure what she means

13       by certified copy.  It's a--

14              MS. WOODROW: Not in your copy.  She's has a

15       certified copy--

16              THE WITNESS: I have a certified--

17              MS. WOODROW: Would you like to view the certified--

18              THE COURT REPORTER: You have to stay behind the--

19              MR. MYERS: No.  I--I've--

20              MS. WOODROW: --Would you like to view the certified

21       copy, Mr. Myers?

22              MS. SWISHER: I would like to know how this exhibit

23       is marked.  Mine has a couple of different letters on it--

24              MS. WOODROW: Oh, I made a mistake on the--

25              THE COURT: I--She introduced it as Exhibit D.
```

```
 1                 MS. WOODROW: D, as in dog.
 2                 MS. SWISHER: Thank you. No objection, Judge.
 3                 THE COURT: Any no objection?
 4                 MR. MYERS: No objection--
 5                 THE COURT: All right.  No objection.  Exhibit D is
 6       admitted.
 7                 (At 10:39 a.m., DX# D - received into evidence)
 8   Q   (MS. WOODROW CONTINUING) And this--I've given you a document
 9       that in the bottom right hand corner is marked as Exhibit F.
10       Oh, I'm sorry.  I will give you the document--
11                 (At 10:39 a.m., brief pausing)
12   Q   (MS. WOODROW CONTINUING) Ms. Hiveley--
13   A   Yes?
14   Q   --if you take a look at this document, you'll see that it has
15       a lot of the information on the original that I showed you
16       from the certified copy.  But I placed dots--boxes around
17       various information and they have been marked with little
18       numbers in the upper left hand corner or the right hand
19       corner.  And the top one is number one (1) and that is the--
20       That--Would you describe that--that information?
21   A   That's--That's from the County.  That's like their stamp of--
22       you know--the recording.
23   Q   And it shows when it was recorded?
24   A   Yes--
25   Q   Is that correct?
```

```
 1  A   Yes.

 2  Q   And when was it recorded?

 3  A   December seven (7), 2006.

 4  Q   Now box--Let's move on to box two (2).  Box two (2)--What does

 5      box two (2) represent?

 6  A   That is our E-Title sticker, saying that when it's recorded to

 7      send it back to our office, so we can make our copies--you

 8      know--

 9  Q   So, you put that sticker on top of something.  Do you remember

10      what it was that you put that sticker on top of?

11  A   I don't remember exactly.  But it's probably the address to

12      the company that prepared this.

13  Q   To the company that prepared the source document?

14  A   Yeah--Yeah.

15  Q   Okay.  All right.  Now--And you put that on the--Now how about

16      that two, oh, seven, six, oh, three, six (2076036)?

17  A   That was our file number.

18  Q   All right.  Let's move on to box three (3).  Can you tell us

19      what box three (3) represents?

20  A   That is our E-Title stamp.

21  Q   How about--Now what about box four (4)?

22  A   That is the MERS address.

23  Q   Okay.  And you put that--All of this stuff that we've been

24      talking about--All of this information--

25  A   Yeah--
```

```
 1   Q   --Other than the recording in the top, box one (1), you placed
 2       on the document--?
 3   A   Yes--
 4   Q   --Is that correct?
 5   A   Yeap--Huh huh.
 6   Q   When you received the document, was it already notarized and
 7       signed?
 8   A   Ah, yes--yeap.
 9   Q   Okay.  Now let's move down to box five (5).  Would you read
10       the information in that box?
11   A   Yeap.  The--It says--Well, it's listing the mortgagors.  And
12       on the document, itself, they had 'Suzie Baker', but again, we
13       have to make sure it matches exactly how the mortgage is--you
14       know--was originally recorded.  So, we have to make sure it
15       matches exactly; otherwise, the County will kick it back.  So,
16       I added in a star, because it should have said, Michael J.
17       Baker and Suzie Baker, husband and wife.  So, that's what I--I
18       added in the, "Michael J. Baker" and then the "husband and
19       wife."
20   Q   And now let's move on to box six (6)?
21   A   Huh huh?
22   Q   Did you--Can you explain what that box contained?
23   A   That is MERS.  Mortgage Electronic Registration Systems.
24   Q   Was that a stamp?
25   A   Yes.
```

```
 1   Q   And did you put that in?

 2   A   Yeap.

 3   Q   Okay.  Now box seven (7) has four, five, six, three (4563)?

 4   A   Yeap.  That is the Liber of the original mortgage.

 5   Q   And the box eight (8)?

 6   A   That's the page--seventy-two (72) of the recording, again.

 7   Q   And box nine (9)?

 8   A   That was the day that the mortgage was recorded.

 9   Q   And you added all of this information yourself?

10   A   Yes--

11   Q   Is that correct?

12   A   Yes.

13   Q   Now--How about--Let's go to box two 92) in that little twelve

14       (12) in the circle?

15   A   I don't know what that is.  That's probably from the County.

16   Q   Okay.  Now--And who signed this document?

17   A   Matt Favorite.

18   Q   And what is--Who is Matt Favorite?  What does the document say

19       he is?

20   A   It says, 'Vice President'.

21   Q   And Vice President of whom--

22   A   Of MERS.

23   Q   And when did he sign this?

24   A   It looks like November tenth (10th) of oh six ('06).

25   Q   And is that--Would you assume that that was the date it was
```

1      notarized?

2  A   Ah, yes.  It looks like it--Yeah.

3  Q   Now let's turn to page two (2).  Would you describe page two

4      (2) for me?

5  A   This is our legal description.

6  Q   And who printed it?

7  A   I printed that.

8  Q   And what date did you print it?

9  A   December six (6).

10  Q   So, that's close to a month--About three (3) weeks after it

11      was notarized?  Is that correct?

12  A   Yes.

13  Q   So, when he notarized it, it didn't have any of this

14      information in it?

15  A   No.  And, again, the County wouldn't record it if it didn't

16      have.

17  Q   Now when you printed it, would you read who you printed this

18      for?  On page--That page two (2)?

19  A   Who I printed for--Orlans--

20  Q   Yes?

21  A   --Orlans.

22  Q   It says, Orlans Associates, P.C.?  Is that correct?

23  A   Yes--Yeap.

24  Q   On the bottom--What's--What's on the bottom that says file and

25      there's a date?  Can you explain that to me?

```
 1   A   I have no idea.  That's like printing--I don't know if the
 2       printer does that.
 3   Q   That just happened--It would show up all the time?
 4   A   I guess so; yes.
 5   Q   Okay--Very well--
 6                MS. WOODROW: --Just a moment.
 7                (At 10:45 a.m., brief pausing)
 8   Q   (MS. WOODROW CONTINUING) And does--
 9                THE COURT: Counsel, before you continue, do you have
10       an additional copy of D and F, by any chance?
11                MS. WOODROW: Of D and F?
12                THE COURT: Yes?  Or of F?
13                MS. WOODROW: F?  I believe we do--
14                THE COURT: Or D?  If you--If you have an additional
15       copy--I know that you've been submitting copies to the counsel
16       and the Court, I need one (1) over into the jury box, if you
17       could--
18                MS. WOODROW: Over there?
19                THE COURT: Yes?
20                MS. WOODROW: For the--
21                THE COURT: Yes, please.
22                (At 10:45 a.m., brief pausing)
23                THE COURT: Thank you.  Go ahead, you may continue.
24                MS. WOODROW: Thank you.  I'll try--We'll try and
25       give them copies, as well, Your Honor--
```

```
 1              THE COURT: All right--Very good.
 2   Q   (MS. WOODROW CONTINUING) All right.  And how did you know to
 3       add all of this?
 4   A   Because this is (sic) things that are required from the
 5       County.  They won't record a document without a legal
 6       description of the property and so forth.
 7   Q   And who told you to do this?  To add this?
 8   A   This is how I was trained.
 9   Q   By Ms. Currier?
10   A   No.  By Ms. Ertman.
11   Q   Ms. Ertman trained you to do that--
12   A   Yes--
13   Q   --And was Ms. Ertman your lead worker?
14   A   We worked side by side, but it was only her and I in
15       Recording.  So, yeah--When I came in, she was--You know--who
16       trained me.
17   Q   And your supervisor never told you not to add material to an
18       already executed assignment of mortgage?
19   A   No.
20   Q   And none of the lawyers ever came and told you not to add
21       information to an already executed assignment of mortgage?
22   A   No.
23   Q   Okay--Very well.
24              (At 10:47 a.m., brief pausing)
25   Q   (MS. WOODROW CONTINUING) I have just handed you Exhibit G--
```

```
 1  A    Huh huh--

 2  Q    And I tried to take out all of the information that looks like

 3       it was added--

 4  A    Huh huh--

 5  Q    --Now would it be--Isn't it true that this is a good

 6       representation of the assignment of mortgage as it appeared on

 7       your desk, with the exception that it had something company

 8       LLC, and information there?

 9  A    Huh huh--Yes.

10  Q    Okay--

11              MS. WOODROW: --All right.  Your Honor, at this time,

12       I would move for the admission of Exhibits F and G.

13              THE COURT: Any objection of Voir Dire?

14              MR. MYERS: No, Your Honor.

15              MS. SWISHER: No, Your Honor.

16              THE COURT: All right.  Exhibits F and G are

17       admitted.

18              (At 10:48 a.m., DX# F - received into evidence)

19              (At 10:48 a.m., DX# G - received into evidence)

20              (At 10:48 a.m., brief pausing)

21              (At 10:49 a.m., above matter continuing)

22              THE COURT: Ma'am, do you have--Do you have the

23       original of F and G before you?

24              (NO AUDIBLE RESPONSE)

25              THE COURT: F--F and G?
```

```
1                THE WITNESS: Yes--

2                THE COURT: Thank you.

3                MS. WOODROW: Sorry, Your Honor.

4                THE COURT: No, it's okay.

5    Q    (MS. WOODROW CONTINUING) At this time, I'm showing you what

6         has been marked as Exhibit J.  Do you recognize that document?

7    A    I--I recognize it as an assignment of mortgage; yes.

8    Q    Did you look at page two (2)?

9    A    Okay?

10   Q    And on page two (2), does that have your name on it?

11   A    Yes.

12   Q    And when was that--Who signed that document?

13   A    Matt Favorite.

14   Q    When did he sign it?

15   A    October twenty-seventh (27th), 2006.

16   Q    And when did you add the description--the legal description?

17   A    February nineteenth (19th), 2007.

18                MR. MYERS: Your Honor, I'm going to object to this

19        document.  It's irrelevant based upon our property address

20        here.  The property address that's listed on this Exhibit is--

21        is not part of what is before this Court on remand.  And I

22        don't believe that this is proper questioning to get into with

23        this particular witness.

24                MS. SWISHER: The same objection, Your Honor.  We do

25        have the transcript of the Circuit Court proceeding, if the
```

1    Court would like to review it with regards to the reason for

2    this remand.  And this is clearly far beyond any scope.

3              THE COURT: Well, except that as I understood, at

4    least, from the statement that was made.  There is, at least,

5    an allegation of a systematic process.  I'm presuming that

6    this is what the J goes to--

7              MS. WOODROW: Yes, Your Honor--

8              THE COURT: --And that--

9              MR. MYERS: Your Honor, I don't object--

10             THE COURT: --And that the property, which is the

11   subject matter of this hearing is the part of that systematic

12   approach.

13             Yes, Counsel?

14             MR. MYERS: Your Honor, I--I accept the fact that

15   what Ms. Hiveley has testified to was the process that was in

16   place in 2000--at the end of 2006, when the assignment of

17   mortgage, that is at issue in this case, was executed.

18             If we continue to go down this line, I believe, that

19   this is duplicative.  There is no objection to this.  The--The

20   process and procedure that's been tested (sic) to--That's been

21   --that's been testified about, Orlans owns that.  That was the

22   process that was in place at that time.

23             So, as far as, continuing to go through additional

24   assignments of mortgage, just so that Ms. Hiveley and,

25   perhaps, other witnesses can come up and say, 'yes, we did it

1    on this one.' 'Yes, we did it on this one.' 'Yes, we did it on

2    this one.'  That's duplicative.  It's, in my opinion, an undue

3    waste (sic) of the Court's time.  And it's--It's not relevant

4    to this particular proceeding, given the fact that there is no

5    dispute from Orlans that that is what the process was at that

6    time.

7              THE COURT: Objection is overruled.  You may

8    continue.

9              MS. WOODROW: Thank you, Your Honor.

10   Q   (MS. WOODROW CONTINUING) I was going to go through the entire

11   document.  But, maybe, I can cut through a little bit.  I will

12   just give you Exhibit K.

13             (At 10:52 a.m., Ms. Woodrow hands witness Exhibit K)

14             MS. WOODROW: I'll try and show it to--

15   (INDISCERNIBLE)--Your Honor.

16             (At 10:53 a.m., brief pausing - continuing)

17             MS. WOODROW: Perhaps, I can make it even briefer,

18   Your Honor.

19   Q   (MS. WOODROW CONTINUING)--Will you take a look at Exhibit K?

20   A   Yes.

21   Q   You see all of the boxes like we had before in the other--

22   A   Yes--

23   Q   --assignment?  Isn't it true that all of the information in

24   those boxes, you added?

25   A   Well, besides the first (1st) box, which is--you know--from the

1   County--

2   Q   Which is--Yes--

3   A   --their recording information.

4   Q   So, it's a similar document--

5   A   Yes--

6   Q   --Is that correct?

7   A   Yes.

8           MS. WOODROW: At this time I would move for the

9   admission of just exhibit--Well, Exhibit J and K, Your Honor?

10          MR. MYERS: On behalf of Orlans, Your Honor, I object

11  to both of these documents for the reasons I've previously set

12  forth.

13          MS. SWISHER: Same objections, Your Honor.

14          THE COURT: Over--Okay--And I've overruled those

15  objections.  Exhibits J and K are admitted.

16          (At 10:53 a.m., DX# J - received into evidence)

17          (At 10:53 a.m., DX# K - received into evidence)

18          MS. WOODROW: Thank you, Your Honor.

19          And in the interest of not--Because I'm sure that

20  everybody can understand where I'm going with this.  I'm just

21  going to skip right to Exhibit N.

22          (At 10:54 a.m., Ms. Woodrow approached the witness)

23          THE COURT: That was N, as in Nancy?

24          MS. WOODROW: N, as in Nancy.  Yes, Your Honor.

25  Q   (MS. WOODROW CONTINUING) And would you describe Exhibit N?

```
 1  A    It's another assignment of mortgage.

 2  Q    And with the same little boxes?  Is that correct?

 3  A    Yes.

 4  Q    What is the date that that document was notarized?

 5  A    November twenty-eighth (28th), 2006.

 6  Q    And if you'll look on page two (2).  When did you alter that

 7       document?

 8            MR. MYERS: Your--Your Honor, I object to the--to the

 9       mischaracterization here.  There has been no testimony from

10       this witness that she had altered this document in any way.

11  Q    (MS. WOODROW CONTINUING) You did add all of that information--

12            THE COURT: Well, to the extent that the word--The

13       use of the word 'altered' is--

14            THE WITNESS: Yeah--

15            THE COURT: --a pejorative--The Court will sustain

16       the objection.  But if you can (sic) rephrase your question?

17            MS. WOODROW: Certainly.

18  Q    (MS. WOODROW CONTINUING) At what--And at what--On what date

19       did you add all of the information to the document?

20  A    December fourth (4th), 2006.

21            MS. WOODROW: Your Honor, I would like to move for

22       the admission of Exhibit N?

23            THE COURT: Any objection of Voir Dire?

24            MR. MYERS: Your Honor, I do object to this based

25       upon the same reasons that were--that were argued to the Court
```

```
 1       for Exhibits J and--
 2                   THE COURT: K.
 3                   MR. MYERS: --K.
 4                   THE COURT: All right--
 5                   MS. SWISHER: I'm objecting, as well, Your Honor.
 6                   THE COURT: All right.  And Exhibit N is admitted.
 7                   (At 10:55 a.m., DX# N - received into evidence)
 8                   MS. WOODROW: Thank you, Your Honor.
 9    Q  (MS. WOODROW CONTINUING) The document that was received by the
10       assignment of mortgage was an executed assigned (sic) and
11       executed document?  Is that correct?
12    A  Yes.
13    Q  When you filed it with the Register of Deeds, it was totally
14       different?  Isn't that correct?
15    A  Well, yeah, we added in the necessary information; yes.
16    Q  But you added information?
17    A  Yes.
18    Q  When he signed it, it didn't have that information?
19    A  No.  It did not.
20    Q  Do you not consider that that was an alteration?
21    A  I don't consider it an alteration, because we didn't change
22       information that they had on there; we added--We filled in
23       blanks that they leave blank, purposely, for us to fill in.
24    Q  So you could have added the judge's name as a grantor on that
25       document?  Isn't that correct?
```

```
 1  A    I could.  But that it would not be recorded--The County would
 2       kick it back to us.
 3  Q    How do you know they would kick it back?  Do they know--How do
 4       they know it's a correct document?
 5  A    Because when the County gets it, they verify the original
 6       recording information on the original mortgage.  And if it
 7       doesn't match, they kick it back.  We have to correct it and
 8       send it back.  And they go back and forth, back and forth,
 9       until we got (sic) the information correct on it.
10  Q    Okay.  (PAUSING)--You said that the Register of Deeds checks
11       your documents for accuracy--
12  A    Huh huh.
13  Q    How do you know that?
14  A    Because if things were not correct, they would send it back to
15       us.
16  Q    So, you had some documents sent back?
17  A    Yes--
18  Q    Is that your--
19  A    Yes--
20  Q    --testimony?
21  A    Yes.
22  Q    For what kind of corrections?
23  A    Well, say, if the Liber and Page were wrong.  Say if--You know
24       --we had the wrong recording information, they would send it
25       back--
```

```
 1   Q   Liber and Page?

 2   A   Yes.

 3   Q   Those were ever a document--So, is it your testimony, then,

 4       that the Register of Deed--Register of Deeds--

 5   A   Huh huh--

 6   Q   --would send documents back to you--Register of Deeds--Excuse

 7       me--

 8   A   Yes--

 9   Q   --would send documents back to you because the Liber and Page

10       was (sic) wrong?

11   A   Yes.  Not--But not just Liber and Page.  If any of the

12       original--The facts of the mortgage were incorrect or if we

13       didn't have a legal description attached, they would send it

14       back.  Those are all things that were required to--for the

15       County to record a document relating to property.

16   Q   Thank you.

17               MS. WOODROW: I have nothing further with this

18       witness.

19               THE COURT: Do you have Exhibit N?

20               THE WITNESS: Yes.

21               THE COURT: Thank you.

22               (At 10:59 a.m., brief pausing)

23               THE COURT: You may Cross-Examine.

24               MR. MYERS: Good morning, Ms. Hiveley.

25               THE WITNESS: Good morning.
```

```
 1                        CROSS-EXAMINATION
 2   BY MR. MYERS:
 3   Q    My name is Tim Myers.  Have we met before?
 4   A    Yes, we have.
 5   Q    Have we worked together before?
 6   A    Not directly; no.
 7   Q    Not directly.  It's because I'm an Orlans' employee and you're
 8        an E-Title employee?
 9   A    Correct.
10   Q    You were an E-Title from 2006 to 2010?
11   A    Yes.
12   Q    Okay.  And--And during that--
13   A    I still continued to work for E-Title, but from home.
14        Probably, up until like 2012, maybe.  But I--I worked from--I
15        stopped working in the office in 2010.
16   Q    Are you aware that Michigan has a Recording Act that addresses
17        recording requirements?
18   A    Ah, no, I'm not aware--But I'm not surprised.
19   Q    And you've given testimony this morning that the Register of
20        Deeds would only accept certain documents--
21   A    Yes--
22   Q    And other documents would be kicked back?
23   A    Yes.
24   Q    Did that come from personal experience?  Or did that come from
25        somebody at E-Title who--who would tell what would be kicked
```

```
 1      back?

 2   A  Well, it came from--you know--me being trained.  Becky would

 3      say--When Becky Ertman trained me, she let me know we have to

 4      have this and this--you know--filled in; otherwise, the County

 5      will not record it.  And we did have things that were sent

 6      back from time to time, if we were missing information or if

 7      the information was incorrect.

 8   Q  And if the information that was missing or that was incorrect

 9      that would be sent back, was that one hundred percent (100%)

10      of the time due to something that you had done?

11   A  Ah--(PAUSING)--Probably, not a hundred percent (100%) of the

12      time.  Or it might have been something that we missed like--

13      you know--Or if we wrote a--Maybe a Liber, like it was one (1)

14      number off or something--You know what I mean?  Like, maybe,

15      it wasn't always something we did or--You know what I mean?

16   Q  What would have happened if--if an assignment of mortgage

17      would have been submitted to a Register of Deeds that didn't

18      have a Liber and Page number?

19   A  It would be kicked back.

20   Q  And then what happens?

21   A  Because the County is not going to fill it in themselves.

22      They won't do anything to it.

23   Q  Okay.  The--The exhibits that you were--You were given F, J,

24      K, and N--

25   A  Huh huh.
```

```
 1  Q   Do you have those handy?  Do you have those in front of you
 2      right there?
 3              THE COURT: Why don't I just give those all back to
 4      you--?
 5  A   (CONTINUING)--Yes.
 6  Q   (MR. MYERS CONTINUING) Can you spread them out on the--on the
 7      table there for you--in front of you?  Would you agree that
 8      the items that they are boxed on each one of those Exhibits--
 9      Are boxed around the same type of information?
10  A   Yes.
11  Q   Did you understand what I mean by boxed around the same type
12      of information?
13  A   Yes.
14  Q   And we'll start with, for example, the Liber and Page number--
15  A   Okay--
16  Q   --Does those uniformly through all of the Exhibits that--that
17      have been introduced today--have Liber and Page numbers that
18      have been added?
19  A   Yes.
20  Q   Had those Liber and Page numbers not been added, what would
21      have happened to the assignment of mortgage?
22  A   It would be rejected from the--the Register of Deeds and they
23      would send it back to us.
24  Q   Okay.  The--The legal description is also attached to each one
25      of these documents--
```

```
 1  A    Yes--

 2  Q    --Correct?

 3  A    Yes.

 4  Q    What would have happened if the legal description was not

 5       attached?

 6  A    They would--Again, the County would reject it and send it

 7       back.

 8  Q    On any of the documents that are in front of you, did you

 9       change the name of the grantor?

10  A    No.

11  Q    Did you change the name of the grantee?

12  A    No.

13  Q    We go to Exhibit F, and that's the assignment of mortgage

14       that's at issue in this case--

15  A    Huh huh--

16  Q    --Does the assignment--Does Exhibit F contain the property

17       address for this particular property?

18  A    Yes--Yes, it does.

19  Q    Does it contain the mortgage amount?

20  A    Yes.

21  Q    Does it contain the date that the mortgage was executed?

22  A    Yes.

23  Q    And that was already preprinted on the form when it hit your

24       desk?

25  A    Yes.
```

1   Q   Does it have the borrower's name?

2   A   It has one (1) of the borrower's names.

3   Q   Do you know why you would have stamped the E-Title P.O. Box

4       below where it says, 'When recorded return to'?

5   A   Yeah.  That was what our sticker--We did that so when the

6       County was done recording it, they would send it back to us,

7       so we can make our copies and keep it for our records, and

8       then it gets--You know--It would then get mailed to--I can't

9       remember who--One (1) of those--One (1) of the companies.

10  Q   Are you aware if there is a legal requirement that every

11      document that's submitted to the Register of Deeds can--

12      requires that an address be listed so the document can be

13      returned?

14  A   Yes.

15  Q   How did you come about learning that information?

16  A   Probably, just--Probably, I was trained.  Just being told that

17      --Because the County has to send it somewhere when they're

18      done recording it.

19  Q   Would you characterize what happened by you to these documents

20      to be a clerical addition or to be an alteration?

21  A   Like adding in the Liber and Page--

22  Q   Yes--?

23  A   --Is that what you mean to say?  Adding in the information?

24      Yeah.  Or stamping--you know--addresses and--you know--stuff

25      like that.

1  Q   Do you consider that to be a clerical addition--

2  A   Oh--

3  Q   --or do you consider that to be an alteration to the document?

4  A   I consider it to be an addition.  I mean, because it's not

5      like I was crossing out things or whiting out information--you

6      know.

7  Q   Why wouldn't you have crossed out something or whited out any

8      information?

9  A   Because that would probably be illegal.

10 Q   Did anyone at E-Title or Orlans ever tell you to cross out or

11     white out any information?

12 A   No.

13 Q   As we sit here today, do you think that you've done anything

14     wrong by what you did to these documents?

15 A   No, I do not.

16          MR. MYERS: Thank you, Your Honor.  I don't have any

17     more questions at this time.

18          MS. SWISHER: Thank you, Your Honor.

19          (At 11:05 a.m., brief pausing)

20          MS. SWISHER: Good morning, Ms. Hiveley.

21          THE WITNESS: Good morning.

22                    CROSS-EXAMINATION

23 BY MS. SWISHER:

24 Q   If you would take a look at Exhibit D.  You've already

25     testified with regards to the information that you added.  Did

```
 1        you add any information that you knew to be false?
 2   A    No.
 3                MS. SWISHER: Thank you.
 4                THE COURT: Do you have any additional questions of
 5        this witness?
 6                MS. WOODROW: Yes.  Just a few, Your Honor.
 7                     REDIRECT EXAMINATION
 8   BY MS. WOODROW:
 9   Q    Was that document--The original document, it was sworn to as
10        being correct?  Is that correct?  When it was notarized?
11   A    I'm sorry?  Which one (1)?  What are you saying?
12   Q    The original document that you received in your in basket
13        before you added--
14   A    Yes--
15   Q    --all of the information?  It was sworn to--
16   A    Meaning--
17   Q    --Is that correct?
18   A    --Meaning it was notarized.
19   Q    It was notarized?
20   A    Correct.
21   Q    And does it say sworn?
22   A    Ah, probably.  Like in the little thing?
23   Q    In the Notary box?
24   A    Yeah.
25   Q    And when you recorded it, it was not what it was sworn to?
```

```
 1       Isn't that correct?
 2   A   Well, correct; yeah.  There were blanks.
 3   Q   Why didn't you just send the documents back to Matt Favorite
 4       to sign a corrected copy?
 5   A   Because that is not how we did it.  They send it to us--
 6   Q   That is not how you did it--?
 7   A   Right.
 8   Q   Instead you took a document that was sworn and you added all
 9       kinds of information--
10   A   Correct--
11   Q   --So, it was no longer the document that was sworn--
12           MR. MYERS: Your Honor, I'm going to object--
13   Q   (MS. WOODROW CONTINUING) --Isn't that correct?
14           MR. MYERS: --as to the characterization that this is
15       a--That the information had been sworn to as accurate.
16           THE COURT: You raised it, Counsel.  Objection is
17       overruled.  Go ahead.  You may continue.
18   Q   (MS. WOODROW CONTINUING) Isn't that correct?
19   A   That is correct.
20   Q   And didn't you make a statement--Isn't it true that you made a
21       statement that you were duly an employee of Orlans Law
22       Associates and, also, of E-Title?
23   A   I was an employee of E-Title.  That was who I was employed by.
24   Q   And who did you speak to before the hearing today?
25   A   Before today?
```

```
 1  Q    Huh huh?

 2  A    Nobody.

 3  Q    You didn't speak to Mr. Myers?

 4  A    No.

 5  Q    Okay.

 6            MS. WOODROW: I've nothing further, Your Honor.

 7            THE COURT: All right.  Any questions based upon

 8       that?

 9            MR. MYERS: I don't have anything further, Your

10       Honor.

11            MS. SWISHER: Just one (1), Your Honor.

12                    RECROSS-EXAMINATION

13  BY MS. SWISHER:

14  Q    Ms. Hiveley, Exhibit D, you testified that there was something

15       that was sworn.  Do you see the word 'sworn' anywhere on this

16       Exhibit--?

17  A    That's why I was trying to look real quick at it.  (PAUSING)--

18       Humm--Humm, it doesn't say 'sworn'; no.

19            MS. SWISHER: Thank you.

20            THE COURT: The Court does have some questions.

21            And let's just take Exhibit D, since it's--When you

22       testified--And correct me if I'm wrong, Ma'am.  You testified

23       that you received these documents--they would be in the in

24       box?

25            THE WITNESS: Yes.
```

```
 1            THE COURT: Okay.  You don't know where they came
 2   from?  Is--Would that be fair to say?  I mean--
 3            THE WITNESS: Well, I do know like some of them would
 4   come in the mail, like through UPS, we'd get everyday--
 5            THE COURT: Okay--
 6            THE WITNESS: And then some came like internally--you
 7   know--like from Orlans--You know what I mean?
 8            THE COURT: Okay.  The ones that would come by mail,
 9   did they have the envelope attached?
10            THE WITNESS: I think they usually came UPS--You know
11   --in a package--So, no.  There wouldn't be an envelope.  Like
12   --It would just be like--You know--assignments--Maybe, like a
13   few assignments in a package.  Do you know what I mean?  Like
14   in an UPS envelope.
15            THE COURT: Okay--
16            THE WITNESS: Yes--
17            THE COURT: But would they come from Minnesota?  Do
18   you know?
19            THE WITNESS: I don't know--
20            THE COURT: Do you know?  Do you recall?
21            THE WITNESS: I mean I don't know--
22            THE COURT: You don't know?  Okay.  That--That's
23   fair.
24            (At 11:09 a.m., long pausing)
25            THE COURT: All right.  There's no--The Court doesn't
```

```
 1      have any further questions.

 2                  Is there questions from any counsel present based

 3      upon the Court's questions?

 4                  MS. SWISHER: No, Your Honor.

 5                  MR. MYERS: I do have a couple of questions, Your

 6      Honor--

 7                  THE COURT: All right.  Go ahead--

 8                  MR. MYERS: --Just maybe for clarification purposes.

 9                          RECROSS-EXAMINATION

10   BY MR. MYERS:

11   Q    Ms. Hiveley, is E-Title set up in such a way that there are

12        various departments?

13   A    Yes.

14   Q    What was the scope of your job description?

15   A    As a Recording Specialist, basically, just recording anything

16        that had to be sent--You know--To be recorded, pertaining to,

17        whether it be like from the--You know--foreclosure side of

18        things or from--You know--New mortgages being--Like through

19        the title side of things.  Just recording documents was my--

20   Q    Let's--Let's just focus on the 2006 time period if you can--

21   A    All right--

22   Q    --I appreciate the fact that it was seven (7) or so years ago.

23   A    Huh huh.

24   Q    If--If you remember the business model of E-Title at that

25        time?  Was that a--Was that a model where people had a whole
```

```
 1        lot of different responsibilities?  Or did it focus just on
 2        one (1)--One (1) group of people just doing a job?
 3   A    Yeah--Yeah.  One (1) group of people--You know--Like say this
 4        department--this was--You know--This was their job to do.
 5        This department had this to do--You know what I mean?  Like--
 6   Q    In law school we'd refer to that as--as making a widget.
 7        Where everyone would make their own particular thing.  Was it
 8        analogous, perhaps, to a--to an auto assembly line?  Where one
 9        (1)--one (1) section of a department would do something and
10        then that would move on to the next section--
11   A    Yeah--
12   Q    Or was it--Or was it set up differently?
13   A    I think it was kind of like that, where like an assembly--
14        Maybe, like where we would--Yeah, like an assembly.  However,
15        you said it.
16   Q    So, you would rely upon people in another department or in
17        another section of another department--
18   A    Yeah--
19   Q    --to bring you those particular assignments?
20   A    Yes.
21   Q    And then once you were done with it, your task ended and it
22        would move onto--to another department or another section of a
23        department?
24   A    Well, once we were done with it, we would send them off at the
25        end of the day--You know--a UPS, to be recorded.  And then--
```

```
 1        Yeah--And then once the County sent them back, basically, it
 2        came to like the mailroom and then they would do whatever they
 3        did with our recorded--you know--copies and stuff.
 4   Q    But you would have nothing to do with it after it was out of
 5        your possession and control?
 6   A    Right.
 7   Q    And until it hit your desk--I think was the testimony that you
 8        had given earlier--
 9   A    Yes--
10   Q    --You didn't have anything to do with it prior to that?
11   A    No.
12            MR. MYERS: Your Honor, I don't have any more
13        questions.  I--I believe, perhaps, that would help clarify
14        where I felt you might have been going with some of your
15        questions.  But that's all I have at this point.
16            THE COURT: Well, I have another question--
17            THE WITNESS: Okay.
18            THE COURT: Do you have D in front of you?
19            (NO AUDIBLE RESPONSE)
20            THE COURT: Exhibit D?
21            THE WITNESS: Yes.
22            THE COURT: When--And I believe, actually, it might
23        be in Exhibit F--If I'm--If I can find mine--Let me just--Okay
24        --Where the box is--Okay, let's go to Exhibit F--
25            THE WITNESS: Okay--
```

1           THE COURT: --because that has the boxes on it--

2           THE WITNESS: Okay.

3           THE COURT: Box five (5).  That was information that

4     was added?

5           THE WITNESS: Yes--

6           THE COURT: Afterwards?

7           THE WITNESS: Yeap.

8           THE COURT: Who put the star in there?

9           THE WITNESS: I did.

10          THE COURT: Okay--

11          THE WITNESS: Yeap.

12          THE COURT: Maybe, you can answer this and maybe you

13    can't.  How do you know when you added that information, that

14    it was all of the interests that they intended to transfer? Do

15    you understand what I mean by that?

16          THE WITNESS: Ask--What--No?  Say that, again?

17          THE COURT: All right.  Where you put the star--

18          THE WITNESS: Huh huh?

19          THE COURT: --Is that the--You're saying that that's

20    the mortgage--Is that a factual statement that you're making--

21          THE WITNESS: Yes--

22          THE COURT: --Or a statement regarding the transfer?

23          THE WITNESS: It's a factual--

24          THE COURT: --Do you know what I mean--?

25          THE WITNESS: --statement, because on the original

1    mortgage, it probably said, Michael J. Baker and Suzie Baker,

2    husband and wife.  So, that's why I put the star to add the

3    'Michael J. Baker and--First, before the 'Suzie Baker'--And

4    then it should say, 'husband and wife.'  So, that's how the

5    original mortgage was written.

6                THE COURT: All right.  I'm a person for words.   So--

7                THE WITNESS: Okay--

8                THE COURT: --When you said it, 'probably said'--?

9                THE WITNESS: Huh huh?

10               THE COURT: --Explain to me how you would know that

11   that's what it said?

12               THE WITNESS: Because, again, in our system--In our

13   computer system, it would already have all of the information

14   in there and I can verify, okay, the mortgagors were this--You

15   know--The mortgage read this.  The Liber and Page was this.

16   So, I mean, I don't remember, specifically, what this

17   particular mortgage, but since I wrote it that way, I'm

18   guessing that that is how--

19               THE COURT: Okay--

20               THE WITNESS: --the original mortgage was written.

21   Do you know what I mean?

22               THE COURT: All right.  And--I'm just trying to think

23   --Somewhere on here I thought I saw a mortgage number or

24   something on here.  (PAUSING)--

25               THE WITNESS: What were you talking--?

1          THE COURT: (CONTINUING)--When you would go into your

2     system--?

3          THE WITNESS: Huh huh?

4          THE COURT: --How would you know what to look at in

5     your system to make sure that you had the right--

6          THE WITNESS: Well--

7          THE COURT: --document?

8          THE WITNESS: --if you're referring to like a

9     mortgage number, you might have been thinking of our file

10    number that's on the top--The two, oh, seven, six, oh, three,

11    six (2076036).  So, I would go into our file in the--in

12    Practice Master, which was our system, and one of the--You

13    know--screens in there, it would have like the original facts

14    of the mortgage--You know?  Again, the mortgagor, the Liber

15    and Page, the day it was recorded.  And then, also, like

16    assignee or an assignor information.  And that's how--On that

17    screen--I would look and say, okay, this--You know--It's

18    supposed to say this.  It's supposed to--You know--That's

19    what's supposed to be in these blanks, or whatever.

20         THE COURT: Okay.  This information that you're

21    looking at, you don't know where that came from?  I think you

22    said Practice Master--?

23         THE WITNESS: Well, it was another department that

24    would have all of that information already entered.

25         THE COURT: All right.  (PAUSING)--

```
 1                    (At 11:16 a.m., brief pausing)

 2                    (At 11:17 a.m., above matter continuing)

 3              THE COURT: Okay.  No further questions.  Any--Again,

 4         any questions based upon the Court's questions?

 5              MR. MYERS: I do, Your Honor.

 6                         RECROSS-EXAMINATION

 7   BY MR. MYERS:

 8   Q    The information that would have been entered by another

 9        department.  Do you have any knowledge as to where that

10        information would come from?

11   A    Ah--(PAUSING)--It'd be like the assignment department--I don't

12        know.

13   Q    Within the system--When you pull this up--

14   A    Huh huh?

15   Q    --Would you have had access to the recorded mortgage?

16   A    Yes.  I believe we do have copies.  That--In the system, there

17        would be copies.  Usually, there would be copies of the

18        original recorded mortgage.

19   Q    And part of the process, when you would check the computer

20        system, did you rely upon the information that had been

21        inputted by another department?

22   A    Yes.

23   Q    So, you weren't just manufacturing or making up the--the

24        information that you were--

25   A    Right--
```

```
 1   Q    --that you were putting on the document?

 2   A    Right--

 3               MR. MYERS: Okay.  Your Honor, I don't have anything

 4        further.

 5               THE COURT: Let me just ask you this.

 6               THE WITNESS: Huh huh?

 7               THE COURT: Did you ever ask yourself the question,

 8        why wasn't this information filled in before it was signed?

 9               THE WITNESS: I--

10               THE COURT: I mean, even in your head?  Did you

11        ever--

12               THE WITNESS: No.  I guess I just assumed like they

13        were just lazy and didn't want to fill it in; I don't know.

14               THE COURT: All right.  Anything else from either

15        counsel?

16               MS. WOODROW: Yes.  Just a couple of questions.

17                      REDIRECT EXAMINATION

18   BY MS. WOODROW:

19   Q    On the Exhibit, you said you entered the file number on top of

20        the E-Title stamp?

21   A    Yeah, the sticker--Yeah.

22   Q    And whose file number was that?

23   A    That is Orlans' file number.

24   Q    Orlans' Law Firm?

25   A    Yeah.
```

```
 1   Q   And the title work that you printed out has Orlans Associates,
 2       also?
 3   A   Yeah--
 4   Q   Isn't that correct?
 5   A   Yeah.
 6   Q   So that was--
 7   A   Right.  You're talking about the legal description; you mean?
 8   Q   Yes?
 9   A   Yes.
10   Q   As Orlans Associates?
11   A   Yes--
12   Q   Is that correct?
13   A   Yes--Huh huh.
14               THE COURT: How--I don't mean to interrupt--How did
15       you get that file number?
16               THE WITNESS: Because that is to their--That's their
17       Practice Master--Their system.  Ah--
18               THE COURT: Their--Whose system?
19               THE WITNESS: Orlans--Sorry.  Orlans--
20   Q   (MS. WOODROW CONTINUING) Law Firm?
21   A   Yes.
22               THE COURT: Okay--All right--
23   Q   (MS. WOODROW CONTINUING) So, they're intertwined?
24   A   Well, that's their system.  And since--
25   Q   So, you used their--The Orlans Associates, P.C. system to
```

67

```
 1        prepare these--
 2   A    Yes--
 3   Q    --documents?
 4   A    Yes.  I had access to their system--
 5   Q    --and to change them to the file?
 6   A    Yes.
 7   Q    Why didn't you change the document and send it back to Mr.
 8        Favorite to resign correctly--As a corrected document?
 9   A    That wasn't the process.
10             MS. WOODROW: Thank you.
11             THE WITNESS: You're welcome.
12             THE COURT: Anything else?
13             MR. MYERS: Nothing further.
14             MS. SWISHER: Nothing further, Judge.
15             THE COURT: Ma'am, I'm sure you're happy about this.
16        You may step down--
17             THE WITNESS: Okay--
18             THE COURT: --as soon as you hand me all of those--
19             (At 11:20 a.m., witness handed the Court all of the
20             documents)
21             (At 11:20 a.m., witness excused)
22             THE COURT: You may call your next witness.
23             (NO AUDIBLE RESPONSES)
24             MS. WOODROW: Oh, I'm sorry.  I'll call Rebecca
25        Ertman.  Thank you, Your Honor.
```

1    THE COURT: All right.  Is she present?

2    MS. WOODROW: Becky Graham (sic)--I believe--Ertman.

3    MS. ERTMAN:  That is not my name.

4    THE COURT: What's your name?

5    MS. ERTMAN:  Becky--

6    MS. WOODROW: Becky?  I'm sorry--

7    THE COURT: All right.

8    MR. MYERS: Your Honor, as a procedural matter, this

9    is a witness who's testifying--testifying by subpoena.  She

10   has not received the witness fee to appear.

11   THE COURT: All right.

12   MS. WOODROW: That will be taken care of.

13   (At 11:20 a.m., brief pausing)

14   THE COURT: Well, I guess, what is--It bothers me,

15   Counsel, if you knew that, why didn't you inform counsel, so

16   that could be taken care of.

17   How much is the witness fee that you need to pay

18   her?  Because from a technical standpoint, she has to be paid

19   prior to her testifying.

20   MS. COLEMAN: It would have been eleven dollars

21   ($11.00), plus the travel.

22   (At 11:21 a.m., brief pausing)

23   MS. WOODROW: Ms. Ertman, how far did you come?

24   MS. ERTMAN:  I came from Sterling Heights and--

25   (INDISCERNIBLE--NOT NEAR MICROPHONE--SPEAKING FROM BACK OF

```
 1      COURTROOM)

 2              MS. WOODROW: Do you think ten dollars ($10.00) will

 3      cover your mileage?

 4              MS. ERTMAN:  It depends on how much the mileage rate

 5      is--(INDISCERNIBLE--NOT NEAR MICROPHONE)--

 6              THE COURT: All right.  Look, I don't mean to hold

 7      things up, but you have to be paid prior to that.  So--You

 8      know, folks, I don't know--Look, before you write that out--

 9      Before we get an objection as to the amount--Somebody figure

10      out how much it is.  The Court is going to take a brief

11      recess.  Figure out what it is.  Get her a check--

12              MS. COLEMAN: Thank you, Your Honor.

13              MS. WOODROW: Thank you, Your Honor.

14              THE COURT: Let's get that done.  The Court is going

15      to stand in recess.

16              THE BAILIFF: All rise.

17              (At 11:22 a.m., above matter recessed)

18              (At 11:38 above matter resumed)

19              THE BAILIFF: All rise.  Court is back in session.

20      You may be seated.

21              THE COURT: I'm assuming that we have all of the

22      payment and everything taken care of?

23              (UNIDENTIFIED VOICE):  Yes Sir.

24              THE COURT: All right.  Ma'am, please come forward

25      and be sworn.
```

```
 1                    THE BAILIFF: Do you solemnly swear or affirm to tell
 2        the truth, the whole truth, and nothing but the truth, so help
 3        you God?
 4                    MS. ERTMAN:  I do.
 5                    THE BAILIFF: Please have a seat. State your first
 6        and last name and spell them both for the record, please?
 7                    THE WITNESS: Becky Ertman, B-e-c-k-y; E-r-t-m-a-n.
 8                              BECKY ERTMAN
 9                    (At 11:38 a.m., called as a hostile witness by Ms.
10                    Woodrow and sworn by the Bailiff and testified as
11                    follows)
12                    THE COURT: You may inquire, Counsel.
13                    MS. WOODROW: Thank you, Your Honor.
14                    Again, I'll call her as a hostile witness.
15                              DIRECT EXAMINATION
16   BY MS. WOODROW:
17   Q    Are you feeling okay?
18   A    Yes.
19   Q    And did you take any prescriptions or have any conditions that
20        are good (sic)--
21   A    No--
22   Q    --that will interfere with your testimony?
23   A    No.
24   Q    Good.  You're employed with Orlans?
25   A    No.
```

1   Q   You were--Who are you employed with?

2   A   Who was I employed with?

3   Q   Yes?

4   A   E-Title.

5   Q   And are you now currently employed with E-Title?

6   A   No.  I'm employed with Ready Docks.

7   Q   With what?

8   A   Ready Docks.

9   Q   Ready Docks.  All right.  Well, how about in 2006 and '07?

10  A   I was employed with E-Title.

11  Q   Okay.  And at 1650 Big Beaver in Troy?

12  A   No.  In 2006, we were still on Rochester Court.

13  Q   And did you move from Rochester Court (sic)?

14  A   Two thousand seven (2007).

15  Q   And E-Title was in the same building as Orlans Associates,

16      P.C.?

17  A   Not at that time; no.

18  Q   Where was Orlans Associates, P.C.?

19  A   Across the street.

20  Q   And when did you merge?  When did the two (2) firms,

21      physically?

22  A   Well, they were. And then we got too big and then they moved

23      across the street.  And then we merged back when we moved into

24      the building on 1650.

25  Q   And when did you move into the building at 1650?

```
 1  A    I believe, 2007?

 2  Q    Do you know for sure or are you just guessing--

 3  A    No, I do not--No.  I do not know for sure.

 4  Q    So, it could have been in the fall of 2000--It could have been

 5       in 2006?

 6  A    No.  In 2007?

 7  Q    No.  Two thousand six (2006)?

 8  A    No.  It could not have been 2006.  I know it was after 2006.

 9  Q    How do you know that?

10  A    I just know that.  I know that it was either 2007 or 2008.

11  Q    You have no--nothing other than just--You have no event that

12       you can point to tell you when it was?

13  A    Event of Renee Hiveley starting me training her.  It was in

14       the building that was on Rochester Court.  And I know that was

15       in 2006.

16  Q    Okay.  And the--All right.  You trained her.  What did you

17       train her to do?

18  A    I trained her to be a Recording Specialist.

19  Q    Pardon?

20  A    To be a Recording Specialist.

21  Q    Okay.  And tell me what--What did her when you trained her?

22  A    I told her we get the documents from various places.  We

23       verify that the information is correct on the documents by

24       looking in our system, which is Practice Master--

25  Q    Is what now?
```

```
 1   A    Practice Master.

 2   Q    Okay.

 3   A    (CONTINUING)--And making--And verifying that the information

 4        on the document matched what was in Practice Master, which--

 5        And that you may find that the legal description was either on

 6        the document or added to the document before we sent it for

 7        recording.

 8   Q    The legal description?

 9   A    Correct.

10   Q    Did you tell her to add names?

11   A    If they were missing; yes.

12   Q    Who trained you?

13   A    It was Rebecca Truitt (sic).

14   Q    Is she a lawyer?

15   A    No.

16   Q    Now the system you use, Practice Master.  Can you--What do you

17        know about Practice Master?

18   A    It's a case file system.  All of our files were put into that

19        system--all of the information--

20   Q    All of our files were put into that system?

21   A    All of Orlans' files were put into that system.

22   Q    Orlans Associates, P.C.?

23   A    Correct--

24   Q    Is that correct?

25   A    Yes.
```

74

```
 1   Q    Then the number that we've referred to--I can show you the
 2        document if you need it--But I think it was two, oh, six, six,
 3        three, six--Two, oh, seven, six, three, six (207636)?  That
 4        file number would have been an Orlans' Law Firm legal file
 5        number?
 6   A    Correct.
 7   Q    And who assigns the file number?  If you know?
 8   A    I do not know.
 9   Q    Do you know when it's assigned?
10   A    I believe when the file is opened.
11   Q    So, basically, your testimony is that the assignments would
12        come in, they would have--they would be very--Have just basic
13        information.  Be signed and notarized and then you would--you
14        would train Ms. Hiveley--And you would do the--You would do
15        this yourself?  And whatever you felt was necessary?  Is that
16        correct?
17   A    No--
18             MR. MYERS:  Your Honor, I object to the question.
19        That is all over the place.  She's--
20             THE COURT:  I'll sustain--
21             MS. WOODROW:  Okay.  I'll restate it--
22             THE COURT:  --I'll sustain the objection.  Rephrase
23        it.
24             MS. WOODROW:  Yes.  Thank you.
25   Q    (MS. WOODROW CONTINUING) You received a document that was
```

```
 1        basically barren of information--An assignment of mortgage? Is
 2        that correct?
 3   A    Correct.
 4   Q    And you would--You would add information that you felt was
 5        necessary to complete the document?
 6   A    No, not that I felt.  What was required by the County--
 7   Q    How do you know what was required by the County?
 8   A    There was a list of the recording requirements I was given
 9        when I started doing the job--
10   Q    And an attorney gave you that list?
11   A    No.
12   Q    Who gave you that list?
13   A    Rebecca Truitt (sic).
14   Q    Do you--
15   A    (CONTINUING)--That list is also on County websites--
16   Q    --Do you know where Rebecca Truitt (sic) got that list?
17   A    No.
18   Q    It was a legal document?
19   A    I don't know.
20   Q    Okay.  All right--Very well.  (PAUSING)--I'm going to show you
21        a document Q--
22               MS. WOODROW: --I'll be quick on this, Your Honor.
23        Probably, it's what you're expecting (sic)--
24               (At 11:44 a.m., Ms. Woodrow approached the witness)
25               (At 11:44 a.m., brief pausing)
```

1           (UNIDENTIFIED VOICE):  No. Here--Right here.

2           MS. WOODROW: Oh, we do have another one (1)?

3           (At 11:44 a.m., brief pausing - continuing)

4    Q   (MS. WOODROW CONTINUING) Okay.  And would you take a look at

5        that document?

6    A   Yes.

7    Q.  And you were listening to the testimony of Ms. Hiveley;

8        weren't you?

9    A   Yes.

10   Q   Okay.  So, you know the box--Box one (1) is the recording

11       information for Genesee County?  Is that true?

12   A   Correct.

13   Q   And did you add box two (2)?

14   A   Yes.

15   Q   Box three (3)?

16   A   Yes.

17   Q   Box six (6)?

18   A   Yes.

19   Q   Box seven (7)?

20   A   Yes.

21   Q   Box eight (8)?

22   A   Yes.

23   Q   Box nine (9)?

24   A   Yes.

25   Q   Box ten (10)?

```
 1   A   Yes.

 2   Q   Box five (5)?

 3   A   Humm, is that the stamp?  Yes.

 4   Q   Box eleven (11)?

 5   A   Yes.

 6   Q   What date was it notarized?

 7   A   January--Or--Yeah, January twenty-fifth (25th), 2006.

 8   Q   And when did you--And look at page two (2)--When did you

 9       modify the document?

10   A   April thirteenth (13th), 2006.

11   Q   And that was on behalf of Orlans Associates, P.C. in that box?

12       Isn't that correct?

13   A   Correct.

14   Q   Now box twelve (12) is an asterisk?  Isn't that correct?

15   A   Yes.

16   Q   And what does that asterisk go to?

17   A   It goes to who MERS was nominee for.

18   Q   So, when Mr. Favorite signed that--When this was notarized,

19       they didn't even know who they were--Who he was sign--Who it

20       was being signed for?  Is that correct?

21   A   Ah, that's not who it was being assigned to.  It was being

22       assigned from--

23   Q   No--As a nominee for?  He didn't even--They didn't even put in

24       who the nominee was--

25   A   No, they did not put in who the nominee was for.
```

1   Q    All right.  And then I'm going to show you Exhibit R.

2                  (At 11:46 a.m., Ms. Woodrow approached the witness)

3                  MS. WOODROW: Oh, I've got it--Thank you--

4   Q    (MS. WOODROW CONTINUING) I show you Exhibit R--

5                  THE COURT REPORTER: Ms. Woodrow--

6   Q    (MS. WOODROW CONTINUING) And would you look at Exhibit R?

7   A    Yes.

8   Q    Would you agree that that's a fair representation of the

9        document when it arrived on your desk?

10  A    Yes.  Except for their recorded--recorded return--

11  Q    Except for the--Right--That is--That's correct--

12                 MS. WOODROW: --All right.  Your Honor, I would ask

13       for the admission of documents Q and R?

14                 MR. MYERS: Your Honor--

15                 THE COURT: Any objection or Voir Dire?

16                 MR. MYERS: --Your Honor, I do object to this.  I

17       don't believe that this is relevant based upon the purpose of

18       remand.  This is outside the scope of why we're here.  And

19       that was the November 2006 assignment of mortgage that was

20       processed by Renee Hiveley.

21                 This witness has not given any testimony that she

22       had anything to do with the particular issue that we're here

23       on.  And furthermore, MRE 403 provides that;

24                 "Relevant evidence may be excluded if its

25            probative value is substantially outweighed by the

79

1      danger of considerations of undue delay, waste of

2      time, or needless presentation of cumulative

3      evidence."

4           All that we're seeing here is the same type of thing

5     that has already been established with Ms. Hiveley's

6     testimony.

7           THE COURT: Well, except that this Q and R are

8     different?  Are they not?  Because now, I believe, is the

9     question that was presented from Plaintiff's table or on

10    behalf of Orlans--I can't recall, specifically--was whether or

11    not there were changes to either the grantor or grantee.  This

12    document, specifically, goes to that.  So, objection is

13    overruled--You may--

14          MS. SWISHER: If I may object, Your Honor?

15          THE COURT: Yes.  You go ahead.

16          MS. SWISHER: Your Honor, not only do I join in

17    Orlans' objection, but additionally, the document marked R, I

18    have no idea what has been removed from this document, because

19    I don't have an original to compare it to.

20          For example--I can look at it--Thank you, Sue--For

21    example, Your Honor, in the top left hand corner, where it

22    says, 'When recorded return to'--And there's, obviously,

23    information that has been redacted from this.  In the process,

24    someone has redacted a loan number, which would, of course, be

25    important for any number of systems in order to ascertain the

1    accuracy of the remaining information.  So, Your Honor, I--

2              THE COURT: Are you talking the seller loan number?

3    Or--

4              MS. SWISHER: It looks like there's an RFC loan

5    number.  But I can only guess that, Your Honor, by looking at

6    Q and comparing it to R.  But I'm just saying that R has--R is

7    in no way, shape, or form, a reliable document.

8              I know that it was presented to the Court as a

9    redaction, but it is just so redacted that I have no way of

10   knowing what was there, Your Honor.

11             MS. COLEMAN: Your Honor?

12             THE COURT: Ms. Coleman?

13             MS. COLEMAN: We don't know what was underneath

14   there, either; because those were stickers that were placed

15   there--We--We assume by someone at E-Title.

16             THE COURT: Well, I guess, maybe, we ought to get one

17   (1) thing clear before I rule on the objection.  When you

18   indicated that this document was redacted--By whom?

19             MS. WOODROW: We took the original--The mortgage--The

20   assignment of mortgage, we took it--We tried to--We removed

21   all of the information that has been testified to that it was

22   added.

23             Unfortunately, we couldn't magically recreate what

24   had been marked out by the sticker.  However, Ms. Ertman

25   indicated that that--that she placed the sticker there.  But

1    she also did testify and established its authenticity as the

2    way the document came to her, but for the sticker being placed

3    on the--and marking out company, LLC, and information

4    underneath that.

5            So, I think, that it has--Unlisted (sic) purposes--

6    It has served its' purpose that it shows this is primarily the

7    document when it arrived at her desk.  And then once it was

8    filed, that shows everything that was added to it.  And that

9    is the purpose.

10           THE COURT: Well--(PAUSING)--

11           MS. WOODROW: It is also the purposes to show that

12   this was an on-going pattern with many of the employees.  I

13   understand that it is cumulative in nature, that's why I was

14   trying to make it quick.

15           THE COURT: But this is similar to--And I understand

16   it's cumulative in nature--But it's similar to the other

17   document--

18           MS. WOODROW: That is correct.

19           THE COURT: And maybe--If I take Q and I just, in my

20   head, for example, take out the areas that are boxed--

21           MS. WOODROW: Correct--

22           THE COURT: --Because she's testified that that's the

23   information that she added, with the exception of box one (1)

24   --Then in my head I can figure out what the document would

25   have looked like--

```
 1              MS. WOODROW: Correct--

 2              THE COURT:--when she received it.

 3              MS. WOODROW: I just--

 4              THE COURT: So, I really--I really don't need R.

 5              MS. WOODROW: You don't need R?  Okay.  I just

 6      thought you'd--

 7              THE COURT: All right--

 8              MS. WOODROW: --The visual--

 9              THE COURT: --R is not admitted.

10              MS. WOODROW: Thank you, Your Honor.

11              MS. SWISHER: Thank you, Your Honor.

12              THE COURT: I will admit Q.

13              (At 11:52 a.m., DX# Q - received into evidence)

14              MS. WOODROW: All right.  I will--I have another pair

15      of documents and then that's the last pair.  But I--I would

16      presume you would rule the same on V, because the--As the one

17      --Because I know you can remove it--You can erase the boxes

18      with your head--So, I will just--

19              MS. SWISHER: You are--

20              MS. WOODROW: Yeap (sic).

21              (At 11:52 a.m., long pausing)

22  Q   (MS. WOODROW CONTINUING) Would you please identify the

23      document that has been moved as exhibit--Marked as Exhibit U?

24  A   It was a recorded assignment of mortgage.

25  Q   For whom?
```

```
 1   A   I'm sorry.  What do you mean for whom?

 2   Q   I don't--Just--I was just going to ask you what the name was--

 3       That's--It doesn't really matter.  It's Exhibit U.  And there

 4       are a lot of boxes on that document, as well?  Is that

 5       correct?

 6   A   Correct.

 7   Q   And in each of those documents, was that information that you

 8       added or a sticker that you added?  Except for box one (1)?

 9   A   I did not add box two (2), either.

10   Q   You did not add box two (2)?  Very good.  And, again, we have

11       the Orlans Law Firm file number in box three (3)?

12   A   Correct.

13   Q   So, that was the standard to put the file number in the box

14       three (3)--in the box three (3), to make it easy to file when

15       it came back?  Is that correct?

16   A   Correct.

17   Q   And what was the date that this was signed?

18   A   December fourteenth (14th), 2006.

19   Q   And when did you modify the document?

20   A   (PAUSING)--December nineteenth (19th), 2006.

21              (At 11:54 a.m., brief pausing)

22   Q   (MS. WOODROW CONTINUING) Were you responsible for filing

23       documents?  Or was there a file clerk?

24   A   Ah--

25   Q   When they would come back?
```

```
 1   A    When they would come back, it would go to the mailroom.
 2                   MS. WOODROW: I would move for the admission of
 3        document U--Exhibit U, Your Honor?
 4                   THE COURT: Any objection?
 5                   MR. MYERS: The same objections as I had to Q and R,
 6        Your Honor--
 7                   THE COURT: The same ruling--
 8                   MS. SWISHER: Objection, Your Honor.  Additionally, I
 9        noticed that U and R are--Excuse me--Q, are also in different
10        Counties, Your Honor.
11                   THE COURT: I--I don't think they're being admitted
12        for the purposes of showing--
13                   MS. COLEMAN: No, Your Honor--
14                   THE COURT: --That they--
15                   MS. WOODROW: But it--
16                   THE COURT: --Various County practices, however--It's
17        the internal practices of E-Title and Orlans, I think that are
18        here (sic)--So, if that's the objection, then it's overruled.
19        And Exhibit U--And if I had not--Exhibit Q is admitted and
20        Exhibit U is admitted.
21                   (At 11:55 a.m., DX# U - received into evidence)
22                   (At 11:55 a.m., DX Q previously admitted)
23                   MS. WOODROW: Thank you, Your Honor.
24                   (At 11:55 a.m., brief pausing)
25                   THE COURT: You have no further questions?
```

```
 1                    MS. WOODROW: No--
 2                    THE COURT: Any Cross-Examination of this witness--
 3                    MS. WOODROW: --No further questions--I'm sorry.
 4          Thank you, Your Honor.
 5                              CROSS-EXAMINATION
 6     BY MS. SWISHER:
 7     Q    Ms. Ertman, with regards to Exhibit Q and U, I think, you
 8          testified that you were the person that added some of the
 9          information that's contained in boxes on those documents? Is
10          that correct?
11     A    Yes.
12     Q    Did you add any information that you thought to be false?
13     A    No.
14     Q    And did, instead, you looked at records to be sure that you
15          were adding accurate information?
16     A    Correct; yes.
17     Q    And you were adding information for the purpose of insuring
18          that the assignments as--Had been signed--were going to be
19          ready for recording?
20     A    Correct.
21                    MS. SWISHER: Thank you.
22                              CROSS-EXAMINATION
23     BY MR. MYERS:
24     Q    Ms. Ertman, you had testified earlier that--In response to a
25          question that--the assignments came to you barren of
```

1    information.  I want to explore that a little bit more,

2    because my--my definition of barren of information would,

3    essentially, be a blank document.  But I want to find out from

4    --from you--And you've got Q and U in front of you?  Correct?

5  A  Correct.

6  Q  Okay.  Let's start with Q.  What--What information was on this

7    document when it came to you?

8  A  When it came to me it had the assignor as MERS as nominee for

9    --But the 'Nominee for' was blank.  The assignee as

10   Residential Funding and their address.  The mortgage infor--Or

11   the mortgage date of the mortgage.  The name of the mortgagor.

12   It was signed and notarized.  The property address was on

13   there.  The mortgage amount was on there.

14 Q  Not exactly barren of information, then?

15 A  Correct.

16 Q  Was there sufficient amount of information on here from which

17   you could go into the system and access the original mortgage-

18   -or a copy of the original mortgage?

19 A  Yes--Correct.

20 Q  The recording information from the--from the original mortgage

21   would have been in the computer system?

22 A  Yes.

23 Q  Would you have taken a look at that?

24 A  In the computer system?  Yes.

25 Q  Is that where the information for the Liber and Page number

```
 1        would have come from?

 2   A    Yes.

 3   Q    Where would the nominee information--The Decision One Mortgage

 4        Company--Where would that information have come from?

 5   A    That would have came (sic) from the mortgage, as well.  I

 6        would have gotten that information from our system--From

 7        Orlans' system.

 8   Q    Box number seven (7), right in the middle of the page where it

 9        says, "TO/FOR:"  And it says; "Mortgage Electronic

10        Registration Systems, Inc. as nominee for".  And that's--

11        that's typed in.  And then there's handwritten in, "Decision

12        One Mortgage Company, LLC."  What did you change to box seven

13        (7)?

14   A    I didn't--Well, I didn't actually change anything to box seven

15        (7).  There was nothing there, so I added, "Mortgage

16        Electronic Registration Systems, as nominee for".  And then I

17        handwrote in, "Decision One".

18   Q    Based on this document when--when it first came into you, how

19        --how were you able to tell that this was a MERS assignment?

20   A    It was signed by MERS.

21   Q    Okay--

22                (At 11:59 a.m., long pausing)

23                MR. MYERS: Your Honor, I--I don't have any more

24        questions at this time.

25                THE COURT: You have Q and U in front of you?
```

1    Correct?

2                   THE WITNESS: Correct.

3                   THE COURT: All right.  Under box two on Exhibit Q

4    and three (3) on Exhibit U.  When these documents would come

5    in, what was under those stickers?  Do you know?

6                   THE WITNESS: Yes, the address of--I believe the--

7    Whoever these--these documents came from.  I believe this was

8    Residential Funding Corporation.  It was their address.  I

9    believe it said, when recorded return to--

10                  THE COURT: Oh, it would say return to Residential

11   Funding in the--Okay--All right.

12                  (At 12:00 p.m., brief pausing)

13                  (At 12:00 p.m., an intern's cell phone rings)

14                  THE COURT: Really?

15                  (At 12:00 p.m., laughter in the courtroom)

16                  THE COURT: I guess I'll ask you the same question.

17                  Did it--Well, let me ask it--Let me ask it this way?

18                  Did you ever question anybody about why you were

19   adding information?

20                  THE WITNESS: No--

21                  THE COURT: --to the document?  Did it ever even in

22   your head darn on you about adding information or did you ever

23   ask yourself the question--'I'm adding information to the

24   signed document'?

25                  THE WITNESS: No.  Because I was making it in

1   recordable form for our client, which is what we assumed they

2   wanted us to do.

3          THE COURT: Your client being?

4          THE WITNESS: The bank--Residential Funding--

5          THE COURT: So, it never darned on you at all to just

6   even question that it had already been signed and--

7          THE WITNESS: No.

8          THE COURT: Exhibit Q; box twelve (12), how did you

9   make the decision to add box twelve (12)?

10          THE WITNESS: Because the company that is signing the

11   document has to be in the notary.  And it has to be the full

12   company's name.

13          THE COURT: Okay.  But that's not your notary?

14          THE WITNESS: No.

15          THE COURT: So, in fact, you altered the notarization

16   of the signature?

17          THE WITNESS: Well, I didn't touch her signature, but

18   the--

19          THE COURT: No, but you--The Notary is the language

20   that appears above.  And then there is a signature below?

21   Correct?

22          THE WITNESS: Correct.

23          THE COURT: The Notary--Would you agree or disagree--

24   In essence, indicates the person and in what capacity they're

25   appearing before that Notary?

1          THE WITNESS: I agree.

2          THE COURT: Where did you get the information to

3     alter the notarization of Mr. Favorite's signature?

4          THE WITNESS: The information, itself, to add the

5     'Decision One'?  I'm sorry.  I don't understand.

6          THE COURT: Well, let me rephrase it this way.  Who

7     told you, you should alter the Notary?

8          THE WITNESS: I do not know.

9          THE COURT: Why did you alter the Notary?

10         THE WITNESS: Because the County would reject it.

11         THE COURT: Do you see a distinction between what may

12    be adding information at the top of the document and adding

13    language to the Notary?

14         THE WITNESS: No.

15         THE COURT: Why not?

16         THE WITNESS: I was just making it in recordable form

17    for our client.  I did not--

18         THE COURT: That wasn't my question.  My question was

19    why don't you see a distinction between the two (2)?

20         THE WITNESS: It's all part of the document.

21         THE COURT: Look at Exhibit Q--down---And at the

22    bottom under the Notary.

23         (At 12:04 p.m., brief pausing)

24         THE COURT: I guess it's Karen Steffensen--(PAUSING)

25    --Isn't really that paragraph--The notarization paragraph?

1    Isn't that really her oath, if you will?

2              THE WITNESS: Yes.

3              THE COURT: So, in--When you changed box twelve (12)

4    --That--When you put that in there, how do you know on January

5    twenty-fifth (25th), 2006, that Mr. Favorite was appearing

6    before her to sign that document in his capacity as--I guess--

7    MERS Registration--MERS Registration Systems--Or Mortgage

8    Electronic Registration Systems, as the nominee for Decision

9    One Mortgage Company.  How do you know that that was the case?

10             THE WITNESS: I don't.

11             THE COURT: Yet, you felt you could change it?

12             THE WITNESS: I was adding information I didn't--I--

13             THE COURT: You felt you could change it?

14             THE WITNESS: I felt I could add the needed

15   information.

16             THE COURT: Anybody ever correct you or caution you

17   about changing a Notary?

18             THE WITNESS: No.  But I--I did not think I changed

19   it.  I was adding information.

20             THE COURT: All right.  So, we don't play word games.

21   If you add information, that changes it; doesn't it?

22             THE WITNESS: Yes, I guess so.

23             THE COURT: So, there really is no distinction

24   between adding and changing?  Would you agree?

25             THE WITNESS: I didn't take anything out that was in

1   there.

2                    THE COURT: I don't know that that was my question.

3        There really isn't a difference between adding and changing,

4        is there?

5                    THE WITNESS: I guess not.

6                    THE COURT: Any questions based upon the Court's

7        questions, from either counsel?

8                    MS. SWISHER: I have one (1), Your Honor--A couple,

9        maybe.

10                            RECROSS-EXAMINATION

11   BY MS. SWISHER:

12   Q   Ms. Ertman, if you look at Exhibit Q, unlike the other

13       assignments of mortgage that we've looked at--I see that--Just

14       above box three (3) it says, "As nominee for".  And then

15       before you added in "Decision One", that was a blank?

16       Correct?

17   A   Correct.

18   Q   So, it was incomplete?  Correct?

19   A   Correct.

20   Q   And if--Again, in the "TO/FOR" section--That's identified as

21       block number seven (7).  Again, it says, "As nominee for".

22       And without your addition, that would be incomplete?

23   A   Correct.

24   Q   And the same would be true of the Notary block.  It says, "As

25       nominee for personally known"--Obviously, something was

```
 1        omitted?  Correct?

 2   A    Correct.

 3   Q    Am I correct in assuming that this 'as nominee for'

 4        information, specifically, "Decision One Mortgage Company,

 5        LLC", is something you would have gotten by looking at the

 6        mortgage, itself?

 7   A    Yes--Correct.

 8   Q    So, you looked at the mortgage, itself?

 9   A    Sometimes, we did--

10   Q    Okay--

11   A    (CONTINUING)--Sometimes, in our--In the Orlans' system, it

12        would just say, 'MERS', so I would have to go and open up the

13        mortgage and see who MERS is nominee for.

14   Q    All right.  But it would be something you would find in the

15        mortgage--

16   A    Yes--

17   Q    --typically?  Correct--

18   A    --It's on the mortgage.

19   Q    And you were in all instances then, simply, filling in what

20        appeared to be an omission?  A blank?

21   A    Yes--Correct.

22   Q    And you believed upon review, presumably, of the mortgage,

23        that what you were adding was accurate?

24   A    Correct.

25   Q    And you're not suggesting by the addition to the Notary block,
```

```
 1          that Mr. Favorite works for Decision One.  You're simply
 2          indicating, as I read it, that MERS was nominee for Decision
 3          One with regards to this mortgage?  Is that correct?
 4    A     Yes.
 5                    MS. SWISHER: Thank you.
 6                    THE COURT: Any other questions?
 7                    MS. COLEMAN: No, Your Honor.
 8                    THE COURT: No?
 9                    MS. WOODROW: No.
10                    THE COURT: You may step down.  Thank you--
11                    MS. WOODROW: Oh--
12                    THE COURT: Oh, did you have--
13                    MS. WOODROW: I did.  I'm sorry, Your Honor.  I was
14          digging for the note (sic)--Okay--
15                         REDIRECT EXAMINATION
16    BY MS. WOODROW:
17    Q     Ms. Ertman, how did you know Decision One Mortgage Company,
18          LLC, was the nominee?
19    A     Because that is what is on--was on the mortgage.
20    Q     So, you made that legal determination that they were the
21          nominee?
22    A     Not the legal determination. That's what the mortgage said--
23    Q     Is it--
24    A     --the assigned mortgage--
25    Q     --It is possible that there was an assignment of mortgage in
```

1   between that mortgage and this document, Exhibit Q?

2   A   It is possible.

3   Q   And how do you know that Matt Favorite didn't want this

4   document returned to whoever and whatever address is

5   underneath the sticker that you put on it and that you were--

6   you were directed to put on it--It was a process and pattern

7   in the company?

8   A   I do not know.

9              MS. WOODROW: Okay--Thank you.

10             MR. MYERS: No questions.

11             MS. WOODROW: Thank you, Your Honor.

12             THE COURT: You may step down.

13             (At 12:10 p.m., witness excused)

14             (At 12:10 p.m., brief pausing)

15             THE COURT: Counsel, I'm returning R, which was not

16   admitted to you.

17             (At 12:11 p.m., brief pausing)

18             MS. COLEMAN: Do we need V back, as well?

19             THE COURT: I don't--

20             MS. COLEMAN: Well, you haven't--

21             THE COURT: --I did not get V presented to me, I

22   don't believe--

23             MS. WOODROW: I didn't bring it up, Your Honor.

24             THE COURT: All right.  You may call your next

25   witness.

1        MS. WOODROW: I don't--

2        THE COURT: Do you have any additional witnesses?

3        MS. WOODROW: I believe there is a Melissa Hall that

4    we did subpoena and then we have Ms. Baker.  But I do note

5    that it is ten (10) after twelve (12).  I didn't know if we're

6    going to break before--

7        THE COURT: I will tell you when I'm ready to break--

8        MS. WOODROW: All right--Thank you--

9        THE COURT: --So, you can call your next witness.

10       MS. WOODROW: Thank you, Your Honor.

11       (At 12:11 p.m., brief pausing)

12       MS. WOODROW: We'd call Melissa Hall.

13       THE COURT: Ma'am, please come forward and be sworn.

14       (At 12:12 p.m., brief pausing)

15       THE BAILIFF: Raise your right hand.

16       Do you solemnly swear or affirm to tell the truth,

17   the whole truth, and nothing but the truth, so help you God?

18       MS. HALL:  Yes Sir.

19       THE BAILIFF: Have a seat.  State your first and last

20   name and spell them both for the record, please?

21       THE WITNESS: Melissa Hall, M-e-l-i-s-s-a; H-a-l-l.

22                    MELISSA HALL

23       (At 12:12 p.m., called as a witness by Ms. Woodrow

24       sworn by the Bailiff and testified as follows)

25       THE COURT: All right.  You may inquire, Counsel.

```
 1              MS. WOODROW: Thank you, Your Honor.
 2                        DIRECT EXAMINATION
 3   BY MS. WOODROW:
 4   Q    Ms. Hall, are you feeling all right today?
 5   A    Yes.
 6   Q    Thank you.  You're employed with Orlans?
 7   A    No.
 8   Q    And you're an E--E-Title?  Right?
 9   A    No.
10   Q    Oh.  Where are you employed?
11   A    I'm with Level Ten Services, Incorporated.
12   Q    Okay.  And what is--What kind of a company is that?
13   A    They provide support services to real estate companies.
14   Q    When did you begin with them?
15   A    In August of 2013.
16   Q    Where is your physical location?
17   A    1650 West Big Beaver in Troy, Michigan.
18   Q    So, it's another one (1) of the Orlans' companies?
19   A    It's a company.
20   Q    That's a 'yes'?
21   A    Yes.
22   Q    Thank you.  And were you working for Orlans in 2006?
23   A    Yes.
24   Q    Okay.  And did you work in the office in Troy?
25   A    In 2006, we were at the 2501 Rochester Court location; yes.
```

1   Q   Okay--

2   A   And that's also in Troy.

3   Q   Thank you.  And did you ever acknowledge that the pattern of

4       practice and the policy and the procedure of Orlans was to

5       modify documents, assignments of mortgage, in particular, when

6       they arrive, and then file them with the Register of Deeds?

7               MR. MYERS: Your Honor, I object to the question.  I

8       don't think we have--The foundation has been laid for this

9       witness to be able to testify--

10              MS. WOODROW: I'm just trying to speed it up, Your

11      Honor.

12              THE COURT: I'm going to overrule the objection.  Go

13      ahead.

14              MS. WOODROW: Thank you, Your Honor.

15  Q   (MS. WOODROW CONTINUING) Would you answer?

16  A   In 2006, I was not working in foreclosure department.

17  Q   Where were you working?

18  A   I was working in the IT Department.

19  Q   The what?

20  A   IT--

21  Q   Please speak up.  I have hearing problem--

22  A   The IT Department.

23  Q   The--Oh, the computer department?

24  A   Technology? Yes.

25  Q   Oh, so you were working with the Practice System (sic)?

```
 1   A   I was working on creating document templates for our system.
 2       And managing projects in the IT Department.
 3               MS. WOODROW: --Okay.  Could you put the microphone a
 4       little closer?  I would --That would--Thank you so much.  I
 5       appreciate that--Okay.
 6   Q   (MS. WOODROW CONTINUING) What kind of templates?
 7   A   We were a document templates related to our computer system.
 8   Q   To do what?
 9   A   To merge information into our documents.
10   Q   From where to where?
11   A   From Practice Master.
12   Q   And Practice Master was the Orlans' Associates system?  Is
13       that correct?
14   A   That's correct.
15   Q   Okay.  And did you ever work in the department where Ms.
16       Hiveley and Ms. Ertman did?
17   A   No.
18   Q   Were you aware of them--their department?
19   A   Yes.
20   Q   And you were aware of what they did?
21   A   No.
22   Q   Did you ever acknowledge to anyone that prior to--Well, let's
23       say in 2006 and 2007, that it was standard to modify a
24       document by adding information?
25   A   I did not have that knowledge.
```

1  Q    You did not acknowledge that to anyone?

2  A    I did not have that knowledge of that process.

3  Q    Okay.  (PAUSING)--So, how many computer systems were there?

4  A    At that time, I don't know.

5  Q    When did you begin working on the IT Department (sic)?  I

6       thought you said you worked in the IT Department in 2006?

7  A    Yes.

8  Q    Well, what is Practice Master?

9  A    It's a system--

10 Q    Okay.  That's where--

11 A    --A case management system.

12 Q    Pardon?

13 A    It's a case management system.

14 Q    A case management system.  What other systems or programs were

15      there that you were aware of?

16 A    I don't recall at that time (sic).

17 Q    You don't recall?

18 A    No.  In 2006?

19 Q    Yeah?

20 A    No.

21 Q    You worked with them every day.

22 A    I don't recall all of them.

23 Q    Okay.  But everybody worked with all of the systems--They all

24      kind of intertwined, did they--Did they not?

25 A    There were some systems that intertwined.

1   Q      How many--

2                  MS. WOODROW: --I think I have nothing further.

3   Thank you.

4                  THE WITNESS: Okay.

5                  MR. MYERS: I don't have anything further, Your

6   Honor.

7                  MS. SWISHER: Nothing, Your Honor.

8                  THE COURT: Ma'am, were you--The IT--The IT

9   Department was for whom?  Who was--What company was that with?

10                 THE WITNESS: It was for the enterprise--Orlans and

11  E-Title.

12                 THE COURT: Pardon?

13                 THE WITNESS: Orlans Associates and E-Title.

14                 THE COURT: And you talked about merging or merging

15  information and creating templates--

16                 THE WITNESS: Huh huh?

17                 THE COURT: --And, again, correct me if I'm wrong.

18  That would be information that was contained within Practice

19  Master that then would be merged into particular documents?

20                 THE WITNESS: That's correct.

21                 THE COURT: All right.  Would that be inclusive of

22  assignments and mortgage?

23                 THE WITNESS: If the client required our office to

24  generate the document for them; then, yes, we would have a

25  document template for an assignment of mortgage.

```
 1                    THE COURT: Do you recall whether or not there was

 2          one?  A template for assignments and mortgages--

 3                    THE WITNESS: I believe there was; yes.

 4                    THE COURT: At some point, you came out of the IT

 5          Department, I'm presuming or no?

 6                    THE WITNESS: That's correct.

 7                    THE COURT: All right.  When and then what department

 8          did you go into?

 9                    THE WITNESS: I switched companies in 2009.

10                    THE COURT: Switched companies--

11                    THE WITNESS: Huh huh--

12                    THE COURT: Where--Where did you go in 2009?

13                    THE WITNESS: I worked for Orlans Moran.

14                    THE COURT: Moran?

15                    THE WITNESS: Yes.  M-o-r-a-n.

16                    THE COURT: And what did you do there?

17                    THE WITNESS: I was the Foreclosure Manager for

18          Orlans Moran.

19                    THE COURT: Okay.  And what did those duties include?

20                    THE WITNESS: I was responsible for managing the

21          foreclosure workflow.

22                    THE COURT: All right.  I'm presuming there is a lot

23          of work to do with--

24                    THE WITNESS: Yes--

25                    THE COURT: --foreclosures?
```

1        THE WITNESS: Yes.

2        THE COURT: What specifically--I mean--Define that a

3   little bit more, please?

4        THE WITNESS: We would receive referrals from

5   clients, open them in the system, and process the foreclosure,

6   according to the process.

7        THE COURT: In that capacity, did you have to deal

8   with assignments?

9        THE WITNESS: Not in our Michigan office; no.

10       THE COURT: Where were they dealt with; to your

11  understanding?

12       THE WITNESS: They were handled in our Orlans Moran

13  office in Boston.

14       THE COURT: Would you see assignments that had been

15  recorded?

16       THE WITNESS: For what state?

17       THE COURT: For Michigan?

18       THE WITNESS: Would I?

19       THE COURT: Yes?

20       THE WITNESS: In Orlans Moran?

21       THE COURT: Yes?

22       THE WITNESS: No.

23       THE COURT: When did you say you switched--I mean, I

24  didn't write that down--From the IT to Orlans Moran?

25       THE WITNESS: Two thousand nine (2009).

```
 1              THE COURT: Two thousand nine (2009). All right.
 2    So, from 2006--Sometime in 2006 to sometime in 2009, you were
 3    with the IT Department?
 4              THE WITNESS: Yes.
 5              THE COURT: All right.  Was the only thing that you
 6    worked on--I mean I guess--We were talking 2006, initially, in
 7    my questioning--Was the only thing that you worked on the--The
 8    sort of merging of information from Practice Master to Word
 9    Documents or whatever--
10              THE WITNESS: I don't--
11              THE COURT: --the merging templates--
12              THE WITNESS: --I don't recall all of my job
13    responsibilities, but that was one (1) of my main
14    responsibilities.
15              THE COURT: All right.  Any questions based upon the
16    Court's questions?
17              MR. MYERS: None, Your Honor.
18              MS. SWISHER: No, Your Honor.
19              MS. WOODROW: None, Your Honor.
20              THE COURT: All right.  You may step down. Thank you.
21              (At 12:21 p.m., witness excused)
22              THE COURT: Any additional witnesses?
23              MS. WOODROW: Yes, Your Honor.
24              THE COURT: Is it Ms. Baker?
25              MS. WOODROW: I believe Ms. Baker would take a little
```

1    bit of time.

2              THE COURT: Well, what the Court is going to do is--

3    Why don't we break for lunch at this point?

4              And everyone needs to return--I'll give you a little

5    bit of a lunch--one, thirty (1:30).  How about that?  Okay?

6              (NO AUDIBLE RESPONSES)

7              THE COURT: And then we can continue.  The Court will

8    stand in recess.

9              THE BAILIFF: All rise.

10             (At 12:22 p.m., above matter in recess)

11             (At 1:51 p.m., above matter reconvened - all parties

12             present)

13             THE BAILIFF: The Court is back in session.  You may

14   be seated.

15             THE COURT: All right.  We're back in the case of

16   Residential Funding versus Baker, et al.

17             All right.  Counsel, are you ready to proceed?

18             MS. WOODROW: Yes, Your Honor.

19             THE COURT: All right.  You may call your next

20   witness.

21             MS. WOODROW: We need to have some additional

22   documents marked.  I don't know if you want to do it now or we

23   can do it later.

24             THE COURT: Okay.  Have they been shown to counsel?

25             MS. WOODROW: No.  They're statutes; that's all.

```
 1                    THE COURT: They're what?

 2                    MS. WOODROW: Statutes.  I was going to do--have you

 3         to take judicial notice of.

 4                    THE COURT: Okay.  But which statutes?

 5                    MS. WOODROW: Okay.  249--750.249; 750.248B; 750.259;

 6         750.3871 (sic)--and 600.1701 (sic)--(NOISE IN BACKGROND)

 7                    THE COURT: Oh, I know what those are, off the top of

 8         my head.

 9                    MS. WOODROW: I'm sure you do--

10                    (At 1:51 a.m., laughter in courtroom)

11                    THE COURT: Have you shown--Have you shown those to

12         the opposing counsel--

13                    MS. WOODROW: Not yet.

14                    THE COURT: Can you show them to opposing counsel--

15                    MS. WOODROW: Sure--

16                    THE COURT: Do you have copies?  Show them to

17         opposing counsel.

18                    MS. WOODROW: I will.

19                    THE COURT: I--I don't know what the subject matter

20         of those are.

21                    MS. SWISHER: I didn't know there was an attorney

22         that's going to testify, Your Honor.

23                    THE COURT: Well, if they're--

24                    MS. SWISHER: Statutes--

25                    MS. WOODROW: Judicial notice--
```

1          MS. COLEMAN: How is that testifying?

2          (At 1:52 p.m., long pausing)

3          MS. SWISHER: Your Honor, I have no way of knowing

4     what these are?

5          THE COURT: What--Which ones are they?

6          MS. SWISHER: Well, Your Honor, it's--

7          THE COURT REPORTER: I need you by a mic--

8          MS. SWISHER: --Most of the--

9          THE COURT: I need you by a mic.

10          MS. SWISHER: Sorry.  Thank you.  MCL 750.249

11    purports to be an excerpt from the penal code, which I take to

12    mean criminal law--We're not here on a criminal matter--Happen

13    to do with the forgery of records.

14          MCR 750.248 lower case (b); again, from the penal

15    code, happen to do with counterfeit documents and the felony

16    that would attach to that.

17          And MCL 750.259; again, from the penal code,

18    regarding affixing a fictitious signature--I had no idea there

19    was a fictitious signature involved in this case.

20          MCL 565.371; fraudulent conveyances of real estate--

21    I didn't know that was at issue in this case.

22          And MCL 600.1701; negligent--Or neglect or violation

23    of duty or misconduct.  I don't have a clue how any of this

24    has any bearing on this matter, which is purportedly about a

25    fraud on this Court.

1          So, Your Honor, I--I would object.  I don't know if

2    these are an issue, why they wouldn't have been addressed in

3    the Defendant's Trial Brief and what they have--

4          MR. MYERS: I--

5          MS. SWISHER: --any bearing on this hearing--

6          MR. MYERS: --I would join.  It's also my

7    understanding this is a fact-finding hearing.

8          THE COURT: Well, I guess, my question is this. What

9    do you--

10         MS. COLEMAN: I--

11         THE COURT: Go ahead, Ms. Coleman.  What were you

12   going to say?

13         MS. COLEMAN: --I don't believe there is an element

14   of surprise here.  Those are all pleaded (sic) in our

15   complaint.  And, I believe, those have also been pleaded in

16   my--What we termed a Trial Brief.

17         (At 1:55 p.m., brief pausing)

18         MS. COLEMAN: They go to the seriousness of the

19   nature, Your Honor, of the actions that were taken in the

20   creation and modification or addition to the loan mods (sic)

21   on the assignment of mortgages.  Not only this one, but as was

22   their policy through--throughout the state, during the

23   relevant time.

24         THE COURT: But I--I guess is--What I don't get is--

25   At some point--Certainly, I'll let counsel argue when we get

1    to the end of all of this--It seems at that point, maybe one

2    could then point out statutes that they believe would apply or

3    have some bearing on it.

4         I don't know why during the course of the

5    Evidentiary proceedings, there would be the necessity for the

6    Court to have those as an exhibit.

7         MS. COLEMAN: Understood, Your Honor.  That's fine.

8         THE COURT: Okay--All right--

9         MS. SWISHER: Thank you, Your Honor.

10        (At 1:56 p.m., brief pausing)

11        MS. WOODROW: We'll call Suzie Baker.

12        THE COURT: Ms. Baker, please come forward and be

13   sworn.

14        THE BAILIFF: Do you solemnly swear or affirm to tell

15   the truth, the whole truth, and nothing but the truth, so help

16   you God?

17        MS. BAKER: I do.

18        THE BAILIFF: Have a seat.  State your first and last

19   name and spell them both for the record, please?

20        THE WITNESS: Suzie Baker.  S-u-z-i-e; B-a-k-e-r.

21                 SUZIE BAKER

22        (At 1:56 p.m., called as a witness by Ms. Woodrow

23        and sworn by the Bailiff and testified as follows)

24        THE COURT: All right.  You may inquire.

25        MS. WOODROW: Pardon?

```
 1                   (NO AUDIBLE RESPONSES)
 2                      DIRECT EXAMINATION
 3   BY MS. WOODROW:
 4   Q    Ms. Baker, how are you feeling today?
 5   A    A little tired.
 6   Q    Okay.  Ms. Baker, are you married?
 7   A    Yes.
 8   Q    And do you have a family?
 9   A    Yes.
10   Q    Tell us a little bit about your family?
11   A    I've been married for twenty-one (21) years.  I have six (6)
12        children; five (5) girls and a boy.
13   Q    We've already talked about the Exhibit D, which is a certified
14        assignment of mortgage.  And you've had an opportunity, I
15        presume, to work with that document?  Is that correct?
16   A    Yes.
17   Q    And--Well, first of all, let me--Let me back up and let me ask
18        you--Do you have a profession?
19   A    Yes.
20   Q    And what is that?
21   A    I'm a Notary Signing Agent (sic).
22   Q    Any other qualifications?
23   A    Yes.  I'm also a Licensed Title Agent.
24   Q    And in your job as--Or your profession of License Title Agent,
25        what kind of activities did you engage in?
```

```
 1  A    Closing of real estate transactions.
 2  Q    Did you prepare documents to file with the Register of Deeds?
 3  A    Occasionally.
 4  Q    And when--Did that--Did you ever have any return (sic),
 5       because you failed to include information?
 6  A    No.
 7  Q    Did you--Have you had an opportunity to talk to the Register
 8       of Deeds of Washtenaw County?
 9  A    Yes.
10  Q    And what did you--Can you just tell us--Without telling us
11       what she said--because you cannot do that; okay?  Would you
12       please tell us what you asked the Register of Deeds?
13  A    I inquired as to the items that are verified when a document
14       is going to be recorded.
15  Q    Okay.  And what did she say was verified?  And what did she
16       say her source was--
17                 MS. SWISHER: Objection--
18                 THE COURT: Sustained--
19                 MS. SWISHER: Thank you, Your Honor.
20                 MS. WOODROW: Pardon?
21                 THE COURT: That's so hearsay--
22                 MS. WOODROW: I'm sorry.  Yes, I--I'm sorry--I just
23       told her not to.  I apologize, Your Honor.
24                 THE COURT: All right.
25                 MS. WOODROW: I'm awfully (sic)--It's been a long
```

```
 1        time.
 2   Q    (MS. WOODROW CONTINUING) Do you know of any statutes or any
 3        basic requirements for recording of documents?
 4   A    Yes.
 5   Q    And what are those statutes?  If you know.  Or what do they
 6        say?
 7   A    Off the top of my head, I know that there is 565.201 and point
 8        203.  The general gist is that there are requirements with
 9        regard to the format of a document.  The--The margin on the
10        top must be two and a half inches (2 ½"), the margins on the
11        side and the bottom must be, at least, a half an inch (1/2").
12        There are requirements that regulate the size of the piece of
13        paper, the weight of the paper, the font type size that is
14        required; they have minimum requirements for all of those
15        items.
16   Q    Did you--Did you ascertain what information that they verify
17        in the--in an assignment of mortgage when it's being recorded?
18             MS. SWISHER: The same objection, Your Honor.  She
19        seems to be asking, again, for hearsay.
20   Q    (MS. WOODROW CONTINUING) What did you understand?  I'm sorry,
21        if I said, what did you say--What did you understand would be
22        verified?
23             MS. SWISHER: Same objection, Your Honor.  She seems
24        to be eliciting from the witness--
25   Q    (MS. WOODROW CONTINUING) What did--
```

1          MS. SWISHER: --in some different language what she
2     was told by a person who is not here--
3          THE COURT: Sustain the objection.
4  Q  (MS. WOODROW CONTINUING) As a result of the discussion, did
5     you understand that there was any information other than the
6     signature of the assignor?  Who--And if the borrower was
7     listed, that the Liber and Page number of the original Note
8     was listed?  If there was any other information--
9          THE COURT: I'm presuming there is an objection to
10    leading and hearsay.  And I'll sustain that objection.
11         MS. SWISHER: Thank you, Your Honor.
12         THE COURT: Go ahead--
13         MS. WOODROW: Okay.  I'm struggling, Your Honor.  I'm
14    sorry--I apologize--All right--(PAUSING)
15 Q  (MS. WOODROW CONTINUING) After discussing that with her, what
16    was your feeling about Ms. Hiveley's comments that--That the
17    documents would be returned if it didn't contain all of the
18    information that she added to the assignments of mortgage?
19 A  My understanding from working in the Title industry is that in
20    order for a document to be recorded in a real estate
21    transaction--Presumably, we'll say, an assignment of mortgage
22    --It's required to have an assignor and an assignee.  It's
23    required to have the Liber and Page that refers back to the
24    original mortgage.  And it has to have the original
25    mortgagee's name on there.

```
 1   Q   Okay.  Thank you--
 2   A   (CONTINUING)--I'm sorry.  I meant the mortgagor's.  I
 3       apologize.  The mortgagor's--
 4   Q   The borrower's, you mean?
 5   A   The borrower's.
 6   Q   Thank you.  All right.  Now as a result of all of the things
 7       that have gone on in your mortgage and legal action, did you--
 8       What did you do about your assignment of mortgage?
 9   A   I'm not real sure what you mean by that?
10   Q   Well, when you saw that--When you saw it and you--and you saw
11       that you were--That it was being foreclosed, did you review
12       the document at all?
13   A   I did pull a copy of the assignment and mortgage (sic) and
14       looked at it.
15   Q   What did you do after that?
16   A   I began to question the signature of Matt Favorite.  I had
17       heard of Robo-Signing, where one (1) person would sign
18       hundreds of thousands of documents in a given day.  Either
19       that person or not that person to someone signing a name.  And
20       I was curious to see, if indeed, my document had been subject
21       to the same kind of treatment.  I did review several
22       assignments of mortgage that had his name on there.  The next
23       thing I noticed was that he was listed as the certifying
24       officer for MERS.  And in my--In the title insurance industry,
25       when someone is acting on behalf of a company--Say for
```

1 example--subordination is being signed by someone at the bank-

2 -They would be given authority to be able to be able to

3 execute that document--And we would ask for a copy of a

4 corporate resolution, showing that they had the authority to

5 do so.  So, with my assignment of mortgage and seeing that

6 Matt Favorite was listed as a--a vice president of MERS, I

7 kind of--I questioned that to say, okay, is there

8 documentation that proves that he is.  So, then I called to

9 Homecomings--

10 Q Who is Homecomings?

11 A The--They were, allegedly, the servicer on my loan.

12 Q At what time?  If you recall?

13 A I--Somewhere in 2006.  I don't know exactly the date that they

14 would have become a servicer.

15 Q Okay.  It's Homecomings--Is that the--

16 A Homecomings Financial.

17 Q Okay.  Homecomings Financial--We'll just call them

18 Homecomings. And you said you called Homecomings--And what--

19 When you called --You can't say what they said--But when you

20 called, what happened?

21 A I called to request a copy of the Corporate Resolution that

22 would evidence Matt Favorite being an authorized signer.

23 Q And what happened after that?

24 A I was transferred to the Specialized Servicing Department

25 where I spoke with a Michelle Brown--

1  Q    To the what?

2  A    Specialized Servicing Department.

3  Q    Okay--

4  A    And I spoke with Michelle Brown there and inquired about

5       whether or not there was a Corporate Resolution that would

6       show that he was an authorized or certified officer for MERS

7       and Residential Funding Company.

8  Q    What happened after that?

9  A    It was my understanding she was going to have to go look for

10      that, because it wasn't readily at her fingertips.  And I

11      requested that she fax me a copy if she found it.  And I told

12      her, specifically, I was looking for the name Matt Favorite,

13      if she could please look for that name?

14 Q    Okay.  I'm going to show you Exhibit B--Proposed Exhibit B.

15                (At 2:05 p.m., Ms. Woodrow approached the witness)

16                (At 2:05 p.m., brief pausing)

17 Q    (MS. WOODROW CONTINUING) I'm showing you Proposed Exhibit B.

18      And do you recognize that document?

19 A    Yes.

20 Q    And what is the date at the top--There's--Is there a--On the

21      top of the document, what does it contain?

22 A    That it's--I'm assuming it's from their fax machine.  Their--

23      Their date time stamp of when they faxed the document to me.

24 Q    What is the date?

25 A    And it reads, March thirty-first (31st) of 2009 at six, fifty-

```
 1    one (6:51).

 2  Q  And who does it look like it's from?

 3  A  It states, Specialized Servicing.

 4  Q  Now the document is entitled what?

 5  A  Corporate Resolution.

 6  Q  And how many pages in this document?

 7  A  Four (4).

 8  Q  And does it--Do you want to explain a little--Just read the

 9     first (1st) paragraph--

10          MS. SWISHER: Your Honor, I would object to the--If

11     this document is being offered as an exhibit for admission--

12     This, in no way tells me where it was from.  It appears to be

13     being offered for the truth of something that's said within

14     it.  It is, therefore, hearsay.  And there is no foundation at

15     all.  The witness has just testified that she thinks maybe it

16     was from a fax machine.  This just falls far, far short of

17     anything that can be authenticated and admitted.

18          MS. WOODROW: I'm still working on the--

19          THE COURT: Response?

20          MS. WOODROW: --I'm still working on the foundation,

21     Your Honor, to have her establish--

22  Q  (MS. WOODROW CONTINUING) Did you confirm--

23          THE COURT: Well, but--

24          MS. WOODROW: Yes?

25          THE COURT: --Hold it.
```

1           MS. WOODROW: Yes Sir?

2           THE COURT: I don't know how this witness--Unless,

3    she's associated in some way with MERS--or Residential

4    Funding, would be able to verify or authenticate this

5    document; number one (1).

6           And even get to the point where she could begin to

7    then say what's contained in the document.  I mean, right now,

8    I've got, at least, two (2) levels of hearsay.

9           MS. WOODROW: Yes, Your Honor--

10          THE COURT: Because I don't know who Specializing

11   (sic) Servicing is--

12          MS. WOODROW: I think the authenticity comes from the

13   fact that she received it from someone who said she was going

14   to receive it (sic).  And certainly, it may not--It may go to

15   the weight of the evidence and not necessarily to its

16   admissibility--

17          THE COURT: Even if you get--Well, yeah, it does, go

18   to its admissibility--Because even if you get past that level

19   of hearsay, I still have--(PAUSING)--I mean I still have a

20   level of hear--I mean this is received from someone,

21   purporting to say something that somebody else said.

22          MS. WOODROW: Well, it's--It's actually going to be

23   put in for what it doesn't say, Your Honor.  I think that

24   under--

25          THE COURT: Well, either way--

1          MS. WOODROW: --804--7--804.7, there's some--some

2     circumstantial guarantees of trustworthiness are here.  The

3     document has William Hultman on the bottom.  He is a known

4     Corporate Secretary.  It has Residential Funding.  It has the

5     Specialized Servicing fax document on it.

6          And the problem is, it would be unreasonable to try

7     to get Ms. Brown to come here for my--I believe she's out in

8     Iowa--She's certainly in a different time zone.  And,

9     therefore, this is the only alternative we have for the

10    proofs.

11         Further, it would qualify as a business record from

12    a regularly conducted activity.  And it has the appearances of

13    authenticity and trustworthiness.

14         THE COURT: Well--Okay--If then you're trying to get

15    it up--I think it's under twenty-four (24) of the exception--

16    the Catch-All Provision--

17         MS. WOODROW: Yes.

18         THE COURT: --There would have to be the Notice

19    given, at minimum to the other side, which I don't think

20    Notice occurred (sic) to anybody of anything, let alone, this.

21         MS. SWISHER: And Your Honor, if I may.  I wouldn't

22    know William Hultman from Adam.  Also, Michelle Brown is alive

23    and well.  Like anyone else and any other out-of-state witness

24    --The Defendants (sic) could have come to this Court and

25    sought an order of permission and taken her deposition, in

```
 1    whatever state she resides in.
 2            That it is difficult doesn't mean that it's
 3    impossible.  She is an available witness for the purposes of
 4    the Evidentiary Rules.
 5            MS. WOODROW: Well, the expense would be very
 6    unreasonable in this under these circumstances, Your Honor--
 7            THE COURT: I don't know that that's a reason.
 8            MS. WOODROW: Poverty?
 9            THE COURT: I mean I get it--
10            MS. WOODROW: That's true.  And I get it--
11            THE COURT: I mean I--
12            MS. WOODROW: Thank you--Yes.
13            (At 2:10 p.m., brief pausing)
14            MS. WOODROW: Well, I can proceed, then.
15  Q   (MS. WOODROW CONTINUING) As a result of the interchange that
16    you had with Ms. Brown, did you come to--Did you come to a
17    belief as to whether or not Matt Favorite was, in fact, an
18    authorized signer for MERS?
19            MS. SWISHER: Objection, Your Honor.  It seems to
20    elicit hearsay.
21            MS. WOODROW: I'm not eliciting hearsay, Your Honor.
22    It's her opinion based upon what she did--
23            THE COURT: An opinion, solely, if it's to her state
24    of mind.  I'll--I'll overrule the objection.  Go ahead.
25            THE WITNESS: Okay--
```

```
 1              MS. WOODROW: You may answer.
 2    A   My understanding is that Matt Favorite was never an authorized
 3        signer for MERS or Residential Funding.
 4    Q   (MS. WOODROW CONTINUING) And did you take further actions to
 5        confirm your understanding?
 6    A   Yes, I did.
 7    Q   And in taking that further action, did you contact Ms. Brown,
 8        again?
 9    A   I contacted her in June of 2010 to request if there had been
10        any updates to the Corporate Resolution that I had received in
11        '09?
12    Q   And did she--Did you two--How did you two (2) communicate?
13    A   We spoke on the phone and I gave her my email address in the
14        event that she would find something--If she would please
15        forward it to me, of any updates.
16    Q   And did you receive an email from her?
17    A   Yes, I did.
18    Q   And as a result of that email, did that change your opinion
19        about whether or not Matt Favorite was not--That Matt Favorite
20        was not an authorized signer for MERS?
21              MS. SWISHER: Same objection, Your Honor.  We seem to
22        be circling the drain here, trying to get this information in,
23        although, it's clearly hearsay.
24              MS. WOODROW: It's her lay opinion based upon the
25        investigation that she covered.
```

```
 1                THE COURT: I'll allow it for the limited purpose of

 2      what her state of mind is.  I don't have much underneath it,

 3      but--

 4  A   (CONTINUING)--After reviewing--

 5                THE COURT: --I'll allow it.

 6                THE WITNESS: Oh--

 7  A   (CONTINUING)--After reviewing the email that I received from

 8      Ms. Brown; Mr. Favorite was still not listed on the updated

 9      Corporate Resolution.  She said--Well--

10                THE COURT: Well, hold it--

11  A   (CONTINUING)--She said--

12                THE COURT: --You cannot tell me what she--

13                MS. WOODROW: You can't say what she said--

14                THE WITNESS: I know--I know.

15                THE COURT: The question is, is what was your

16      understanding?

17                THE WITNESS: My understanding is that Matt Favorite

18      was still not and had not ever been an authorized signer for

19      MERS nor RFC between 2006 and 2010--

20                THE COURT: All right.  Thank you.

21                MS. WOODROW: Thank you.

22  Q   (MS. WOODROW CONTINUING) I'm going to show you--This is the

23      Sheriff's Deed--

24                THE COURT REPORTER: Microphone--

25                (At 2:13 p.m., brief pausing)
```

```
 1  Q    (MS. WOODROW CONTINUING) And on that Exhibit on the bottom--Do

 2       you recognize that, first?

 3  A    Yes.  I recognize it--

 4  Q    Do you recognize that document?

 5  A    Yes, I do.

 6  Q    And on the bottom of that document on the left hand side,

 7       there is a file number.  Would you read that file number?

 8  A    Two, zero, seven, dash, six, zero, three, six (207-6036).

 9  Q    Do you recall whether or not that's the same file number that

10       was on the assignment of mortgage that had been written that

11       Renee Hiveley entered above on the--where she put a sticker

12       for return to E-Title?

13  A    Yes.

14            MS. WOODROW: Thank you.  I've nothing further, Your

15       Honor.   Thank you.

16            THE COURT: Cross-Examination?

17            MR. MYERS: Your Honor, could we have one (1) second?

18            THE COURT: Yes.

19       (At 2:14 p.m., long pausing)

20       (At 2:15 p.m., above matter continuing)

21                    CROSS-EXAMINATION

22  BY MS. SWISHER:

23  Q    Ms. Baker, do you have in front of you the document that was

24       previously identified as Defendant's Exhibit D?  The

25       assignment of mortgage?
```

```
 1  A    No.
 2                   (At 2:15 p.m., the Court handed DX# D to the
 3                   witness)
 4                   MS. SWISHER: Thank you, Your Honor.
 5  Q    (MS. SWISHER CONTINUING) In reference to this Exhibit D, it
 6       indicates that it references a mortgage dated May the
 7       fifteenth (15th), 2006, executed by Michael J. Baker and Suzie
 8       Baker, husband and wife.  Do you see that?
 9  A    Yes.
10  Q    Is that information accurate?
11  A    Yes.
12  Q    You and your husband, Michael did, in fact, sign a mortgage on
13       that date?  Correct?
14  A    Yes.
15  Q    And the mortgage was to MERS?
16  A    No.
17  Q    They were not identified as the mortgagor?
18  A    No--
19  Q    Mortgagee?  Excuse me.
20  A    No.
21  Q    Who was it?
22  A    The mortgage was to Franklin Financial.
23  Q    MERS was, as nominee for Franklin Financial?  Correct?
24  A    MERS was listed as a nominee for the Lender?
25  Q    Okay--That's what I meant.  And do you see in the middle of
```

```
 1       the page someone has inserted in handwriting the Liber and
 2       Page number and the recording date with regards to when your
 3       mortgage was recorded?
 4   A   Yes.
 5   Q   Do you have any reason to think that's inaccurate?
 6   A   No.
 7   Q   So, all of that information is accurate?  Correct?
 8   A   Yes.
 9   Q   Thank you.  You previously testified that you called Ms.
10       Brown?  Is that correct?
11   A   Yes.
12   Q   Isn't it true that you made inquiries through MERS?
13   A   I contacted Ms. Brown directly through Homecomings.  That
14       wasn't through MERS.
15   Q   Is Dexter Title your company?
16   A   It's a company I own; correct.
17   Q   And you incorporated that in 2006?  Is that correct?
18   A   It's not incorporated.  It's not--
19   Q   It's no longer incorporated?
20   A   --It's an LLC.  It's not incorporated.
21   Q   Okay.  It--But it is your company?  Correct?
22   A   Yes.
23   Q   You--You handle the filing with the State of Michigan?
24       Correct?
25   A   Correct.
```

```
 1   Q    How many persons did it employ?

 2   A    Just me.

 3   Q    You were the only person who would identify themselves as

 4        Dexter Title?

 5   A    I own the company; yes.

 6   Q    And isn't it true that in March of 2009, you, on behalf of

 7        Dexter Title--Or I should say--As Dexter Title--emailed

 8        Camelia Martin, at MERS, asking for information regarding Matt

 9        Favorite?

10   A    I don't recall.

11   Q    Do you recall what was your--What Dexter Title's email address

12        was at that time?

13   A    Dexter Title at Yahoo dot com (dextertitle@yahoo.com).  But I

14        have several email addresses, so--

15   Q    (PAUSING)--I'm showing you what I believe was marked as

16        Exhibit Thirteen (13).  Is that the number at the bottom?

17   A    That's what it shows.

18   Q    Does this refresh your memory?

19   A    No, it doesn't.

20   Q    So, you do not recall emailing from Dexter Title to Camelia

21        Martin at MERS?

22   A    I don't recall.  I deal with several emails a day over the

23        last, obviously, seven (7); eight (8) years.

24   Q    And this is the email address that you just identified; is it

25        not?  Dexter Title at Yahoo dot com (dextertitle@yahoo.com)?
```

```
 1  A    It is.
 2  Q    And as--Do you have any reason to think that this is not your
 3       email?
 4  A    No.
 5  Q    And it says, "Can you please verify in writing that Matt
 6       Favorite had authority to sign as an officer of MERS."  Is
 7       that correct?
 8  A    Yes.
 9  Q    And you said, "We have found discrepancies in the public
10       record."  Who is we?
11  A    I had conversations with an attorney who was part of the land
12       --title (sic).  The attorney was--
13            MS. WOODROW: I'll object that the attorney/client
14       privilege applies.  You don't need to--
15            THE COURT: All right.  I think the question was; Who
16       is we?
17            MS. SWISHER: Yes, it was.
18            THE COURT: Does that include an attorney?
19            THE WITNESS: It does.
20            THE COURT: All right.  And anything that you would
21       have--a conversation that you would have had with that
22       attorney is protected by privilege.  So, you don't have to--
23            THE WITNESS: Okay--
24            THE COURT: --state that.  Do you understand that,
25       Ma'am?
```

```
 1              (NO AUDIBLE RESPONSE)
 2              THE COURT: Do you understand that, Ms. Baker?
 3              THE WITNESS: Yes--
 4              THE COURT: All right.  So--
 5              THE WITNESS: Thank you--
 6              THE COURT: --I'll sustain the objection to the
 7    extent the question was even asked.
 8              MS. SWISHER: I just wanted to know who 'we' was,
 9    Your Honor.  And I think she provided that.
10  Q (MS. SWISHER CONTINUING) In other words--Again, Dexter Title
11    was simply you?  Correct?  There are no other employees?
12  A Correct.
13  Q And you say, "In the event you do not find any record of Mr.
14    Favorite, our underwriter would like us to send an affidavit
15    to you to enter into our file for MERS stating the same."  Do
16    you see that?
17  A I see that.
18  Q So, you were purporting to solicit from MERS information to
19    assist an underwriter?
20              MS. WOODROW: Objection, Your Honor.  She has called
21    and she wanted to find out about him--
22              MS. SWISHER: That's--No, we're not talking about a
23    phone call--
24              MS. WOODROW: It's the--
25              MS. SWISHER:--We're talking about an email.
```

1              MS. WOODROW: --In the email she was trying to

2    investigate to find out information about Mr. Favorite.

3              THE COURT: I don't know kind of objection it is--

4    It's overruled.

5              MS. SWISHER: Thank you, Your Honor.

6  A  (CONTINUING)--I'm sorry.  I don't understand your question,

7    completely?

8  Q  (MS. SWISHER CONTINUING) Well, Ms. Baker, Exhibit Thirteen

9    (13) is an email that you sent?  Correct?

10  A  It appears.

11  Q  And it indicates that you are looking for information for an

12    underwriter?  Was that true?

13  A  The underwriter was an attorney that I spoke with.

14  Q  What--Why would you be talking with an underwriter at that

15    point regarding your mortgage?

16  A  Working in the title industry and using the resources that I

17    have available to me would include an attorney that

18    specializes in real estate.  I certainly would ask a question

19    of him--There were several documents that were found that had

20    different, varying signatures, which led to questions about

21    authenticity of Mr. Favorite.

22  Q  Where on this email is your name, Suzie Baker?

23  A  It's not.

24  Q  Where on this email is your home address?

25  A  It's not.

1  Q    Do you, in any way, that you're gathering this information for

2       yourself, a borrower?

3  A    No.

4              MS. SWISHER: Your Honor, we would move for the

5       admission of Exhibit Thirteen (13)?

6              THE COURT: Any objection or Voir Dire?

7              MS. WOODROW: No, Your Honor.

8              THE COURT: Exhibit Thirteen (13) is admitted.

9              (At 2:22 p.m., PX# 13 - received into evidence)

10             MS. SWISHER: Your Honor, I think, that's all I have.

11      Just a second, please.

12             (At 2:23 p.m., brief pausing)

13             MS. SWISHER: Thank you, Your Honor.

14                      CROSS-EXAMINATION

15  BY MR. MYERS:

16  Q    Ms. Baker, where is Mr. Baker today?

17  A    He is home with my sick child.

18  Q    Is that the reason that he's not here today?  Or is there

19      another reason he's not here today?

20  A    My daughter, who is five (5), has a fever.  And he's home with

21      her, because I couldn't send her to a daycare to be taken care

22      of today.

23  Q    Did he have any involvement during the entire scope since 2006

24      to present with communicating with anybody about the mortgage?

25  A    He would have had some conversations; yes.

```
 1  Q    What would those conversations have entailed?

 2  A    I didn't have those conversations.

 3  Q    You have no idea of what the conversations he would have had

 4       with the--

 5  A    Well, there was certainly conversation regarding the Force

 6       Placed Insurance that he discussed.

 7  Q    Anything else?

 8  A    Ah--(PAUSING)--

 9            MS. WOODROW: Objection.  That's an overbroad

10       question, Your Honor.

11            MR. MYERS: If she knows.

12            THE WITNESS: I--I--

13            THE COURT: If her husband had any conversations

14       regarding the mortgage, ever?

15            MR. MYERS: Yes.  She's testified that, to some

16       extent there was conversations about the Force Placed

17       Insurance.  And I'm inquiring if there was anything else that

18       she's aware of.

19            THE COURT: I'll overrule the objection.  I'll allow

20       you to answer.  I mean I--I don't know what--Why I need to

21       know whether or not her husband had any conversations

22       regarding the mortgage.

23            MR. MYERS: I'm just wondering what her husband's

24       involvement was with all of this.  There's--There's a large

25       box of documents back there and Ms. Baker has clearly had an
```

132

```
 1        intensive amount of involvement over the years and I'm curious
 2        what her husband's involvement is.
 3                    MS. WOODROW: Your Honor?  The issue here is--
 4                    THE COURT: What--What is the relevance of that?
 5                    MS. WOODROW: Thank you.
 6                    MR. MYERS: I'll withdraw it.  I can move on.
 7                    THE COURT: Thank you.
 8   Q    (MR. MYERS CONTINUING) You testified that Dexter Title is your
 9        company.  Do you have any other title related companies?
10   A    Yes.
11   Q    What are those?
12   A    Baker Title, also.
13   Q    And is Baker Title, an LLC, as well?
14   A    Yes, it is.
15   Q    Where is that located?
16   A    Out of my home.
17   Q    And what is the purpose of Baker Title?
18   A    It's the same as Dexter Title.  When I filed Baker Title, was
19        because I realized that using the word 'Dexter' in my business
20        name kind of limited my ability to service other areas.  I
21        didn't want to appear to only serve Dexter.
22   Q    And what--What is the work that you service?
23   A    Pardon me?
24   Q    What is the work that you service?
25   A    At--At what time?  What year?  When?
```

1    Q    Well, you--You're the one that said that you started these

2         companies to service certain things.  I'm just wondering what

3         it is that you service?

4    A    In the beginning, I was doing title insurance, and insuring

5         properties.  Currently, I'm a Notary Signing Agent, so I do

6         people's mortgage closings.  I get documents from Lenders and

7         I go to their homes and I sign the documents with them and

8         send them back.

9    Q    What was your job in 2006?

10   A    I was in title insurance.

11   Q    And that was working for your own company?

12   A    Part of it was; yes.

13   Q    Do you have Exhibit D in front of you there?

14             THE COURT: Exhibit what?

15   A    (CONTINUING)--Yes.

16             THE COURT: D?

17   Q    (MR. MYERS CONTINUING) Ms. Swisher had asked you certain items

18        about this document if the information was true and accurate.

19        The mortgage amounts, nine thirty-seven comma five hundred

20        point zero, zero (937,500.00), was that the correct amount of

21        the mortgage?

22   A    I believe so.

23   Q    And below that the property address; 5141 North Territorial

24        Road, Dexter, Michigan, 48130.  Is that--Is that the accurate

25        property address?

```
 1 A   That is the property address.
 2 Q   Is there any item within Exhibit D that you believe is
 3     inaccurate?
 4 A   Yes.
 5 Q   What's that?
 6 A   The assignor is not accurate from a title standpoint.  And I
 7     did not--My mortgage was with Franklin Financial.  MERS was
 8     only a nominal (sic) party for the Lender.  They weren't the
 9     actual Lender.
10 Q   As someone who's apparently had a title company and seems to
11     be familiar with the title industry, are you acquainted with
12     MERS?
13 A   Very limited on a very distant basis.
14 Q   Ma'am, have you--Have you read and reviewed your mortgage?
15 A   Yes, I have.
16 Q   And do you remember that MERS is named as the mortgagee in
17     your mortgage?
18 A   They're named as a nominee for the Lender.  They're not named
19     as the mortgagee.
20 Q   What's your understanding of how your mortgage was recorded?
21     Under what company's name as the--as the mortgagee, with the
22     Register of Deeds?
23 A   As Franklin Financial, as the Lender.  With MERS as the
24     nominal (sic)--as a nominee for the Lender, their successors
25     and/or (sic) signs.
```

1    Q    You don't believe that MERS is the mortgagee for your

2         mortgage?

3              MS. WOODROW: Your Honor, the mortgage will speak for

4         itself.  She may not--You know--have a recollection as her

5         recollection.  But the document speaks for itself.  We have a

6         copy here if you would like--

7              THE COURT REPORTER: Microphone--

8              MS. WOODROW: We have a copy here if you would like

9         it, Your Honor.  The mortgage speaks for itself.  And--

10             MR. MYERS: Well, she's--She's identified the

11        assignor as being incorrect on this.  And if MERS is the

12        mortgagee--Which I agree, the mortgage speaks for itself and

13        does identify MERS in there, as the mortgagee; then MERS is

14        the proper assignor in this.  So, that's--I'm attempting to

15        inquire into a little bit more information about why she

16        believes that MERS is not the mortgagee.

17             MS. WOODROW: I do note that it does say that MERS is

18        the mortgagee, Your Honor, under the security interests--

19             THE COURT: Okay.  If the parties stipulate that MERS

20        is the mortgagee, I don't have a problem with it--

21             MS. WOODROW: Thank you--

22             THE COURT: --I'm not sure why we're even going

23        around and around about it.  It either is or it isn't.

24    Q    (MR. MYERS CONTINUING) Well, other than the assignor, is there

25        anybody else?  Or is there any other item in this that you

1   believe is untrue?

2  A  I don't know that it's Matt Favorite's signature.  And

3     according to a copy of Karen Steffensen's Notary application,

4     which I have reviewed, the signature--And no, I'm not a

5     handwriting expert.  However, on her Notary application, she

6     has a d'nealian second (2nd) grade curly Q kind of E, which is

7     not how it's reflected on this document.

8  Q  Anything else?

9  A  Not off the top of my head.  However, I have not reviewed the

10    legal descriptions, but--recently, to verify that that was

11    actually the correct legal description.

12 Q  So you have no reason, as we sit here today, to believe that

13    it's not true?

14 A  What?

15 Q  The legal description?

16 A  Oh, I--I don't believe that it's incorrect; necessarily; no.

17          MR. MYERS: Very good.  Your Honor, I have no more

18    questions.

19          THE COURT: Anything additional?

20          MS. WOODROW: No, thank you, Your Honor.

21          THE COURT: Anything?

22          MS. WOODROW: Thank you--

23          MS. SWISHER: No.  Thank you, Your Honor.

24          THE COURT: All right.  You may step down.

25          (At 2:30 p.m., witness excused)

```
1              (At 2:30 p.m., brief pausing)
2              THE COURT: Any additional witnesses?
3              MS. WOODROW: No, Your Honor.
4              THE COURT: All right.
5              MS. SWISHER: Your Honor, I'd like to make a motion--
6              MS. WOODROW: We would refer--reserve the right to
7      call Rebuttal witnesses, however.
8              THE COURT: Yes.  Your motion?
9              MS. SWISHER: Thank you, Your Honor.
10             The Court and everyone is well aware, we are here
11     with regards to a remand from the Circuit Court.  I have in
12     front of me the transcript of that court proceeding.  And I'm
13     specifically referencing the Circuit Court proceeding on
14     October four (4), 2012.
15             And Your Honor, I'm happy to give the Court the
16     entire transcript.  I am admittedly cherry-picking here just
17     to provide the synopsis of what I understand to be at issue.
18             The counsel for the Baker's indicated they had newly
19     discovered evidence that had occurred since the last judgment
20     on November seventeenth (17th) of last year, which is, I
21     believe, this Court's Opinion of November seventeenth (17th),
22     2011.
23             And in response to this suggestion of new evidence,
24     the Circuit Court said quote;
25             "Well, you'd have to prove that the newly
```

1     discovered evidence was fraud.  And that had that not

2     been committed, that judge would have changed the

3     decision."

4          Your Honor, this is my understanding of why we're

5     here.  That there was a representation to the Circuit Court of

6     newly discovered evidence that constituted a fraud on this

7     Court.

8          Your Honor, I--Simply put, I've heard nothing in the

9     way of the proofs offered by the Defendants that even includes

10    any falsehood.  Let alone, a fraud.  And I haven't heard

11    anything offered that would even have been part of this

12    Court's record.  This was simply before this Court for an

13    eviction action following a foreclosure.

14         Your Honor, we have spent a great deal of time

15    getting to this point today.  And we would request that the

16    Court proceed upon these very limited proofs offered by the

17    Defendants to find that there was no fraud on this Court.

18    Thank you, Your Honor.

19         MR. MYERS: I would join in Ms. Swisher's motion.

20    Whatever processes the Court heard this morning that may have

21    been done better or in a different way, there certainly has

22    been no testimony to connect the dots that it was illegal;

23    that it was improper.  That it--

24         THE COURT: Well, I don't mean to interrupt you.  I

25    guess one thing that the Court was thinking of--And I wasn't

1    looking at it necessarily in the context of the Circuit

2    Court's remand, but just as--I think it certainly fits within

3    the realm of that.

4         During the lunch break, I looked at the original

5    filing in this case.  And the testimony that I've heard today

6    regarding information that's added to the documents--to the

7    assignment, along with, at least, in one other instance, the

8    changing of the assignment, but not in the Baker case.

9         Can you tell me then why the assignment, which--I

10   guess is--critical when I look at the Sheriff's Deed and I

11   look at the complaint, which the Sheriff's Deed is part of the

12   complaint, which was filed in this case--While the--Why the

13   assignment--Why that would be considered valid?

14        Because I--I believe we would all agree that there

15   has to be a proper Notary on the assignment.  And if you look,

16   specifically, at the language in Exhibit D--

17        Did you give me the--

18        THE DEFENDANT: MS. BAKER: I'm sorry.  I left it on

19   the table.

20        THE COURT: (CONTINUING)--And it's kind of a long

21   question that I have--But the Notary is indicating--And I'll

22   read from it that--In part--It says;

23        "On November tenth (10th), 2006 before me, the

24        undersigned, a Notary Public in and for said State,

25        personally appeared Matt Favorite, Vice President of

1        Mortgage Electronic Registration Systems, Inc., and

2        then in parenthesis MERS ("MERS"), personally known

3        to me to be the person whose name is subscribed to

4        the within instrument and acknowledged before me that

5        he executed the same in his or--his slash her

6        (his/her) authorized capacity."

7              Once that document is changed, that Notary is no

8        longer true.

9              MR. MYERS: May I respond?

10             THE COURT: Go ahead.

11             MR. MYERS: The document was not notarized as to the

12       truth of the content.  The document was notarized as to the

13       appearance of Matt Favorite.  The Notary block states only

14       that it's notarized--That this person appeared and signed the

15       document.

16             THE COURT: But the document that's filed isn't the

17       document he signed.  That's, I guess, my point.

18             MR. MYERS: But if the Court is focusing on the

19       notarized portion of it, the document was not notarized for

20       the truth of the contents of the document.  The Notary

21       occurred only as to who this person was.  And I don't--I don't

22       want to--

23             THE COURT: Counsel, let me--Let me--Because this is

24       a very important point--

25             MR. MYERS: I understand.

1          THE COURT: --This is a very important point for the

2     Court.  Without that Notary that this document could not have

3     been filed with the Register of Deeds?

4          MR. MYERS: Correct.

5          THE COURT: The Notary indicates that the document--

6     This document is the document that Matt Favorite executed.

7     When, in fact, given the testimony, that's not the case.

8          MR. MYERS: I would suggest to the Court that if that

9     is the case, the issue is between the attorney and the client,

10    because this was accepted by the Register of Deeds.  There has

11    been nothing--In fact, the testimony was to the contrary that

12    everything contained in this document was true and accurate

13    and was done for the purpose of making it recordable.

14          And while I agree that what was submitted was not

15    the document that was signed and notarized, I don't believe

16    that that necessarily changes the content of the document with

17    what has been added.

18          This wasn't a situation where the assignor or the

19    assignee had been changed.  And I--I sense the Court has some

20    pretty strong feelings that disagree with where I'm going with

21    this.

22          THE COURT: Well, you can sense what you want to

23    sense for me.  I mean I'll say what I'm going to--I'm

24    thinking.  I mean I don't have a problem saying what I'm

25    thinking.

1          I'm just--I'm not getting an answer to my question.

2     Because if you have to have a proper Notary on the document.

3     And the document--And the Notary indicates that this person,

4     basically, appeared before me and signed this document.  And I

5     present that then to the Register of Deeds.

6          The difficulty that I'm having with Exhibit D is

7     that's not true, because the Notary no longer is true.

8     Because after it's signed; after it's notarized, it's then

9     filed.  But it's not the document that Matt Favorite--Under

10    anybody's definition--executed.

11         MR. MYERS: I guess we look at it from a different

12    angle.  It is--

13         THE COURT: I'm sure.

14         MR. MYERS: --It is the same document, because none

15    of the additions that were made change the underlying nature

16    of this document.  And that was why we sort of went through

17    and asked the questions, 'can you identify the mortgage from

18    this?'  'Can you identify the mortgage amount?'

19         THE COURT: Counsel, look at Exhibit D.  I mean I--I

20    hear what you're saying, but I--In particularly, the third

21    (3rd) line of the Notary.

22         'It would be the person's whose name is

23         subscribed to be within the instrument and acknowledge

24         to me that he executed the same in his or her authorized

25         capacity.'

1          And then it goes on--(PAUSING)--That's not true.

2     Because the moment information is added and Mr. Favorite does

3     not re-sign and then re-notarize, that no longer is true.

4          The document that was presented--Put in short form--

5     The document that got presented to the Washtenaw County

6     Register of Deeds, is not the document that Mr. Favorite

7     executed.  (PAUSING)--That's my difficulty.

8          I mean I'll let you go on with your argument.  But I

9     mean, in fairness, I just wanted to lay that out to you that

10    that's a problem.

11         And well--And let me just--So that you can frame

12    your argument however you wish--That it is that assignment

13    then which, in essence, then from MERS then to Residential,

14    that is evidence in the Sheriff's Deed--Or, at least, was

15    indicated in the Sheriff's Deed, which in and of itself, is

16    the basis upon which Residential was able to proceed.

17         MR. MYERS: Obviously, I view this a little bit

18    differently than the Court does.  I--

19         THE COURT: Go ahead--

20         MR. MYERS: --I appreciate what you've told me.  But

21    let me try to address this, maybe, from--from a different

22    perspective.

23         Orlans was the attorney that was retained by the

24    client to move forward with having this document recorded.

25    The intention behind Exhibit D, was that an assignment of

1    mortgage be recorded.

2         Material terms were presented.  Certainly, there

3    were blanks that were left outside of this document.  As the

4    attorney responsible for insuring that this document was

5    recorded--And I appreciate the fact that you cautioned Ms.

6    Ertman before--about the wordsmithing--I think that there is a

7    difference between changing a document and clerically adding

8    information that would cause the document, itself, to be

9    rejected.

10        I am not aware of any statute that says that would

11   necessarily invalidate the entire document.  In fact, the law

12   is to the contrary--MCL 565.201, sub 5 provides that;

13        "An instrument that complies with the provisions

14        of this act and any other act relating to the recording

15        of instruments shall not be rejected for recording

16        because of the content of the instrument."

17        Subsection four (4) of that statute provides that;

18        "Any instrument received and recorded by a

19        Register of Deeds shall be conclusively presumed to

20        comply with this act."

21        And so what is contained in Exhibit D, whether or

22   not there are clerical errors--or clerical additions made

23   after its' execution, it doesn't change, A, the intent behind

24   the document or the material terms that are contained in the

25   document.

1    There has been no testimony today to say that can't

2    be accepted by the Register of Deeds.  The State's Recording

3    Statute, actually says to the contrary that it can be.

4    And I appreciate the Court's time and indulgence in

5    allowing me to--to respond, I guess, to what you've stated as

6    your opinion on this.  In 2006--

7    THE COURT: I think I stated it as a concern--

8    MR. MYERS: --In 2006, this was the process.  And

9    I've not heard any testimony today that that process would,

10   otherwise, invalidate the underlying intention behind the

11   assignments or invalidate something that the Register of Deeds

12   accepted as a valid document.

13   THE COURT: Okay.

14   (At 2:45 p.m., brief pausing)

15   THE COURT: (CONTINUING)--If the Register of Deeds

16   would have had knowledge that what's contained in the Notary

17   is not true, do you believe they would have accepted it?

18   MR. MYERS: I can't answer that.  We haven't had any

19   testimony today--

20   THE COURT: Can't or don't want to?

21   MR. MYERS: Well, I don't want to speak for the

22   Register of Deeds, Your Honor--

23   THE COURT: No.  But because--No, here's the point,

24   Counsel.  And I think you know what my point is.  As I stated

25   before, you can't file this without a Notary.

1          MR. MYERS: That's true.  You, also, can't file it

2     without certain other information that the Register of Deeds

3     requires.  And the Register of Deeds do (sic) take a look at

4     these documents.  They do reject documents.  If they would

5     have seen the handwritten information; if they would have seen

6     that the legal description was in addition to the document; I

7     would suggest to the Court that had the Register of Deeds--

8     After they took a look at this--Being concerned, that document

9     would have been rejected.

10         THE COURT: Hold it, Counsel.  No.  On that basis,

11    they wouldn't reject.  Whether part of it is type-written,

12    handwritten or not--And somebody has signed it and notarized

13    it; they're not going to--I've not known of a Register of

14    Deeds, anywhere that's going to say, well, part of this is

15    typed and part of this is handwritten; and we're going to, on

16    that basis, reject it.  I've never heard of that occurring.

17         My question is a little bit different.  Had they

18    known that what is contained in the Notary is absolutely

19    false, would they have rejected it?  Because, I no longer have

20    a valid Notary.

21         MS. SWISHER: May I speak to that, Your Honor?

22         THE COURT: You may.

23         MS. SWISHER: Your Honor, I think, the content of

24    this particular Notary's block, if you will, is being given

25    more importance than it's probably due.

1          And I say it for this reason.  I deal with notarized

2     documents all of the time.  And it would simply, typically

3     say, on this date, this person showed up in front of me--

4     Today's requirements would--in Michigan--You'd show your

5     driver's license and the Notary would sign and say--Yeah, that

6     was the guy--

7               THE COURT: That was the person--Huh huh--

8               MS. SWISHER: --That's it.  And I think that's all

9     the Notary requirement is--That's all the State would require

10    of a Notary.

11              So--And there has been no proofs, whatsoever, that

12    Matt Favorite didn't exactly--didn't sit in front of Karen

13    Steffensen and sign this document.

14              THE COURT: Well--

15              MS. SWISHER: --That's the issue before this Court--

16              THE COURT: --No, it's not, Counsel--

17              MS. SWISHER:--Is there a fraud?

18              THE COURT: No, it's not.  Because if I look at the

19    document, whether it would say what it should say under

20    Michigan that this person appeared is one (1) thing.  That's

21    not what it says.  What it says is, is that Matt--In just a

22    colloquial sense--Matt Favorite appeared before me in his

23    capacity and signed this document.  That's not true.

24              MS. SWISHER: He--He did.  I think what--What Your

25    Honor appears to be saying is after--

148

1          THE COURT: The document that was presented to the--
2      to the Register of Deeds; he signed?
3          MS. SWISHER: He--Yes.  He signed that document.  I--
4      I see what the Court is saying.  There was detail added to it
5      afterwards.  I understand--
6          THE COURT: He didn't sign that document, then.  The
7      document that's presented, he didn't sign.
8          MS. SWISHER: If someone had added a page number,
9      would that affect the Court's--
10         THE COURT: Potentially, it could.
11         MS. SWISHER: I--Be--Before Mr. Myers stated it, I
12     was going to direct the Court to the same Michigan statute.
13     Once a document is accepted by the Register of Deeds for a
14     recording, it's deemed to have met the recording requirements.
15         I don't know why this issue would stand out as any
16     different from any other ministerial (sic) issue that is dealt
17     with under that statute.  It's adding dates--It's information
18     that everyone has testified is accurate.  The whole point of
19     recording is to ensure that there is an accurate chain of
20     title.  And this accomplished that very point.
21         MERS is not a party to this--If anyone were to
22     complain, it would seem--It would be the assignor.  They're
23     not here; they're not complaining.  There is no suggestion as
24     between the two (2) parties to this assignment, MERS and RFC,
25     that they intended to do anything but exactly what was

149

1    accomplished by this document.  That's what they wanted to do.

2         This is simply a way of telling everyone who looks

3    at a public record, which the Register of Deeds maintains,

4    what it was that the parties to these instruments intended.

5    MERS assigned this mortgage, which is accurately identified.

6    And that was the point.  That was accomplished.

7         So, Your Honor, I think, I understand what you are

8    saying.  I just don't understand where it gets us, because by

9    recording this assignment, it accomplished exactly what the

10   parties to the assignment wished to accomplish.

11        MS. COLEMAN: May I say something, Your Honor?

12        THE COURT: Well, I was going to let them finish.  I

13   don't know if they were finished with their argument--But--

14   Their motion.

15        MS. SWISHER: Your Honor, I would suggest that there

16   --Again, I don't see any proofs presented to the Court to this

17   point to demonstrate a fraud on this Court.  We are prepared

18   to present evidence if this needs to go forward, but I just

19   don't see it.  So, I'm asking that the Court make this

20   determination in the nature of a Directed Verdict.

21        As the Court may recall, there were lots of

22   pleadings filed by the Defendants that covered a whole lot of

23   other things, and I am pleased that we don't have to go down

24   all of those little paths.  But based upon what we have today

25   --The supposed--(PAUSING--

1          And I should add, too, the whole issue of fraud on

2    the Court, as I indicated from looking at the Circuit Court's

3    transcript, is here because the Defendants represented that

4    they had new information; new evidence.

5          And Your Honor, this assignment of mortgage was

6    recorded back in 2006.  Everything we've talked about today is

7    nothing new.  Thank you, Your Honor.

8          MR. MYERS: Again, I would echo the lack of the--lack

9    of the evidence to suggest that this process, itself, has the

10   effect of invalidating the assignment of mortgage.  Thank you.

11         THE COURT: Any response to their motion?

12         MS. WOODROW: If they had added an extra zero to the

13   amount of money on the assignment of mortgage, would that have

14   been okay and make it okay to be filed?  I think not.

15         I think basically, they're talking about new

16   evidence--And we looked at the Supreme Court case of Hazel-

17   Atlas Glass Company versus Hartford-Empire Company.  That

18   dealt with a fraud on the Court.

19         What happened was many, many years before it came to

20   the Supreme Court.  The attorney drafted an article about a

21   process for making glass.  And he talked someone else into

22   filing in a trade--or printing--Publishing in a trade journal.

23         That dealt with a process that was being used by

24   Hazel-Atlas.  Hartford-Empire then filed for a patent, cited

25   that article, got the patent; but it was contrary to Hazel-

1    Atlas and then they sued Hazel-Atlas.  They won against Hazel-

2    Atlas and many, many years--Fourteen (14) years later, it was

3    finally discovered that it was a false--a fraudulent article

4    and it was a whole--the whole thing was based on that

5    fraudulent article and it was a fraud on the Court.

6         There was some dilatory conduct by Hazel-Atlas, but

7    the Court really didn't care.  What the Court, basically, said

8    was, "No fraud is more odious than an attempt to subvert (sic)

9    the administration of justice."

10        And that's really what's going on here.  They have

11   routinely created the articles.  So, I don't think that a

12   Directed Verdict is called for at this time.  Thank you, Your

13   Honor.

14        THE COURT: Anything else with reference to your

15   motion?

16        MS. SWISHER: No, Your Honor.

17        THE COURT: All right.  Reference to the Motion for a

18   Directed Verdict, the Court will have to look at the evidence

19   in light most favorable to the non-moving party, that being,

20   Ms. Baker.

21        In looking at the evidence with reference--In that

22   regard, the Court would deny the Plaintiff's Motion for a

23   Directed Verdict.

24        As the Court has indicated what it sees.  And if one

25   were to view that--I would further note that there becomes

1    then the issue of what the Court would have done at that time

2    and would it have lead, as I believe it was Judge Connors, to

3    indicate that the Court would have acted differently.

4         I think one needs to realize that when this case

5    originally came up, it was before the case of Residential

6    Funding versus Saurman.

7         It being before that point and time, had this issue

8    been raised before the Court--And I'll have to go back and I

9    will (sic) go into detail on that, but clearly, the Court may

10   very well have acted differently within the confines of where

11   the whole circumstance regarding mortgages and the foreclosure

12   process was at that time.

13        Ultimately, I don't know what that would have meant

14   in terms of the cases that have subsequently come down, like

15   Saurman and then Kim and other cases.  I don't know where that

16   ultimately would have led us.  But I--I--The question I--I

17   think it's proper that Judge Connors put forth, and that is,

18   would the Court have acted differently had it known.

19        That doesn't mean that the Court has made a

20   determination that there is fraud.  I'm just saying that there

21   is sufficient evidence in which the Court, at this juncture,

22   could make that determination, if the Court so chose to do so.

23        So, motion is denied.

24        (At 2:56 p.m., brief pausing)

25        MS. SWISHER:  Thank you, Your Honor.

```
 1                    THE COURT: All right--

 2                    MS. SWISHER: May we confer just to figure out who's

 3       going to offer--

 4                    THE COURT: Certainly--

 5                    MS. SWISHER: Thank you.

 6                    THE COURT: Did you need a little bit of time to do

 7       that?

 8                    MR. MYERS: If you could give us five (5) minutes or

 9       so--

10                    MS. SWISHER: Thank you.

11                    THE COURT: The Court will stand in recess for about

12       ten (10), fifteen (15) minutes--We'll stand in recess.

13                    THE BAILIFF: All rise.

14                    (At 2:56 p.m., above matter recessed)

15                    (At 3:49 p.m., above matter reconvened - all parties

16                    present)

17                    THE BAILIFF: All rise.  The court is back in

18       session. You may be seated.

19                    THE COURT: Back on the record in the case of

20       Residential Funding versus Baker.

21                    You may call your witness.

22                    MS. SWISHER: Thank you, Your Honor.  The Plaintiff

23       calls Peter Knapp to the stand.

24                    THE COURT: Sir, please come forward and be sworn.

25                    (At 3:50 p.m., brief pausing)
```

```
 1                    THE BAILIFF: Do you solemnly swear or affirm to tell

 2        the truth, the whole truth, and nothing but the truth, so help

 3        you God?

 4                    MR. KNAPP: Yes, I do.

 5                    THE BAILIFF: Have a seat.  State your first and last

 6        name and spell them both for the record, please.

 7                    THE WITNESS: Peter, P-e-t-e-r; Knapp, K-n-a-p-p.

 8                              PETER KNAPP

 9                    (At 3:50 p.m., called as a witness by Ms. Swisher

10                    and sworn by the Bailiff and testified as follows)

11                    THE COURT: You may inquire.

12                    MS. SWISHER: Thank you, Your Honor.

13                              DIRECT EXAMINATION

14     BY MS. SWISHER:

15     Q    Mr. Knapp, with whom are you currently employed?

16     A    Ocwen (sic) Loan Servicing.

17     Q    And are you from Michigan?

18     A    I'm not.

19     Q    Okay.  So, you live in another State?

20     A    Yes.

21     Q    And can you briefly tell the Court what Ocwen Loan Servicing

22          is?

23     A    They're a loan servicer.  They--Well--service loans--

24     Q    For mortgages?

25     A    --service loans; yes.
```

```
 1   Q   Thank you.  And for how long have you had any involvement as
 2       an employee in a mortgage servicing or mortgage lending
 3       business?
 4   A   Mortgage servicing since January 2003.
 5   Q   Okay.  So, you've been involved in this mortgage servicing
 6       industry for a number of years?
 7   A   Yes.
 8   Q   Do you have any relationship with or authority from MERS?
 9   A   I do.
10   Q   And what is that?
11   A   I'm a signing officer for MERS.
12   Q   Thank you.  I know there's been a lot of testimony with
13       regards to Exhibit D--
14           MS. SWISHER:--And Your Honor, I'm not sure where the
15       admitted Exhibits have happened off to--
16           THE COURT: They're right here.
17           MS. SWISHER: Thank you, Your Honor.
18   Q   (MS. SWISHER CONTINUING) Mr. Knapp, you have before you
19       Exhibit D, which is an assignment of mortgage that's been the
20       topic of a lot of test--testimony today.  You have been in
21       court, have you not, when all of that testimony was being
22       given?
23   A   I was.
24   Q   And as I recall, Exhibit D, it assigns a mortgage against 5142
25       North Territorial Road, Dexter from MERS to Residential
```

```
 1        Funding Company, LLC?  Is that correct?
 2   A    Yes.
 3   Q    And are you familiar with the process by which MERS holds and
 4        assigns mortgages?
 5   A    Generally, I am; yes.
 6   Q    Okay.  And as an authorized signer, what's your expectation
 7        with regards to who would handle the task of assigning a
 8        mortgage?
 9   A    It--MERS delegates the--the actual task of the assign--
10        handling the assignments or executing the assignments to their
11        --to member companies.  Essentially, those are loan servicers.
12   Q    So, presumably, here--That would be RFC, Residential Funding?
13   A    Or the servicer for RFC.
14   Q    Certainly.  Okay.  With regards to the testimony that you've
15        heard today, did you hear about the handwritten additions to
16        Exhibit D?
17   A    I did.
18   Q    And, specifically, as I recall, that testimony was that the
19        name Michael Baker and the notation of husband and wife were
20        added?  Did you hear that testimony?
21   A    I did.
22   Q    And, I believe, that the Liber and Page number was added?
23   A    Yes.
24   Q    And, I believe, the last page of that document, which is the
25        Legal, was added?  Is that correct?
```

1   A   Yes--That's what I heard; yes.

2   Q   I know that you did not sign this particular assignment of

3       mortgage.  And as I recall, this was back in 2009.  If you, in

4       2009, had been given this document and it was, instead, your

5       signature on behalf of MERS and you were to learn that those

6       particular pieces of information had been added, would you

7       have found fault with that?

8   A   Ultimately, as--As long as the information contained on the

9       document is accurate, it wouldn't--it wouldn't jump out at me.

10      I wouldn't lose any sleep over it; so to speak.

11  Q   With regards to the testimony that you've heard today that

12      Orlans' Law Firm has been mentioned, have you had occasions

13      where you've signed an assignment of mortgage for MERS and it

14      was sent off to a law firm in another State so that it could

15      be recorded--

16  A   Yes.

17  Q   Would you expect the law firm to know that State's recording

18      requirements?

19  A   Yes.

20  Q   Would you take issue with the addition of factually correct

21      information to your Affidavit, if that that law firm believed

22      that that information was necessary to the recording?

23  A   Well, if the information we're talking about is, say,

24      something, along the lines of, I wrote down the United States,

25      and they filled in, 'Of America', I--I can't tell you that I'd

```
 1        have a problem with that.

 2   Q    Okay.  And with the particular information that was added here

 3        --Again, there was testimony that it was accurate information

 4        that was added.  I take it; you would not have had a problem

 5        with that?

 6   A    My intent for signing a document when I'm signing this would

 7        be to--I--I need to transfer--Or I need to have an instrument

 8        that will transfer the property from MERS to Residential

 9        Funding.  And if the--the instrument accomplishes that, then

10        that satisfied the--the intent of executing that document.

11   Q    And that is the purpose with these assignments of mortgage?

12        Correct?  To transfer the mortgage interests from one entity

13        to another?

14   A    I think that's the only purpose for an assignment of mort--

15        assignment of mortgage.

16                  MS. SWISHER: Thank you.

17                  THE COURT: Cross-Examination?

18                  MS. WOODROW: I would, Your Honor.

19                       CROSS-EXAMINATION

20   BY MS. WOODROW:

21   Q    Mr. Knapp, you a signer?  Is that what your position is?  I

22        don't think I caught that?

23   A    I'm a Loan Analyst for Ocwen (sic)

24   Q    A what?

25   A    I'm a Loan Analyst.
```

```
 1  Q    A Loan Analyst?

 2  A    Yes.

 3  Q    Okay.  So, do you know anything about the Baker loan?

 4  A    I prepared for my testimony here today.

 5  Q    Did you review the Baker file?

 6  A    I--Yes.

 7  Q    Okay.  Is Ocwen (sic) the servicer?

 8  A    Ocwen (sic) is the servicer.

 9  Q    Oh.  And when did they become a servicer?

10  A    They acquired--I believe they became the servicer on or around

11       February sixteenth (16th) of 2013.

12  Q    And who owns the mortgage?

13            MS. SWISHER: I object to the form of the question--

14            THE COURT: Sustained--

15            MS. SWISHER: --The mortgage has been foreclosed--

16            THE COURT: Sustained.  You need to rephrase.

17            MS. WOODROW: Oh.  Thank you.

18  Q    (MS. WOODROW CONTINUING) Where is the Note?

19  A    (NO AUDIBLE RESPONSE)

20  Q    Have you seen the Note?

21  A    I've not--Well, I've seen a copy of the Note, but I've not

22       seen the Note--The original.

23  Q    Okay.  Would you object if an assignment of mortgage was

24       prepared with all of the proper information and given you to

25       sign and be notarized?
```

```
 1  A    No, I--If I received a--a copy of an assignment of correct
 2       information, I would have no problem signing that.
 3  Q    Is it a preference--preferable to sign a document that has all
 4       of the correct information?
 5  A    Of course.
 6  Q    Does the name William Hultman mean anything to you?
 7  A    No.
 8  Q    Didn't he used to be the Corporate Secretary of MERS?  One (1)
 9       of the founders?
10  A    I--I--If he is, I--I don't know.  I don't know who he is.
11  Q    Have you ever seen a Corporate Resolution?
12  A    I've seen a document entitled Corporate Resolution.
13  Q    I think there might be one (1) that was left on the desk there
14       --Marked Exhibit B in this.
15  A    I have Exhibit D in front of me.
16  Q    No.  B, as in boy.
17            (At 3:58 p.m., brief pausing)
18            MS. SWISHER: Your Honor, I think, counsel is
19       referencing a document that was not admitted.
20            MS. WOODROW: Correct.
21            THE COURT: All right--
22            THE DEFENDAN-MS. BAKER:  I left it there--
23            MS. WOODROW: It was left up at the--on the witness
24       stand.
25            THE COURT: I thought that I had returned all of them
```

```
 1        to you--
 2                   MS. WOODROW: Okay--
 3    Q   (MS. WOODROW CONTINUING) What is a Scribner's error?
 4    A   My understanding is that a Scribner's error is an error in the
 5        --I've always thought of it as an error in the legal
 6        description that needs to be corrected.
 7    Q   It is some sort of an error in a legal document?  Is that
 8        correct?  And you sign a document saying, Scribner's error;
 9        correction of documents?  Isn't that correct?
10    A   My association has been, not necessarily just any legal
11        document, but my association with a Scribner's error has been
12        associated to some type of defect in addressing or naming
13        which property has been attached to--
14    Q   Some kind of an error in a document, then?  Right?
15    A   --the debt.
16                   MS. SWISHER: I object to the--
17                   MS. WOODROW: It's--
18                   MS. SWISHER: --question.  It's been asked three (3)
19        times.  And the witness has testified consistently twice.
20                   MS. WOODROW: Okay.
21    Q   (MS. WOODROW CONTINUING) So, the purpose--
22                   THE COURT: Overruled.
23                   MS. WOODROW: Thank you, Your Honor.
24    Q   (MS. WOODROW CONTINUING)--The purpose of a Scribner's error is
25        to correct a document--I say that a Scribner's error is to
```

```
 1        correct a document error, such as the misspelling of a name?

 2        Right?

 3   A    Yes.

 4   Q    And reverse the digits and the address?  And left out a line

 5        of the title--of the title description?

 6              MS. SWISHER: Objection; compound.

 7   A    (CONTINUING)--Just my only hesitation--

 8              THE COURT: Go ahead--

 9              THE WITNESS: Sorry--

10              THE COURT: --You can answer the question.

11   A    (CONTINUING)--My only hesitation is I--I'm--My association of

12        my--my interaction with the term Scribner's error has always

13        been limited to some type of mortgage related document.  So,

14        I've never thought or contemplated that it might actually

15        apply to other types of documents.  If it does then your

16        definition of it or your explanation of the definition of it

17        would be accurate.

18   Q    (MS. WOODROW CONTINUING) Okay.  And the assignment of mortgage

19        is a mortgage related document, isn't it?

20   A    It is.

21   Q    Okay.  So, when a document doesn't have all of the information

22        in it, you could file it and then find a Scribner's error to

23        correct the document and put all of the correction information

24        in; couldn't you?

25   A    (NO AUDIBLE RESPONSE)
```

```
 1              MS. SWISHER: I object to the question.  I think it
 2     asks for a legal conclusion presumably regarding the laws of
 3     the State of Michigan.
 4  Q  (MS. WOODROW CONTINUING) As a lay person.  In working in--You
 5     work in mortgages and you sign these documents all the time--
 6              THE COURT: I'll sustain the objection.  You'll need
 7     to rephrase your question.
 8              MS. WOODROW: Okay.
 9  Q  (MS. WOODROW CONTINUING) Wouldn't it be possible to have your
10     counsel prepare--Or have your counsel ever prepared a
11     Scribner's error for you to sign?  Affidavit of Scribner's
12     error?
13  A  I've never signed a Scribner's error.
14              THE COURT: Did you say, never?
15              THE WITNESS: I never--I never have.
16              THE COURT: Okay.
17              MS. WOODROW: Okay.  Just one (1) moment.
18              (At 4:01 p.m., brief pausing)
19              THE COURT: If you had questions regarding the
20     Corporate Resolution that was marked as Exhibit B, it's right
21     there, Counsel.
22              MS. WOODROW: Oh, there it is.  Thank you--
23              (At 4:01 p.m., Ms. Woodrow approached the Bench)
24              THE COURT: Yes, you may approach--
25              MS. WOODROW: I have nothing--I have nothing further,
```

1    Your Honor.  Thank you.

2              THE COURT: All right.  Anything additional?

3              MR. MYERS: No questions.

4              MS. SWISHER: Nothing.  Thank you.

5              THE COURT: Sir, if I could just ask you.  (PAUSING)

6    --You still have Exhibit D in front of you?  Correct?

7              THE WITNESS: Yes, Your Honor.

8              THE COURT: I want to make sure I'm understanding

9    your testimony in this case.

10             As I understand it--Strike that.  Let me ask it this

11   way.

12             Have you ever signed one where there are items--

13   Where there are lines or items that are purposefully left

14   blank and then sent off?

15             THE WITNESS: No Sir.

16             THE COURT: No?

17             (NO AUDIBLE RESPONSE)

18             THE COURT: (CONTINUING)--So, when you execute--Say,

19   in an assignment of mortgage--To your knowledge is it

20   complete?

21             THE WITNESS: Yes Sir.

22             THE COURT: All right.  If you look at the middle of

23   that document where it talks about--I think the Liber and Page

24   --And I'm looking for my actual copy of it--

25             (At 4:02 p.m., brief pausing)

```
 1              THE COURT: But it--It--I believe there are lines

 2      there, underneath--

 3              MS. WOODROW: I have a copy, Your Honor.  May I

 4      approach?

 5              THE COURT: Yes, you may--If you would.  Thank you,

 6      Counsel--

 7              MS. WOODROW: You're welcome.

 8              THE COURT: That way, we can make sure you're picked

 9      up on the mic.

10              (At 4:03 p.m., brief pausing)

11              THE COURT: (CONTINUING)--See, in the middle where it

12      indicates; 'And recorded in the book of--And then there's a

13      line on page--And then there's a line as instrument number

14      blank on--and another line.

15              In your copy it's filled in.  Have you ever signed

16      one where that is left blank?

17              THE WITNESS: No Sir--

18              THE COURT: Or something along those lines?  All

19      right.

20              I guess, I'll ask this.  If it were blank, would you

21      sign it?

22              THE WITNESS: No Sir.

23              THE COURT: And why would that be?

24              THE WITNESS: It's preferred to sign a completed

25      document.
```

```
 1              THE COURT: So, am I to take from your testimony--And
 2    I appreciate the answer--Am I to take from your testimony that
 3    if the document does not look complete to you, you would not
 4    sign it?
 5              THE WITNESS: Well, I would be responsible for the
 6    information contained in it.  That--This is my take on it.
 7    So, if there were any errors made on the document after I
 8    signed it, I would be responsible for that.
 9              THE COURT: Okay.  And so, you wouldn't sign it
10    because you don't want the responsibility for something that
11    might be added or--
12              THE WITNESS: That's correct.
13              THE COURT: All right.  Any questions based upon the
14    Court's questions?
15              MS. SWISHER: No, Your Honor.
16              MR. MYERS: No, Your Honor.
17              MS. WOODROW: No thank you, Your Honor.
18              THE COURT: All right.  Sir, thank you.  You may step
19    down.
20              THE WITNESS: Thank you.
21              THE COURT: Thank you.
22              MS. SWISHER: And Your Honor, to be clear, is the
23    witness excused?  He does have a plane to catch.  So, I just
24    wanted to make sure before he leaves the courtroom--
25              THE COURT: Back to where?
```

1         THE WITNESS: Dallas, Texas.

2         THE COURT: It's--It's warm down there? Right?

3         THE WITNESS: Warmer.

4         THE COURT: I have a Texan over here.  But--Then if

5    it's someplace that's warm, no, he can't go.  Yes, this

6    witness is excused.

7         Thank you, Sir.  And have a safe flight, please.

8         THE WITNESS: Thank you very much.

9         THE COURT: All right.  Any additional witnesses for

10   the Plaintiff?

11        MS. SWISHER: No, Your Honor.

12        THE COURT: Any witnesses for Orlans--?

13        MR. MYERS: No, Your Honor--

14        THE COURT: --at this time?  (PAUSING)--Are there any

15   Rebuttal witnesses at this juncture, as to the testimony of

16   Mr. Knapp?

17        (NO AUDIBLE RESPONSE)

18        THE COURT: All right.  The--And without going into

19   detail--The Court had brought up--Had counsel back in Chambers

20   --Had brought up an issue that I think needs to be addressed

21   before I hear argument on the case.

22        I'm going to give counsel an opportunity to look at

23   that issue and have you back and then we'll hear argument on

24   the case.

25        MS. COLEMAN: Your Honor?

```
1              THE COURT: Yes?

2              MS. COLEMAN: Does this mean that we're not hearing

3     the motion on the escrow--

4              THE COURT REPORTER: Microphone--

5              MS. COLEMAN: I'm sorry.  Does it mean that we're not

6     hearing the Motion on the Escrow Increase at this point?

7              THE COURT: I would--

8              MS. SWISHER: I would appreciate having heard, Your

9     Honor, that's why I popped up.  But it will be short.

10             THE COURT: Yeah--People always tell me that in this

11    case.

12             All right.  Let me give a date.  And then I'll hear

13    the Motion--

14             MS. WOODROW: Can I turn on my phone, so I can look

15    at my calendar, Your Honor?

16             THE COURT: Yes, you may.

17             (At 4:06 p.m., brief pausing)

18             THE COURT REPORTER: We have a bench trial at--

19    (INDISCERNIBLE)--

20             THE COURT: What is that?

21             THE COURT REPORTER: (INDISCERNIBLE)--Motions and

22    small claims--

23             THE COURT: What time is that set for?

24             THE COURT REPORTER: We set it for ten (10).

25             THE COURT: That's on the fourth (4th)?  And that's
```

169

```
 1    the only thing I have?
 2                THE COURT REPORTER: Right now that's all I have on
 3    the--(INDISCERNIBLE)--
 4                THE COURT: If it's enough time, I can have you back
 5    on the fourth (4th)--(PAUSING)--That's set at what time?
 6                THE COURT REPORTER: Ten (10).
 7                THE COURT: At about eleven o'clock (11:00), if that
 8    would work.
 9                MS. COLEMAN: Yes, Your Honor.
10                MS. SWISHER: That would be perfect.
11                MR. MYERS: To next Monday?
12                THE COURT: Next Monday.  Will that--Will that be
13    enough time, Counsel?  I just--
14                MR. MYERS: Oh yes.
15                THE COURT: Okay.
16                MS. WOODROW: That should be fine, Your Honor.
17                THE COURT: All right.  At eleven (11).  I do have
18    something before then.  And then we'll, hopefully, get them
19    out of the way.
20                (At 4:07 p.m., brief pausing)
21                THE COURT: All right.  As for the Motion for Escrow?
22                MS. SWISHER: Thank you, Your Honor.  I was just
23    double-checking my calendar.
24                THE COURT: All right--That's okay.
25                MS. SWISHER: Your Honor, very simply put.  As we've
```

1      indicated in the motion that I filed--When this Court entered

2      an Order requiring an escrow payment some time ago--As you

3      know I wasn't involved in this case at that point--The Order

4      was prepared in such a way that it didn't suggest to me that

5      it was via stipulation.  I simply thought it was a Court Order

6      entered after some discussion.

7              In the response that was received, Plaintiff's--

8      Excuse me--Defense Counsel correctly points out that I have a

9      typo in my Brief.  I referenced, apparently, in error,

10     2.612(C)(1)(D).  And I intended to say (C)(1)(F).  So, it's

11     just simply the provision that says any other reason

12     justifying relief.

13             And Your Honor, very simply put, this is an

14     extraordinarily valuable property.  It is probably not the

15     sort of property that this Court routinely has at issue before

16     it.  The monthly escrow payment is five hundred dollars

17     ($500.00) a month.  I think we're talking at about a property

18     that would rent for something more in the neighborhood of

19     north of two thousand, five hundred dollars ($2,500.00) a

20     month.

21             I could look at this value issue from any number of

22     measures.  My client has to continue to pay property taxes.

23     This five hundred ($500.00) a month is just simply far too

24     modest, given what we all know now, particularly, with regards

25     to the length of this case.

1       Something surely no one anticipated way back when

2   this escrow order issued and we simply request that the amount

3   per month be increased, accordingly.  Thank you.

4       MS. COLEMAN: Your Honor, several motions have been

5   brought before this Court.  Despite the fact that this Court

6   has declared on numerous occasions that it is limited in its -

7   --in this Remand from the Circuit Court, to make a

8   determination as to whether--On the issue of whether there's

9   been a fraud upon the Court.

10      Nonetheless, both Orlans and Plaintiff's each filed

11  separate motions to have Defendant's allegations dismissed. An

12  action which this Court could not take.  The Plaintiff then

13  filed a Motion for a Writ of Possession, based on non-payment

14  of the escrows (sic), and refused to withdraw this motion

15  after the Defendants provided them with receipts that all

16  payments were made.

17      The Defendants were then required to spend many

18  hours with both the Fourteen A Three (14A3) and this court, to

19  determine why the court's records did not reflect those

20  receipts.

21      Now we have yet, one more, what we consider,

22  frivolous and meritless motions brought by Plaintiff, asking

23  this Court, yet, again, to take action which is outside the

24  parameters of the remand order.

25      On a more personal note, Your Honor, it was clearly

1   stated to this Court that I would be in surgery.  My surgery

2   was on the eleventh (11th).  I was in no condition to respond

3   to a motion, but it was forced to, six (6) days after my

4   operation.  This is not an emergency situation that could not

5   have waited just a couple more weeks.

6          To the--To address some of the issues brought by

7   opposing counsel.  They discussed the delay that was had at

8   the last hearing; not all of which was due to the Defendant's

9   counsel, but none of which was created by Defendant's

10  themselves.  Yet, Plaintiff seeks to punish Defendants any

11  delay or any inconvenience, we believe, was compensated for by

12  the sanctions that were ordered at the last hearing.

13         Plaintiff cites that there will be a need to return

14  to the Circuit Court--

15         THE COURT: Well, can I just stop you, Counsel?

16  Because I--This matter is actually before the Circuit Court on

17  appeal?  Correct?

18         MS. COLEMAN: No--

19         THE COURT: Or is it--

20         MS. COLEMAN: --This is an independent action.

21         THE COURT: It's an independent action.

22         MS. COLEMAN: Yes.

23         THE COURT: And that was then sent back to me.  So--

24  (PAUSING)--I mean I'm ready to rule.  Because I--I'm going to

25  have to deny the motion.  I don't believe I have the authority

1    to increase the escrow, unless, the Circuit Court would give

2    me that authority to do so.  I mean I--

3              MS. COLEMAN: And that was in my arguments, as well,

4    Your Honor.

5              THE COURT: Yes.  I mean I--I don't believe--

6              MS. COLEMAN: And just a quick summary.  None of the

7    issues presented were unknown factors at the time that the

8    stipulated Escrow Order was entered into.

9              There is nothing new here going on. They were

10   already paying property taxes, insurance--It was already

11   anticipated that my clients were not willing to just roll

12   over.  So, this was going to be for the long haul.  And yet,

13   they entered into it.  We--We find, absolutely no merit in it,

14   Your Honor.  Thank you.

15             MS. SWISHER: If I may briefly, Your Honor?

16             THE COURT: Yes.

17             MS. SWISHER: This--This eviction action is still an

18   action before this Court.  And ultimately, we will be coming,

19   presumably to this Court to request a Writ of Restitution. And

20   so, from my perspective, the only bearing the Circuit Court

21   action to play on this is that the Circuit Court procedure, I

22   got to believe, was not anticipated when this Court entered

23   the escrow order long ago.

24             I've never seen anything like this.  So, I have no

25   idea how any of us could have anticipated a new action in the

1   Circuit Court, resulting in a remand to this Court and heavens
2   knows how many other procedures.
3          So, if that is their sole reason for asking for the
4   increase--And I certainly did not intend, by the filing of my
5   motion to affect any given attorney dealing with a health
6   problem.  Up until this morning, Ms. Baker had three (3)
7   attorneys.  So, that they chose to put this responsibility on
8   Ms. Coleman is certainly not my doing.
9          MS. COLEMAN: If I could point out, Your Honor.  I
10  believe we filed our complaint--independent action--five (5)
11  months before we entered into the--the stipulated escrow
12  order.
13         THE COURT: Well, here's--All right--To the extent
14  that the Court could deal with it, I'm still going to deny the
15  relief (sic).
16         I will tell you since the very beginning--And I was
17  just looking back through the Register of Actions--I guess
18  when I had good handwriting--And I--You know the original
19  escrow amount was actually set around two thousand (2,000) per
20  month.  And we--And that went along for while.
21         There was some hardship that occurred.  And the
22  parties had been working back and forth.  And then ultimately,
23  there was a point at which--Actually, there have been two (2)
24  or three (3), it appears, adjustments to the escrow amount.
25         And periodically, there has been a request to pay

1   the amount out.  And it's been paid to the Plaintiff's in this

2   case, as this matter has proceeded on.

3       But since there, at least, had been a Stipulated

4   Order and--You know, I guess, I was a bit concerned--And I

5   understand that sometimes there is new counsel coming in--And

6   when they get a chance to look at the case, they're trying to

7   figure out why things are the way that they are.

8       But what's clear to me is, is that I--With a case

9   that's gone on this long--And sometimes, it becomes difficult

10  to keep the Defendant on track regarding escrow.  And we have

11  had our points at which we've had to get the Baker's back on

12  track, but have gotten them back on track.  And it was an

13  agreed upon amount of the five hundred (500), so that

14  something was paid (sic).

15      I don't really see, necessarily, a change in the

16  circumstances.  Certainly, the property is what it is.  But

17  there is a Stipulated Order that that's where we are.  And I

18  can't help it that it's taking as long to get through it as it

19  is. But I'm going to deny the request at this juncture to

20  increase escrow.  I'll leave it where it is.  And--

21          MS. COLEMAN: Thank you, Your Honor--

22          MS. SWISHER: Thank you, Your Honor.

23          THE COURT: --we'll do it that way.  All right.

24  Thank you.

25          (At 4:17 p.m., brief pausing)

```
 1              THE COURT: Well, we'll see you folks in a week.

 2              (At 4:17 p.m., above proceedings concluded)

 3

 4   STATE OF MICHIGAN    }

 5                        }

 6   COUNTY OF WASHTENAW }

 7

 8                        CERTIFICATE

 9

10       I, Jacqueline A. Reed, certify that this transcript,

11   consisting of 177 pages, is a complete, true and correct transcript

12   to the best of my ability of the proceedings and testimony taken

13   and transcribed in this case by Ms. Jacqueline A. Reed, CER-0536,

14   held on Monday, October 28, 2013, in Ann Arbor, Michigan.

15

16

17

18   Dated:   November 27, 2013

19

20

21                              _____

22                              Jacqueline A. Reed, CER 0536
                                14A District Court
23                              4133 Washtenaw Avenue
                                Ann Arbor, Michigan  48107
24                              (734) 973-4516

25
```

# EXHIBIT B

Dated: 11/10/2006          CORPORATION ASSIGNMENT of MORTGAGE

OMPANY, LLC

RFC Loan Number:
Seller Loan Number: 12040942
MIN: 100194006020082104          MERS Phone: 1-888-679-6377
**FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. ("MERS")**

the undersigned hereby grants, assigns and transfers to
**Residential Funding Company, LLC**

**8400 Normandale Lake Blvd, Suite 600, Minneapolis, MN  55437-1085**

all beneficial interest under that certain Mortgage dated 05/15/2006
executed by SUZIE  BAKER

TO/FOR:

and recorded in Book _____ on Page _____ as Instrument No. _____ on _____
of official Records in the County Recorder's Office of WASHTENAW County, Michigan.

**MORTGAGE AMOUNT:** $937,500.00
**PROPERTY ADDRESS:**   5142 NORTH TERRITORIAL ROAD  DEXTER, MI  48130
**TOGETHER** with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Mortgage.
                                  **Mortgage Electronic Registration Systems, Inc. ("MERS")**

                                  BY: _____

STATE OF                                    NAME: Matt Favorite
COUNTY OF                 Minnesota )        TITLE: Vice President
                         Hennepin )

On 11/10/2006 before me, the undersigned, a Notary Public in and for said State personally appeared Matt
Favorite, Vice President of Mortgage Electronic Registration Systems, Inc. ("MERS")  personally known to me
to be the person whose name is subscribed to the within instrument and acknowledged to me that s/he executed
the same in his/her authorized capacity, and that by his/her signature on the instrument the entity upon behalf of
which the person acted, executed the instrument.  WITNESS my hand and official seal.

_____
Notary Public in and for said State

Prepared 11/10/2006 by Matt Favorite, Residential
Funding Company, LLC, One Meridian Crossings,
Suite 100, Minneapolis, MN 55423, (952) 979-4000.

KAREN E. STEFFENSEN
NOTARY PUBLIC-MINNESOTA
MY COMMISSION EXPIRES 1-31-2010

# EXHIBIT C

OFFICIAL SEAL
L-4596  P-209
12/07/06
Washtenaw Co., MI
Lawrence Kestenbaum
Clerk Register



Page: 1 of 2
01:26 P
12/07/06
ACS-5782642-AS-2006-2
Lawrence Kestenbaum, Washtenaw
L-4596  P-209

Dated: 11/10/2006       CORPORATION ASSIGNMENT of MORTGAGE

When recorded return to: _____ OMPANY, LLC
e-Title
PO Box 5041
Troy MI 48007-5041

RFC Loan Number: _____
Seller Loan Number: 12040942
MIN: 10019400602008 2104       MERS Phone: 1-888-679-6377

**FOR VALUE RECEIVED,** Mortgage Electronic Registration Systems, Inc. ("MERS")

**1595 Spring Hill Rd., Vienna, VA 22182**

the undersigned hereby grants, assigns and transfers to

**Residential Funding Company, LLC**

8400 Normandale Lake Blvd, Suite 600, Minneapolis, MN 55437-1085

all beneficial interest under that certain Mortgage dated 05/15/2006
executed by SUZIE BAKER, husband and wife
* Michael J. Baker and

TO/FOR:       Mortgage Electronic Registration Systems Inc.

and recorded in Book 4563 on Page 72 as Instrument No. _____ on 6/12/2006
of official Records in the County Recorder's Office of WASHTENAW County, Michigan.

**MORTGAGE AMOUNT:** $937,500.00
**PROPERTY ADDRESS:** 5142 NORTH TERRITORIAL ROAD  DEXTER, MI  48130

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Mortgage.

Mortgage Electronic Registration Systems, Inc. ("MERS")

BY: _Matt Favorite_
NAME: Matt Favorite
TITLE: Vice President

STATE OF                    Minnesota )
COUNTY OF                   Hennepin )

On 11/10/2006 before me, the undersigned, a Notary Public in and for said State personally appeared Matt
Favorite, Vice President of Mortgage Electronic Registration Systems, Inc. ("MERS") personally known to me
to be the person whose name is subscribed to the within instrument and acknowledged to me that s/he executed
the same in his/her authorized capacity, and that by his/her signature on the instrument the entity upon behalf of
which the person acted, executed the instrument. WITNESS my hand and official seal.

_Karen E. Steffensen_
Notary Public in and for said State

KAREN E. STEFFENSEN
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 1-31-2010

Prepared 11/10/2006 by Matt Favorite, Residential
Funding Company, LLC, One Meridian Crossings,
Suite 100, Minneapolis, MN 55423, (952) 979-4000.

e-Title Agency

PracticeMaster SnapShot  Page 1 of 1

| | |
|---|---|
| Case | 207.6036 |
| Tax ID | C-03-15-300-012 |
| Legal Description | Parcel H; Commencing at the West one-quarter corner of Section 15, Town 1 South, Range 5 East, Webster Township, Washtenaw County, Michigan; thence North 88 degrees 40 minutes 35 seconds East 2707.07 feet along the East-West one-quarter line to the center of said Section 15 (as monumented); thence South 01 degrees 42 minutes 54 seconds East 1572.85 feet along the North South one-quarter line of said Section 15, and the centerline of Scully Road (66.00 feet wide); thence North 88 degrees 42 minutes 58 seconds West 340.00 feet for a Place of Beginning; thence South 01 degrees 35 minutes 55 seconds East 964.00 feet; thence North 75 degrees 19 minutes 46 seconds West 556.69 feet along the centerline of North Territorial Road (66.00 feet wide); thence North 25 degrees 26 minutes 45 seconds East 979.39 feet; thence South 55 degrees 49 minutes 15 seconds East 109.82 feet to the Place of Beginning, being part of the Southwest one-quarter of said Section 15. |

Also Known for Tax Purposes as:
Commencing at the West one-quarter corner of Section 15, thence North 88 degrees 40 minutes 35 seconds East 2707.07 feet; thence South 01 degrees 42 minutes 54 seconds East 1572.85 feet; thence North 88 degrees 42 minutes 58 seconds West 340.00 feet for a Place of Beginning; thence South 01 degrees 35 minutes 55 seconds East 964.00 feet; thence North 75 degrees 19 minutes 46 seconds West 556.69 feet; thence North 25 degrees 26 minutes 45 seconds East 979.39 feet; thence South 55 degrees 49 minutes 15 seconds East 109.82 feet to the Place of Beginning, being part of the Southwest one-quarter of said Section 15, Town 1 South, Range 5 East.

Orlans Associates PC

Printed by: Renee Hiveley                                    Wednesday, 12/06/2006  2:34 pm

Page: 2 of 2
01:26 P
12/07/06
ACS-5762642-AS-2006-2
Lawrence Kestenbaum, Washtenaw

L- 4596   P- 209

SUBMITTED
FOR RECORDING

DEC - 7 2006

Washtenaw County, Mi
Clerk Register's Office

# EXHIBIT D

## AFFIDAVIT OF SUZIE C. BAKER

STATE OF MICHIGAN     )
                        ) ss.
COUNTY OF WASHTENAW)

Suzie Baker, being first duly sworn, deposes and states as follows:

1. That she resides at 5142 N. Territorial Rd., Dexter, MI 48130.
2. That said property was foreclosed upon by advertisement, the sheriff's sale date being held on February 22, 2007.
3. The Mrs. Baker, along with her husband filed for chapter 13 bankruptcy on February 12, 2008, and that it was converted to a chapter 7 on May 11, 2008.
4. That the chapter 7 was discharged on August 26, 2008.
5. That at the time of the filing of the Baker bankruptcy, the claims for wrongful foreclosure and fraud upon the court were not included as assets of the estate, the Bakers were not yet aware of said claims.
6. The fraud perpetrated in the wrongful foreclosure was not discovered until about March 2009.
7. The fraud upon the court claims were not discovered until July 2012 when it was discovered that Rene Hiveley, an employee of e-Title (Orlans sister company) had attached an Orlans legal description to a previously executed and notarized assignment of the Baker mortgage.
8. In 2010, after learning of the fraud in the wrongful foreclosure, Suzie Baker called her bankruptcy attorney, Ray G. Tallerday, and asked him if there was something they needed to file in the bankruptcy court as a result of the new wrongful foreclosure claims.
9. Attorney Tallerday informed Suzie Baker that there was nothing to be done or filed in the bankruptcy case.
10. Notwithstanding that response, Suzie Baker called the chapter 13 trustee, Tammy Terry, and spoke to an office assistant named Wendy regarding the wrongful foreclosure litigation.
11. When asked by Mrs. Baker if there was something that needed to be filed in the bankruptcy court, Wendy stated that nothing needed to be filed.
12. The above shows that Suzie Baker made every reasonable attempt to find out if something had to be filed with her closed bankruptcy case.

Date: December 19, 2013

_Suzie C. Baker_
Suzie C. Baker

Subscribed and sworn to before me this 19th day of December, 2013

_Cliff Orman Behrens_
, Notary Public,
WASHTENAW County, Michigan
My Commission expires: 11-24-2017

CLIFFORD ORMAN BEHRENS
Notary Public, State of Michigan
County of Washtenaw
My Commission Expires Nov. 24, 2017
Acting in the County of _____

1

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                    Case No. 08-43175

MICHAEL JAMES BAKER, *pro se*,                            Chapter 7
and SUZIE CARMEN BAKER, *pro se*,

                    Debtors.                              Judge Thomas J. Tucker
_____/

**ORDER REGARDING TRUSTEE'S MOTION FOR APPROVAL
OF SETTLEMENT, AND REGARDING FURTHER
PROCEEDINGS ON OTHER MOTIONS**

        This case came before the Court for a hearing on March 5, 2014, on the following
matters: (1) the Chapter 7 Trustee's motion entitled "Trustee's Motion for Approval of
Settlement and For Order Requiring Turnover of Property" (Docket # 79, the "Settlement
Motion"); (2) the Trustee's objection to Debtors' amended exemptions (Docket # 70, the
"Exemption Objections"); and (3) the Debtors' motion for relief from the automatic stay (Docket
# 92, the "Stay-Relief Motion").  Confirming action taken during the hearing, and for reasons
stated by the Court on the record during the hearing,

        IT IS ORDERED that:

1.  The Court finds and concludes that the claim(s) referred to by the Court in its bench opinion
ruling on the record[1] as the "fraud on the court claim" or the "fraud on the court claims," is/are
not property of the bankruptcy estate in this bankruptcy case, and therefore may not be settled,
compromised, or released by the Trustee in this case.

2.  The Settlement Motion (Docket # 79) is denied.

3.  This Order is without prejudice to the right of the Trustee to file a motion or stipulation for
the Court's approval of a revised settlement (the "Revised Settlement") with Orlans Associates,
PC ("Orlans") and Residential Funding Company, LLC ("RFC"), which is the same as the
proposed settlement that was the subject of the Settlement Motion (Docket # 79) except that the
Revised Settlement may not purport to settle, compromise, or release the fraud on the court
claim(s), which the Court has ruled is/are not property of the bankruptcy estate.  But the Chapter
7 Trustee must file any such motion or stipulation for approval of the Revised Settlement no later
then March 19, 2014, and if the Trustee does so, and submits an appropriate proposed order, the
Court will enter an order approving such Revised Settlement, without further notice or hearing.

_____

        [1]  The Court is ordering a transcript of its bench opinion ruling on the Settlement Motion,
made during the March 5, 2014 hearing.

4.  This Order also is without prejudice to the right of the Chapter 7 Trustee to file a motion seeking approval of a settlement other than the settlement proposed in the Settlement Motion or the Revised Settlement, including a settlement agreed to by the Debtors, at any time.

5.  The Court will hold a further hearing on the Exemption Objection and on the Stay-Relief Motion on **March 26, 2014 at 12:00 noon**.

6.  Until the Court has held and concluded the further hearing on the Stay-Relief Motion, currently scheduled for March 26, 2014, or unless otherwise ordered, neither the Debtors, nor RFC, nor Orlans, nor any of their agents or attorneys, may take any action in any state court with respect to the fraud on the court claim/claims referred to in paragraph 1 of this Order.

.

**Signed on March 05, 2014**

/s/ **Thomas  J. Tucker**
**Thomas  J. Tucker**
**United States Bankruptcy Judge**

2

# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                              Chapter 7

    BAKER, Michael J. and Suzie C.,                Case No. 08-43175-tjt

        Debtors.                                Judge Thomas J. Tucker

_____/

## ORDER APPROVING REVISED SETTLEMENT
## AND REQUIRING TURNOVER OF PROPERTY

This case is before the Court on the motion of Douglas S. Ellmann, Trustee

(Docket # 79, the "Motion"), for an order approving a proposed settlement and requiring

the turnover by the Debtors of certain real property known as 5142 N. Territorial Road,

Dexter, Michigan (the "Property") and the settlement and resolution of litigation claims

asserted by the Debtors in connection with Michael Baker and Suzie C. Baker v.

Residential Funding Company, LLC and Orlans Associates PC, Washtenaw Circuit Court

case #11-1260-CH and Residential Funding Company, LLC v Michael J. Baker and Suzie

Baker, Michigan District Court 14-A-1, case #08-3-C-235 LT (collectively, the

"Litigation Claims").  The Court held a hearing on the Motion and on objections to the

Motion on March 5, 2014, and the Court denied the Motion, but without prejudice to the

extent stated in the Court's March 5, 2014 Order (Docket # 111).  The Court's March 5,

2014 Order having stated that the Court would approve the proposed settlement on the

revised terms provided for herein, if the parties to the settlement stipulated to same; those

parties having filed a stipulation on March 11, 2014 (Docket # 115), and the Court being fully advised in the premises;

**IT IS ORDERED AS FOLLOWS:** [1]

1.      The Motion (Docket # 79) is granted, with modifications, and the settlement described therein, as revised by this Order, is approved.

2.      The Court finds: that the rights, if any, of the Debtors in or to the Property, or to possession of the Property, or in or to the Litigation Claims, as described herein and in the Motion, except as provided herein, are exclusively property of the bankruptcy estate under 11 U.S.C. § 541, subject only to the Debtors' limited claims of exemption that are allowed in this case;[2] that the Trustee is authorized, to the extent provided in this Order, under 11 U.S.C. § 363(b) to settle and release the Litigation Claims and to settle and compromise any claims by the Debtors in or to the Property, including possession of the Property; that the Trustee is entitled, under 11 U.S.C. § 542 to the turnover of the Property; and that the Trustee is entitled, under the settlement approved by this Order and subject to those terms as stated in the Motion, to the funds held in escrow by the 14-A-1 Michigan District Court related to the Debtors' occupancy of the Property, with Residential Funding Company, LLC ("RFC") to receive a portion of those funds under the circumstances described in the Motion.

---

[1]  This Order has been modified by the Court, from the version the parties stipulated to and submitted for entry on March 11, 2014.

[2]  *See* the final paragraph of this Order.

2

3.      The funds held in escrow by The State of Michigan District Court 14-A-1 in case #08-3-C-235 LT shall be paid by that court or the clerk of that court to the Trustee, and the Trustee shall pay a portion of those funds to RFC if required by the terms stated in the Motion.

4.      Having determined that the Litigation Claims, except as noted in this Order, are property of the bankruptcy estate, and having approved the settlement of the Litigation Claims as provided herein, the Court holds that the Debtors may not proceed in any court, except as provided herein, with respect to the Litigation Claims or contend that they have any rights with respect to such Litigation Claims.

5.      The Debtors, and all persons claiming under them, including all occupants of the Property, shall upon entry of this Order surrender the Property to the Trustee.

6.      In the event that the Debtors have not surrendered the Property to the Trustee within one week following entry of this Order, the Trustee shall be entitled to the assistance of the United States Marshal, or of a state-court officer, to enforce this order by forcibly evicting the Debtors and other persons in possession of the Property.

7.      In surrendering the Property the Debtors shall also surrender to the Trustee all keys, alarm codes and documents relating to the Property.  The Debtors shall not remove anything affixed or attached to the Property by means of cement, plaster, nails, bolts, screws or roots, such as light fixtures, built-in kitchen appliances (i.e., any appliance that is affixed to any wall, cabinetry, or which is hardwired), air conditioning

3

units, water heaters, furnace, wall-to-wall carpeting, sinks, bathroom fixtures, doors,

garage door openers, and trees or other plantings in the yard, and the Debtors shall not

damage the Property.  The Debtors shall remove their personal belongings from the

Property.  Any personal property of any description remaining on the Property one week

after the entry of this Order shall be deemed abandoned and may be disposed of by RFC

or its agent.

8.      The Trustee shall have the right to seek recourse against the Debtors for any

damage to the Property, but as a part of the settlement may assign any such damage

claims to RFC.

9.      The Court finds that title to the Property, legally described as:

Parcel H; Commencing at the West one-quarter corner of Section 15, Town 1 South,
Range 5 East, Webster Township, Washtenaw County, Michigan; thence North 88
degrees 40 minutes 35 seconds East 2707.07 feet along the East-West one-quarter
line to the center of said Section 15 (as monumented); thence South 01 degrees 42
minutes 54 seconds East 1572.85 feet along the North South one-quarter line of said
Section 15, and the centerline of Scully Road (66.00 feet wide); thence North 88
degrees 42 minutes 58 seconds West 340.00 feet for a Place of Beginning; thence
South 01 degrees 35 minutes 55 seconds East 964.00 feet; thence North 75 degrees
19 minutes 46 seconds West 556.69 feet along the centerline of North Territorial
Road (66.00 feet wide); thence North 25 degrees 26 minutes 45 seconds East 979.39
feet; thence South 55 degrees 49 minutes 15 seconds East 109.82 feet to the Place of
Beginning, being part of the Southwest one-quarter of said Section 15.

Also Known for Tax Purposes as:

Commencing at the West one-quarter corner of Section 15, thence North 88 degrees
40 minutes 35 seconds East 2707.07 feet; thence South 01 degrees 42 minutes 54
seconds East 1572.85 feet; thence North 88 degrees 42 minutes 58 seconds West
340.00 feet for a Place of Beginning; thence South 01 degrees 35 minutes 55
seconds East 964.00 feet; thence North 75 degrees 19 minutes 46 seconds West
556.69 feet; thence North 25  degrees 26 minutes 45 seconds East 979.39 feet;
thence South 55 degrees 49 minutes 15 seconds East 109.82 feet to the Place of

4

Beginning, being part of the Southwest one-quarter of said Section 15, Town 1 South, Range 5 East.

Tax# C-03-15-300-012

transferred to RFC pursuant to the Sheriff's Deed recorded with the Washtenaw County Register of Deeds on March 8, 2007 at Liber 4611, Page 452, and therefore to the extent necessary to confirm the foregoing transfer, as part of the settlement, the Assignment of Mortgage and foreclosure, as addressed in the Litigation Claims, are deemed, solely for purposes of approval and implementation of the settlement, to be proper and of full force and effect. However, to the extent that RFC is to receive from the Trustee under the settlement an interest in the Property, RFC is a good-faith purchaser of the Property for purposes of 11 U.S.C. § 363(m).

10.     This Order may be recorded with the Washtenaw County Register of Deeds if desired by RFC.

11.     A certain claim or claims referred to by the Court in its March 5, 2014 Order (Docket # 111 at paragraph 1) as the "fraud on the court claim" or the "fraud on the court claims" (the "FOC Claim") has been found by the Court not to be property of the bankruptcy estate, and such claim(s) is/are therefore excluded from the claims which may be, or are, settled and released by the Trustee.

12.     As used herein, FOC Claim means the Debtors' claim that when the 2008 eviction proceeding (case #08-3-C-235 LT) was filed and/or when the Consent Judgment was presented for entry in that proceeding and obtained from the court in that proceeding, Orlans Associates, PC ("Orlans") and/or RFC failed to disclose to the state court that the

5

Assignment of Mortgage from MERS to RFC was altered, forged or fraudulent.  The

Court makes no determination that any document was improper in any way, that Orlans

or RFC had any duty to disclose anything with regard to the Assignment of Mortgage, or

that the FOC Claim has any validity or entitles the Debtors or either of them to any relief.

All such matters are left for determination by the appropriate state court(s), and are not

being settled or released by the settlement that is being approved by this Order.

13.     The Debtors may pursue the FOC Claim as provided herein as long as they

do not interfere with or try to control property of the bankruptcy estate.  The Debtors may

not pursue any claim which existed as of February 12, 2008 (a "pre-petition claim") and

which therefore is property of the bankruptcy estate, or any remedy for such a claim,

including any wrongful foreclosure claim.  (As this Court ruled during the March 5, 2014

hearing and in its March 5, 2014 Order, however, the FOC Claim is not such a pre-

petition claim.)

14.     Therefore, the Debtors will not be entitled to seek title to the Property,

possession of the Property, an extension of their possession of the Property, or damages

related to their loss of the Property or of an interest in the Property.  Nor may the Debtors

seek damages based on any claim or allegation that the pre-petition foreclosure of the

mortgage on the Property was wrongful or defective, except insofar as such a claim or

allegation is part of the FOC Claim.  Any claim that existed as of February 12, 2008 (a

"pre-petition claim") is controlled by the Trustee and is to be released by the Trustee and,

6

upon consummation of the settlement approved by this Order, will cease to exist or to be enforceable.  (But as this Court has ruled, the FOC Claim is not such a "pre-petition claim").

15.     This Order is without prejudice to the Debtors' amended claims of exemption filed on December 13, 2013 (Docket # 68), to the extent the amended claims of exemption apply to property of the bankruptcy estate (as opposed to the FOC Claim), and this Order is without prejudice to the Trustee's objection to such amended claims of exemption, filed December 27, 2013 (Docket # 70).  These matters will be the subject of a further hearing, as stated in the Court's March 5, 2014 Order (at paragraph 5), currently scheduled for March 26, 2014 at 12:00 noon.

**Signed on March 11, 2014**                    **/s/ Thomas J. Tucker_____**
                                                 **Thomas J. Tucker**
                                                 **United States Bankruptcy Judge**

7

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                                    Case No. 08-43175

MICHAEL JAMES BAKER                                       Chapter 7
and SUZIE CARMEN BAKER,

                                                         Judge Thomas J. Tucker

              Debtors.

_____ /

**FURTHER ORDER REGARDING THE CHAPTER 7 TRUSTEE'S MARCH 14, 2014
MOTION FOR MODIFICATION OF THE MARCH 11, 2014 SETTLEMENT ORDER**

        This case came before the Court on the motion filed on March 14, 2014 by the Chapter 7
Trustee, entitled "Motion for Modification of Order Approving Revised Settlement and
Requiring Turnover of Property" (Docket # 118, the "Trustee's Motion").  In response to the
Trustee's Motion, the Court filed an Order on March 20, 2014, entitled "Order Regarding the
Chapter 7 Trustee's March 14, 2014 Motion for Modification of the March 11, 2014 Settlement
Order" (Docket # 128, the "March 20 Order").  As required by the March 20 Order, the Trustee,
Orlans Associates PC ("Orlans") and Residential Funding Company, LLC ("RFC") have each
filed a timely written response to the March 20 Order (Docket ## 132, 133, 134).  Based on those
written responses, and based on the March 20 Order,

        IT IS ORDERED that:

1.  The Trustee's Motion (Docket # 118), and the concurrences in that motion filed by Orlans and
RFC (Docket ## 121, 126), are all deemed withdrawn, with prejudice.

2.  The Court's March 11, 2014 Order entitled "Order Approving Revised Settlement and
Requiring Turnover of Property" (Docket # 116, the "Revised Settlement Order") will remain in
effect, with no changes.

3.  The stay and suspension of the Revised Settlement Order, as ordered in the Court's March 20
Order (Docket # 128 at p. 3 ¶ 3) is terminated, effective immediately, so that the Revised
Settlement Order is fully effective.

**Signed on March 25, 2014**                    **/s/ Thomas J. Tucker_____**
                                                **Thomas J. Tucker**
                                                **United States Bankruptcy Judge**

# EXHIBIT H

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:

      BAKER, Michael J. and Suzie C.,

      Debtors.

_____/

Chapter 7
Case No. 08-43175-tjt
Hon. Thomas J. Tucker

**BRIEF IN SUPPORT OF TRUSTEE'S MOTION
FOR APPROVAL OF SETTLEMENT
<u>AND ORDER REQUIRING TURNOVER OF PROPERTY</u>**

This brief focuses on the primary issue which might be raised by the Debtors: Whether the Litigation Claims are property of the estate. The basic facts related to the Washtenaw Litigation and the Trustee's proposed settlement of the Litigation Claims are set forth in the motion and are not repeated here. Capitalized terms used in this brief are defined in the motion.

The Trustee previously filed a brief (and corrected brief) in support of his objection to the Debtors' claim of exemptions in the Litigation Claims, so the discussion related to the disallowance of the exemptions is not repeated here.

Because the Litigation Claims are property of the estate, the Trustee has the authority to compromise them, provided that the applicable standard governing his compromise of claims belonging to the estate is met. The satisfaction of that standard is addressed in the motion.

The gravamen of the Litigation Claims is that irregularities in the foreclosure of the mortgage on the Property entitle the Debtors to relief with respect to the foreclosure. It is

undisputed that the foreclosure sale occurred on February 22, 2007, nearly a year prior to the petition date.  The allegedly improper assignment-of-mortgage document, which the Debtors claim to have been "fraudulent", and which forms the basis for the Litigation Claims in all of their mutations, was recorded by Orlans on behalf of RFC with the register of deeds prior to the foreclosure sale.  The bankruptcy case was not commenced until February 12, 2008.  Thus, the alleged wrongdoings which give rise to the Litigation Claims occurred pre-petition.  The Litigation Claims, to the extent that they exist, came into being pre-petition and were an asset of the estate upon the creation of the estate. They did not cease to be property of the estate when the case was later closed because the Litigation Claims were not listed by the Debtors as an asset.  11 U.S.C. § 554(c).  The Litigation Claims have, since the commencement of the case, been an asset of the estate.

The post-petition event or series of events which the Debtors claim to constitute a component of the Litigation Claims, and which they may argue to cause the Litigation Claims (or some portion of them) to be a post-petition asset, is the Eviction Proceeding. The Debtors claim that a fraud upon the 14-A-1 District Court was perpetrated when Orlans obtained the Consent Judgment allegedly knowing that there had been alleged irregularities with respect to the foreclosure.  (Significant facts in addition to knowledge by Orlans of alleged irregularities would have to be proven in order to establish fraud upon the court, and the Trustee does not believe that a fraud upon the court occurred, but an explanation of the elements of "fraud upon the court" is not required for purposes of

this brief.) The Debtors would characterize the "fraud-upon-the-court" claim as a separate, post-petition, asset.

Despite the fact that the Litigation Claims apparently became known post-petition, and were asserted for the first time post-petition, those claims are "sufficiently rooted in the pre-bankruptcy past" so as to be an asset of the estate. *Segal v. Rochelle*, 382 U.S. 375, 380 (1966) (loss-carry back tax refund claim, which could only be obtained through post-petition conduct, was property of the estate because it was "sufficiently rooted in the pre-bankruptcy past"). Clearly, no aspect of the Litigation Claims would exist were it not for the Debtors' contention that there was an improper foreclosure of the Property prior to the bankruptcy filing. The allegations by the Debtors of the perpetration of an alleged fraud upon the court include, as the central element, the allegedly improper execution of the assignment of mortgage document, a document prepared, executed and recorded pre-petition. The claim is therefore rooted in prebankruptcy conduct. *See e.g., In re Underhill*, 498 B.R.170, 177 (B.A.P. 6th Cir. 2013) (postpetition tortious interference claim constituted property of the estate because the "claim had its roots in prebankruptcy . . . conduct"); *In re Richards*, 249 B.R. 859, 861-62 (Bankr. E.D. Mich. 2000) (asbestos injury claim that accrued post-bankruptcy when the debtor was diagnosed was property of the estate because the exposure occurred prepetition).

Moreover, the alleged "fraud upon the court" which the Debtors may attempt to characterize as a post-petition claim is not a claim at all. Rather, a fraud upon a court is the basis for a remedy -- the setting-aside of a judgment. As such, it is not a cause of

action any more than the basis for an appeal is a cause of action. *Nederlander v. Nederlander*, 205 Mich. App. 123, 126 (1994); *Vader v. Vader*, 2004 WL 1178210 (Mich. App. 2004) (Fraud in connection with divorce judgment does not constitute an independent cause of action).

Moreover, the Consent Judgment, which is the judgment which the Debtors would have set aside, is moot. It was entered in violation of the automatic stay because it represented an act to gain possession of property of the estate, specifically the Property, which (to the extent that the Debtors had an interest in it, such as a possessory interest) was still property of the estate as of the date of the Consent Judgment. This is because the Property, like the Litigation Claims, had not been listed in the schedules and therefore was not abandoned with the closing of the case. Therefore, the Consent Judgment is void or voidable. Enforcement of the Consent Judgment in any event is not at issue because no one seeks to enforce it. Instead, the Trustee seeks the turnover of the Property as a part of the settlement. The "fraud-upon-the-court" remedy theoretically available to the estate is therefore meaningless.

If Orlans did engage in serious wrongdoing in connection with the foreclosure, for example having committed a criminal forgery as the Debtors have adventurously alleged, the seriousness of such conduct would not uproot the conduct from its prebankruptcy soil. The alleged wrongful conduct, whether it was actionable or not, or so serious as to constitute a crime, occurred prepetition. The Trustee has no reason to believe that there was a crime committed, but if there was, that is a matter for the public authorities, and not

the Debtors or the Trustee.  Therefore, an argument by the Debtors that the conduct of Orlans was on a large scale or would be punishable as a crime or other public offense does not help their argument that any *private* remedy for such conduct is not an asset of the estate.  It would be an argument, rather, that there is a *public* remedy for the alleged conduct, but the existence of a public remedy does not directly concern either the Debtors or the Trustee.

For these reasons there is no basis for an argument that the Litigation Claims, or any variant of them, is not property of the estate.  The motion should therefore be granted.

*Respectfully submitted*,

**SILVERMAN & MORRIS, P.L.L.C.**

By: _/s/ Thomas R. Morris_
Thomas R. Morris (P39141)
Special Counsel to Chapter 7 Trustee
30500 Northwestern Highway, Suite 200
Farmington Hills, Michigan 48334
morris@silvermanmorris.com
(248) 539-1330   Fax:  (248) 539-1355

Dated:  January 24, 2014

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                          Chapter 7

    BAKER, Michael J. and Suzie C.,          Case No. 08-43175-tjt

        Debtors.                               Hon. Thomas J. Tucker

_____/

### REPLY BRIEF IN SUPPORT OF TRUSTEE'S
### MOTION FOR APPROVAL OF SETTLEMENT AND
### FOR ORDER REQUIRING TURNOVER OF PROPERTY

Douglas S. Ellmann, Trustee, by and through his special counsel, Silverman &

Morris, P.L.L.C., submits this reply brief in support of his Motion for Approval of

Settlement and for Order Requiring Turnover of Property.

The statements made in this brief and in other submissions by the Trustee are

for the purpose of seeking approval of a settlement and are intended to be covered by

F.R.E. 408. In the event that the Court does not approve the settlement and the

Trustee determines to pursue the claims, or in the event that the Debtors or another

party offer a greater amount to purchase the claims, statements by the Trustee in

pursuit of approval of the settlement shall not constitute admissions and shall not be

admissible.

### There is a sufficient basis for the settlement.

The response filed by the United States Trustee argues that the motion does not

provide sufficient detail regarding the reasons for the settlement. The Trustee

disagrees, but the additional information provided in this reply brief further supports

the settlement and meets the United States Trustee's objection.

The Trustee's motion cites *Harrison v. Bank of America*, 2013 W.L. 440163

(E.D. Mich. 2013) as an example of similar "wrongful foreclosure" claims which met

with failure.  *Conlin v. MERS*, 714 F.3d 355 (6th Cir. 2013), which is discussed further

below, provides even stronger support for the settlement, and is likewise

indistinguishable.  In *Conlin v.* MERS, the United States Court of Appeals, applying

Michigan law, provided an extended discussion of multiple points of law applicable to

the claims at issue.  *Conlin v. MERS* represents controlling authority on several

dispositive points.  Other cases cited below provide additional examples of the

"morass of litigation involving mortgage foreclosures under Michigan law," *Conlin v.*

*MERS* at 357, and the difficulties which the Trustee would encounter were he to

pursue the claims.  Because of the mounting number of precedents unfavorable to the

claims, the settlement is clearly in the best interest of the estate and its creditors.

**<u>How the litigation kept the Debtors in their home rent free for seven years.</u>**

The United States District Court summed up the Debtors' litigation in its Order

Remanding Case dated August 15, 2012:

> Plaintiffs Michael and Suzie Baker borrowed $937,500 in 2006 and
> secured the loan with a mortgage on their house. They defaulted on their
> payments and the mortgage was foreclosed. The present case is the latest
> in a series of lawsuits through which the plaintiffs have attempted to
> stave off eviction, all the while living in the house rent free for the past
> 5–1/2 years.

*Baker v. RFC et al*., 886 F.Supp.2d 591, 592 (E.D. Mich 2012).  The Debtors accomplished this delay by burdening the parties and the courts with verbosity and imprecision.  They have made allegations which are plainly frivolous.  The Trustee and his attorneys have searched through the Debtors' pleadings in an attempt to locate a viable cause of action and have found none worth more in litigation than in settlement.

The "Verified Complaint and Jury Demand" filed by the Debtors with the Washtenaw County Circuit Court on November 15, 2011 contained ten counts.  It seeks a wide variety of relief.  It admits that the Debtors granted the mortgage to secure a loan in the amount of $937,500.00; that they defaulted; that the mortgage was foreclosed; that a sheriff's sale occurred; and that RFC was the purchaser.  The Debtors admit in their complaint that they did not redeem the Property.  The Complaint recites some of the tortured procedural history which preceded the complaint, specifically that the complaint which they filed in 2009 was dismissed with prejudice; that the Debtors filed an appeal; that the appeal is dismissed; that they were granted a motion for reconsideration; that the appeal was nevertheless eventually denied on the merits.

Count I of the complaint is an argument against the *res judicata* effect of prior rulings adverse the Debtors.  Count I does not constitute a basis for recovery of money from either Orlans or RFC, but is merely a rearguard theory anticipating a negative effect from prior rulings.

Count II, comprised of 47 paragraphs, each containing multiple allegations, apparently is intended to state the claim of "fraud on the court."  Count II of the complaint is so convoluted as to be impossible for the Trustee to summarize without the Debtors being positioned to claim that the Trustee omitted some supposedly important detail.  Therefore, the Trustee adopts the Debtors' characterization of the claim from their Motion for Relief from the Automatic Stay (Docket #92, ¶7):  "The fraud on the court consisted of a process of altering/forging assignments of mortgage."  The viability of that claim is discussed below.

Count III alleges that the Defendants acted in concert.  On its own, this theory of joint liability does not provide a basis for a recovery.

Count IV purports to be an action to quiet title.  It is duplicative of other counts and has no value because the Debtors do not hold title to the Property.

Count V, entitled "Wrongful Foreclosure," relies upon the decision of the Michigan Court of Appeals in *Residential Funding Co., LLC v Saurman*, 292 Mich. App. 331 (April 21, 2011).  That decision was reversed, *Residential Funding Co., L.L.C. v. Saurman*, 490 Mich. 909 (November 16, 2011), withdrawing the support upon which this count relies.  The wrongful foreclosure claim is discussed further below.  Because the wrongful foreclosure claim cannot be meaningfully distinguished from the claims dismissed in *Conlin v. MERS* and other cases, the claim faces failure if pursued.

Count VI is based upon an alleged violation of MCL § 565.371, a criminal statute prohibiting the recordation of "any conveyance of real estate, with intent to deceive any person as to the identity of the grantor mentioned in such conveyance." A similar claim was rejected in *Vanderhoof v. Deutsche Bank National Trust*, 2014 WL 211819*3 (6th Cir. 2014) (unpublished decision; copy attached as Exhibit 1). Nor do the Debtors have standing to enforce a criminal statute.

Count VII is an action under MCL § 600.1701 and MCL § 600.1721 for damages caused by Orlans as attorneys for "misbehavior in their office." This claim, essentially a claim of contempt of court, is cumulative and does not represent an independent cause of action. As is shown below, the preparation of the assignment of mortgage is unlikely to be found by a court to be the basis of a claim of contempt or "misbehavior."

Count VIII claims a violation of MCL § 600.2907(a), which prohibits the "encumbering of property through the recording of a document without lawful cause with the intent to harass or intimidate any person." The assignment of mortgage did not purport to encumber the Property. The mortgage was the document which encumbered the Property. The Debtors admit to granting a mortgage on the Property to secure a loan to them of over $900,000.00, so there are not facts to support a claim of a violation of the cited statute. A similar claim was rejected in *Vanderhoof*, *supra* at *3.

Count IX relies upon MCL § 600.5855, a provision of law which extends a limitations period during the period of time in which the cause of action is fraudulently concealed.  This provision does not support a claim for damages or other valuable relief.

Count X, which claims a violation of MCL § 445.252, seeks damages for the violations of the Michigan Regulation of  Collection Practices Act, a statute which applies to the collection of debts for money owing on "an expressed or implied agreement or contract for a purchase made primarily for personal, family, or household purposes."   This statute is inapplicable because no "contract for a purchase" is involved.  See *Kukuk v. HSBC Bank*, 132269 *4 (Mich. App. 2014) (dismissing MRCPA claims; unpublished decision; copy attached as Exhibit 2).

### The Trustee holds any cause of action.

The Debtors characterize the claims against Orlans and RFC as 1) a "wrongful foreclosure" claim, and 2) a "fraud on the court" claim.  The purpose of this dichotomy was originally to avoid the *res judicata* effect of the Debtors' 2008 consent to an order of eviction, the subsequent dismissal of their 2009 lawsuit in which they sought to set aside that order, and their failed appeal of that dismissal.  The false distinction is now used by the Debtors to support an argument that the Trustee holds only a portion of the claim(s) against Orlans and RFC.  The Trustee does not accept this dichotomy because there is a single set of pre-petition facts which give rise to the claims against Orlans and RFC:  The completion by Orlans of the signed but

incomplete assignment of mortgage, and the recordation of the "altered" (i.e. completed) document.  The issues with respect to ownership of the claim(s) are whether a separate "fraud on the court" claim exists, and if so whether that claim is property of the Debtors.

That a separate "fraud on the court" claim does not exist was explained in the Trustee's principal brief.  Under Michigan law a claim of fraud on the court is not a cause of action which entitles the holder of the claim to money damages.  Fraud on the court is a basis only for relief from a judgment or order.  *Rogoski v. City of Muskegon,* 107 Mich. App. 730, 736-737 (1981).   If the fraud is "extrinsic" then relief might be sought by a separate lawsuit.  *Sprague v. Buhagiar*, 213 Mich. App. 310, 314 (1995). An example of extrinsic fraud "would be fraud with regard to filing a return of service."  *Id.*  The Debtors claim that Orlans's "fraud on the court" constitutes extrinsic fraud. The Debtors provide no explanation as to why the unspecified, undefined "fraud" alleged by them constitutes extrinsic fraud rather than intrinsic fraud.  The Debtors allege no facts which constitute extrinsic fraud.  As the Debtors correctly recited in their brief, intrinsic fraud encompasses acts such as perjury or discovery fraud.  If the assignment of mortgage document was in fact "fraudulent" as the Debtors contend, then "reliance" upon it by RFC would be perjury or the presentation of false evidence, akin to perjury.  Thus, the fraud, if it exists, is intrinsic fraud.  If only intrinsic fraud is alleged, relief by independent action is not available. "There is not a separate cause of action.  Plaintiff's remedy is to move to reopen the

7

judgment pursuant to MCR 2.612(C)." *Id.*  The right, even if it existed, to reopen the

judgment of eviction, has no value because RFC is no longer seeking to evict the

Debtors.  Nor do the Debtors provide an explanation why the potential procedural

distinction between the remedies for extrinsic and intrinsic fraud provides an

advantage other than the possibility that "litigation of a dispute could go on *ad*

*infinitum*." *Rogoski, supra* at 737.  The Trustee's settlement of that claim, the claim

being the right to seek to set aside the 2008 eviction order, therefore has a value

significantly less than the sum to be collected by the Trustee.

     The Debtors also concede that "the fraud on the court claims do not even

belong to the Bakers."  (Debtors' brief, page 7).  Rather, because the "fraud was

perpetrated against the state courts, those claims belong to those courts." *Id.*

The Debtors cite several Michigan criminal statutes and quote Judge Simpson as

pondering whether to involve the Washtenaw County Prosecutor's Office.  However,

as explained by the Trustee in his principal brief, any criminal prosecutions of Orlans

or RFC do not concern him.  The Trustee proposes to settle only private or civil

claims which are property of the estate.  Because the Trustee does not propose to grant

a release of any claim which belongs to a court (or the public prosecutor, as the

representative of the people of the state of Michigan), the supposed criminal aspect of

the "fraud on the court" claim is not at issue.

     There is no explanation offered by the Debtors in their response or in any other

document which has been supplied to the Trustee as to how the assignment of

mortgage document defrauded or even misled the Debtors or any court.  There is no connection between the document and damages claimed by the Debtors.  There is no logical causation of damages.  Thus, in addition to other problems afflicting the Debtors' theories regarding "fraud on the court," there is substantial doubt as to the merit of any claim asserted by the Debtors.

### The settlement amount is reasonable.

The Debtors argue that the proposed settlement amount is too low.  The Debtors speculate that the "fraud on the court" claims are "worth anywhere from $1.5 million to $8 million…. possibly more."  (Debtors' brief, page 4).  They offer no opinion as to the value of the "wrongful foreclosure" claim other than to say that "they believe their case is worth anywhere from $1.5 million to $8 million… perhaps more."  (Debtors' brief, page 5).  Since the Debtors use the same value estimate for all of the claims as they use for the "fraud on the court" claim, they attribute no separate value to the "wrongful foreclosure" claim.   Thus, if the "fraud on the court" claim belongs to the "court" and is not being settled by the Trustee, and the "wrongful foreclosure" claim has no separate value, the settlement must be adequate.

An examination of the Debtors' pleadings, whether in the prior litigation or in this bankruptcy case, reveals that they try to make up for lack of substance with strong language and logical leaps.  They state that the assignment of mortgage document was "altered and thereby fraudulent."  They skip over the required elements of fraud (scienter, intent to deceive, actual deception, reliance and damages) and ignore the

possibility that the completion by Orlans of the document after its execution and prior to its recordation was made at the direction of the assignor of the mortgage, or with its acquiescence.  That is what Orlans and RFC contend, and the Debtors have no evidence to the contrary.  The Debtors attempt to apply the case of *In re Sutter*, 665 F.3d 722 (6th Cir. 2012) for the proposition that RFC has "no rights under the forged document."  They ignore the possibility that the assignment of mortgage document at issue, completed with the consent of the assignor, does not meet the definition of a forgery.  The *Sutter* case is unremarkable because the holding was that the creditor which claimed an interest in real property pursuant to the mortgage instrument *not executed* by the owners of the property, was an unsecured creditor.  The Debtors admit that they executed a mortgage on the Property, that they defaulted in payment, that the mortgage was foreclosed, and that the Debtors failed to redeem the Property.

The case law shows that the execution of an assignment of mortgage "in blank" (i.e. with spaces for information to be filled in after execution), and the later completion and recordation of the document on behalf of a foreclosing mortgagee does not provide a basis for the mortgagor to challenge the foreclosure sale, especially not after the redemption period has expired.  *Harrison v Bank of America*, *supra* (unpublished; copy attached as Exhibit 3), cited by the Trustee in his motion, shows that the likelihood of success for the Trustee, were he to prosecute the purported claims against Orlans and RFC, is low because it is unlikely that the Trustee will be able to make a "clear showing of fraud or irregularity," and prove prejudice to the

Debtors or the bankruptcy estate. *Id.* at *3. According to *Harrison*, under Michigan law, a deed remains valid even if the notarial act is invalidated. *Id.* at *5. The Debtors claim that the notarial act related to the assignment of mortgage document is invalid because information was added to the document after the notarial acknowledgement. If a deed is valid despite an invalidation of a notarial act, so is an assignment of mortgage valid despite the invalidation of a notarial act. In *Kukuk*, *supra* at *7, Justice Shapiro of the Michigan Court of Appeals, in his concurring opinion, referring to an assignment-of-mortgage document similar to that which the Debtors complain of, clarified the ruling by the court of appeals by noting that "an assignment of a mortgage note [sic] in blank does not, in and of itself, create a defect in title when the assignment is later completed and recorded." *Id.*   *Conlin v. MERS*, *supra,* involved "alleged defects in the assignment of the mortgage on the property from Defendant Mortgage Electronic Registration Systems to Defendant U.S. Bank." *Id.* at 357. In *Conlin v. MERS,* the plaintiff's claim was that an assignment of mortgage by MERS to the foreclosing bank was "forged or 'robo-signed'" and that MERS "had no capacity to assign the Mortgage to U.S. Bank." *Id.* at 360. Orlans was one of the defendants. The case is indistinguishable and will govern the result if the claims are pursued in federal court.

Applying Michigan law, the court of appeals "wade[d] into the morass of litigation involving mortgage foreclosures under the Michigan law," *Id.* at 357, and upheld the dismissal of the plaintiff's claims. The court of appeals discussed at length

Michigan law regarding challenges to a foreclosure so after the lapse of the statutory redemption period. Because Michigan law evidences an interest in finality, "the ability for a court to set aside a sheriff's sale has been drastically circumscribed." *Id.* at 359; *Schulthies v. Barron*, 16 Mich. App. 246, 167 N.W.2d 784, 785 (1969); *Senters v. Ottawa Sav. Bank, FSB*, 443 Mich. 45, 503 N.W.2d 639, 643 (1993). "Michigan courts have held that once the statutory redemption period lapses, they can only entertain the setting aside of a mortgage sale where the mortgagor has made a clear showing of fraud, or irregularity." *Conlin v. MERS* at 359. Moreover, "[i]t is further clear that not just any type of fraud will suffice. Rather, '[t]he misconduct must relate to the foreclosure procedure itself.'" *Id.* at 360 (citations omitted). Mr. Conlin's claim of fraud, like that of the Debtors, was that the assignment of mortgage had been forged or "robo-signed" and that MERS lacked the capacity to assign the mortgage. *Id.* The court of appeals found this to be insufficient because it did not relate to the foreclosure procedure itself. For that reason, the plaintiff lacked standing to challenge the assignment of mortgage. "This is because a third party may only challenge an assignment if that challenge would 'render[] the assignment absolutely invalid or ineffective or void.'" *Id.* at 361.

The court of appeals next concluded that even the invalidity or ineffectiveness of an assignment of mortgage would not render the assignment void. Rather, it would be merely voidable by someone with standing to challenge the assignment of mortgage. In other words, although a note holder challenging RFC's right to foreclose

might challenge RFC's title to the Property, the Debtors cannot.  See also *Kukuk, supra* at *5.

The Debtors, like the plaintiff in *Conlin v. MERS*, made no viable claim of prejudice:

> To prove foreclosure-defect claims, 'plaintiffs must show that they were prejudiced by defendant's failure to comply with [MCL §] 600.3204.  To demonstrate such prejudice, they must show that they would have been in a better position to preserve their interest in the property absent defendant's noncompliance with the statute.'
> *Id.* at 361 (citations omitted).

As in *Conlin v. MERS*, the Debtors have not alleged that they suffered prejudice due to alleged defects in the assignment of mortgage.  One example of prejudice would be double liability.  *Id.* at 362.  The Debtors, who received a discharge in bankruptcy of any liability on the promissory note executed by them (or one of them) in an amount in excess of $900,000.00, could show no prejudice.  The court of appeals concluded as to the *Conlin* claims in a way which portends litigation disaster for the Trustee if he is required to assert the Debtors' claims against RFC and Orlans:

> Applying these precedents to this case, it is apparent that neither of Plaintiff's theories -- the 'robo-signed' assignment or MERS's incapacity to assign -- can support this action.  Even were the assignment from MERS to U.S. Bank invalid, thereby creating a defect in the foreclosure process under § 600.3204(1)(d), Plaintiff has not shown that he was prejudiced.  He has not shown that he will be subject to liability from anyone other than U.S. Bank; he has not shown that he would have been in any better position to keep the property absent the defect; and he has not shown that he has been prejudiced in any other way.  Additionally, he has also failed to make the clear showing of fraud in the foreclosure process required to challenge the foreclosure after the expiration of the six-month redemption period.

*Id.*   For these reasons, there is a high risk to the Trustee that the pursuit by him of the claims would result in defense to the estate and no recovery.

The grandiloquence of the Debtors' attorney does not support their case.  The completion by Orlans of the assignment of mortgage document, or even of thousands of similar assignments of mortgages, is not "egregious," "reprehensible," "criminal," "of great public concern," or even "diabolical" because the Debtors' attorney says so. Every case commenting on the practice of the post-execution completion of a document with the consent of the parties to the document has found it to be acceptable.  Nor is there a basis on which to connect the Debtors' supposed personal problems (such as a loss of consortium) to the procedure used for the pre-petition completion and recording of the assignment of mortgage document.  The claims asserted by the Debtors served their purpose:  Delaying the eviction of the Debtors for more than five years following their discharge in bankruptcy.  The only value of those claims to the estate is now in settlement.  If the Debtors believe the claims to be highly valuable, they are invited to explain concisely and logically why the Trustee's analysis is faulty.  They are also free to out-bid RFC and Orlans and purchase the claims.

## <u>CONCLUSION</u>

For all the reasons stated above and in the Trustee's motion and principal brief,

the Court should grant the Trustee's motion.

**SILVERMAN & MORRIS, P.L.L.C.**


By:  /s/ Thomas R. Morris
     Thomas R. Morris (P39141)
Special Counsel for Trustee
30500 Northwestern Highway, Suite 200
Farmington Hills, MI 48334
morris@silvermanmorris.com
(248) 539-1330   Fax:  (248i) 539-1355


Dated:  February 20, 2014

# EXHIBIT J

703 F.3d 949 (2012)

# Keith J. MITAN, as Personal Representative of Estate of Frank J. Mitan, Plaintiff-Appellant,

### v.

# FEDERAL HOME LOAN MORTGAGE CORPORATION, Defendant-Appellee.

No. 12-1169.

### United States Court of Appeals, Sixth Circuit.

December 12, 2012.[*]

*950 ON BRIEF: Jeffrey T. Goudie, Orlans Associates, P.C., Troy, MI, for Appellee. Keith J. **Mitan**, West Bloomfield, MI, pro se.

Before: MERRITT, MARTIN, and GILMAN, Circuit Judges.

BOYCE F. MARTIN, JR., Circuit Judge.

Keith **Mitan**, a Michigan resident proceeding pro se, appeals the district court's dismissal of his civil complaint and grant of summary judgment to the defendant-appellee. For the reasons discussed below, the district court's judgment is reversed and the case remanded.

Wells Fargo Home Mortgage foreclosed by advertisement the home of Frank J. **Mitan**. Frank is deceased and Keith **Mitan** is the personal representative of his estate. Federal Home Loan Mortgage Corporation purchased the foreclosed home at a sheriff's sale on February 2, 2010, and the redemption period expired six months later. Two weeks prior to that expiration, **Mitan** filed a complaint in a Michigan state court, naming Freddie Mac as the defendant, and Freddie Mac removed the proceedings to the United States District Court for the Eastern District of Michigan pursuant to 12 U.S.C. § 1452(f). In his complaint, **Mitan** alleged that the foreclosure by advertisement was contrary to Michigan law, and he sought a jury trial, monetary damages, to quiet the property's title, and fees and costs. Freddie Mac moved for summary judgment in response.

The magistrate judge issued a report and recommendation finding that Freddie Mac's motion should be granted because **Mitan** did not have standing to sue, as his interest and title in the property were extinguished at the end of the redemption period. The district court initially adopted *951 the report under the mistaken belief that **Mitan** had not filed any objections. **Mitan** then filed a motion under Federal Rule of Civil Procedure 60 for relief from the judgment, reconsideration, or rehearing. The district court concluded that **Mitan** timely filed his objections, but that the complaint was still meritless for the reasons set out in the report; accordingly, the court denied **Mitan's** motion and granted Freddie Mac's motion for summary judgment.

On appeal, **Mitan** argues that: (1) the district court erred in failing to review *de novo* the portions of the report that **Mitan** objected to; and (2) he has standing to sue.

We review *de novo* a ruling on a motion for summary judgment, viewing the facts and reasonable inferences

drawn therefrom in the nonmovant's favor. *Dowling v. Cleveland Clinic Found.,* 593 F.3d 472, 476 (6th Cir.2010). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Jones v. Muskegon Cnty.,* 625 F.3d 935, 940 (6th Cir.2010).

After foreclosure of a residential mortgage in Michigan, the former owner generally has a redemption period in which to redeem the property by paying the applicable amount, and the filing of a lawsuit during the redemption period does not toll the expiration of that period. *See, e.g., Overton v. Mortg. Elec. Registration Sys.,* No. 284950, 2009 WL 1507342, at *1 (Mich.Ct.App. May 28, 2009) (unpubl.). After the expiration of that period, the former owner's rights are terminated. *Piotrowski v. State Land Office Bd.,* 302 Mich. 179, 4 N.W.2d 514, 517 (1942); *Mission of Love v. Evangelist Hutchinson Ministries,* No. 266219, 2007 WL 1094424, at *4-5 (Mich.Ct.App. Apr. 12, 2007) (unpubl.). **Mitan** does not contest that he filed suit two weeks before the expiration of the redemption period, or that his suit did not extend the deadline. Instead, he argues the property at issue was foreclosed without statutory authority and thus that the foreclosure was void *ab initio. See, e.g., Davenport v. HSBC Bank USA,* 275 Mich.App. 344, 739 N.W.2d 383, 385 (2007). To assess **Mitan's** argument, it is necessary to explain in some detail Michigan's statutory scheme for loan modification, which limits the circumstances in which a lender may foreclose by advertisement. The law came into effect in 2009 and applies to the mortgage at issue here.[1]

When a lender wishes to foreclose by advertisement on a borrower's principal residence, it must provide the borrower with a notice designating a person whom the borrower may contact to negotiate a loan modification. Mich. Comp. Laws § 600.3205a(1). If the borrower requests negotiation within the prescribed time period, the lender's designated person may request from the borrower certain documents. *Id.* § 600.3205b(2). If negotiations fail, the designated person is still required to apply statutory calculations to determine whether the borrower qualifies for a loan modification. *Id.* § 600.3205c(1). If the borrower qualifies, the lender may not foreclose by advertisement unless the designated person offers the borrower a loan-modification agreement that the borrower fails to return within fourteen days of receipt. *Id.* §§ 600.3205c(6)-(7). When the lender does not adhere to these provisions, the law provides the borrower a cause of action to convert the foreclosure by advertisement to a judicial foreclosure. *Id.* *952 § 600.3205c(8). The law also affirmatively prohibits foreclosure by advertisement in certain circumstances. These include situations where the designated person has not negotiated with the borrower as requested, where the parties have independently agreed to a loan modification, and where the statutory calculations show that the borrower qualifies for a loan modification. *Id.* §§ 600.3204(4)(d)-(f).

The facts of **Mitan's** case as applied to these statutory requirements are in some dispute. On August 6, 2009, Wells Fargo, via its law firm, sent Frank the required notice naming the law firm as the designated contact person. Frank responded to the law firm in a timely fashion and requested negotiation. The law firm requested documents from Frank. From here, the factual record becomes muddled. Frank apparently never returned the documents to the law firm. Instead, he wrote the law firm stating that he returned the documents directly to Wells Fargo at Wells Fargo's request. Frank later wrote the law firm stating that Wells Fargo had pre-approved him for a loan modification. However, there is a letter in the record from Wells Fargo stating that it would not adjust the terms of the mortgage because Frank had not provided enough information.

The district court might have noted these facts had it performed a proper *de novo* review of **Mitan's** objections to the magistrate judge's report and recommendation, as required by 28 U.S.C. § 636(b)(1).

Instead, before becoming aware that **Mitan** had objected, the district court judge filed a one-paragraph order accepting the magistrate judge's report. Realizing his error, the judge issued a new order stating he had "reviewed plaintiff's objections" but noting only summarily that **Mitan** had no standing to sue once the redemption period expired. This order does not contain an explanation of the district court's reasons or otherwise evidence de novo consideration of **Mitan's** objections. Plenary review would have shown that the question of standing under Michigan law is more complicated than the magistrate judge believed.

As a general rule, Michigan law does not permit property owners to make claims related to foreclosed property after expiration of the redemption period. See Piotrowski, 4 N.W.2d at 517; Overton, 2009 WL 1507342, at * 1. **Mitan** claims that this rule is not applicable here. Because the foreclosure by advertisement violated Mich. Comp. Laws § 600.3204(4)(f), he argues, it was void and the redemption period never began. We agree with **Mitan's** interpretation of the law.

Michigan law distinguishes between foreclosures with notice defects and those with "structural defect[s] that go[] to the very heart of defendant's ability to foreclose by advertisement in the first instance." Davenport, 739 N.W.2d at 384. Notice defects render a foreclosure voidable. Jackson Inv. Corp. v. Pittsfield Prods., Inc., 162 Mich.App. 750, 413 N.W.2d 99, 101 (1987). Structural defects, on the other hand, render the foreclosure absolutely void. Davenport, 739 N.W.2d at 385. In Davenport, for instance, the defendant bank had no statutory authority to foreclose because it did not own an interest in the mortgage when it published its first notice of foreclosure, as required by Mich. Comp. Laws § 600.3204(1)(d). Similarly, Mich. Comp. Laws § 600.3204(4) is a statutory prohibition on foreclosure by advertisement where a lender does not take the required steps to negotiate a loan modification. Although one of the required steps is to provide notice, see Mich. Comp. Laws § 600.3204(4)(a), the failure to comply with the loan-modification process as outlined in the statute is a structural defect because it deprives the borrower *953 of the opportunity to demonstrate eligibility for a loan modification that would avoid foreclosure altogether. See id. § 600.3204(4)(f). In contrast, the notice defect at issue in Jackson did not call into question the underlying right of the lender to foreclose once past the procedural defect. See 413 N.W.2d at 101. It follows that, as a matter of Michigan law, a lender that fails to follow the loan-modification procedures set forth by the statute has engendered a structural defect and is thus without authority to commence a foreclosure. Without a valid foreclosure, the redemption period has not begun, and the owner of the property retains an interest conferring standing to sue.

The remaining question is factual. Did Wells Fargo, in this particular case, foreclose on the property in violation of the loan-modification law? On this record, we are unable to tell. **Mitan** alleges that Frank returned the necessary paperwork to Wells Fargo, that Wells Fargo had approved a loan modification, and that Frank qualified for a loan modification under the statutory calculations. Portions of the record bring these points into dispute. Besides this, it is altogether unclear why Wells Fargo's designated agent did not have access to communications that Frank may have sent directly to Wells Fargo. It is also unclear whether Wells Fargo or its agent ever attempted to make the calculation required under Mich. Comp. Laws § 600.3205c(1). If further factual development shows that Wells Fargo did not comply with the loan-modification law, then **Mitan** has standing and may pursue the merits of his claim.

In sum, the district court erred when it held that **Mitan** lacked standing because the redemption period had expired. If Wells Fargo violated the loan-modification law, then the redemption period never began. On remand, the district court should make factual findings to determine whether Wells Fargo assessed Frank's eligibility for a loan modification as required by statute.

The judgment of the district court is reversed, and the case is remanded for further proceedings.

[*] This decision was originally issued as an "unpublished decision" filed on December 12, 2012. The court has now designated the opinion as one recommended for full-text publication.

[1] All statutory citations below refer to the version of the law in effect on February 2, 2010, the date of the foreclosure sale. There have been some amendments to the law since that date, none of which affects our analysis.

Save trees - read court opinions online on Google Scholar.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – DETROIT**

Michael J. Baker and
Suzie C. Baker,  Appellants/Debtors,

                                        Case No:

V                                         Hon.

                                         Filed as Case No. 08-43175-tjt in the U.S. Bankruptcy Court for
                                         the Eastern District of Michigan, Southern Division-Detroit
                                         Hon. Thomas J. Tucker (P33794)

RESIDENTIAL FUNDING
COMPANY, LLC, and ORLANS             Filed As Case No: 11-1260-CH in the ASSOCIATES, P.C.,
         Appellees                State of Michigan 22nd Circuit Court
                                           Hon. David S. Swartz (P22850)

                                           Filed as Case No. 2:11-cv-15169-DML-PJK
                                         US District Court, ED Southern Michigan
                                         Hon. David M. Lawson (P27097)
                                                       /

| | |
|---|---|
| Beatriz H. Coleman (P40188) | Deanna Swisher (P38341) |
| TILA Attorney Group, PLLC | Foster, Swift, Collins & Smith, PC |
| Attorney for Appellants/ Debtors | Attorney for Appellee/Residential Funding Company, LLC |
| 3662 Vorhies Rd. | 313 South Washington Square |
| Ann Arbor, MI 48105 | Lansing, MI 48933 |
| Phone:  734.429.1346 | Phone: 517-371-8133 |
| bhcoleman@myexcel.com | dswisher@fosterswift.com |
| | |
| David S. Wilkinson (P65130) | I. W. Winsten  (P30528) |
| Frego & Associates | Honigman, Miller, Schwartz and Cohn, LLP |
| Attorney for Appellants/Debtors | Attorneys for Appellee/Orlans Associates, PC |
| 23843 Joy Road | 2290 First National Building |
| Dearborn Heights, MI 48127 | Detroit, MI  48226 |
| Phone: 313-724-5088 | Phone: 313-465-7608 |
| fregolaw@aol.com | Fax: 313-465-7609 |
| | iww@honigman.com |
| | |
| | Thomas R. Morris (P39141) |
| | Silverman & Morris |
| | Special Counsel for Trustee |
| | 30500 Northwestern Highway, Suite 200 |
| | Farmington Hills, MI 48334 |
| | Phone: (248) 539-1330 |
| | Fax: (248) 539-1355 |
| | morris@silvermanmorris.com |

                                                                                 /

## ORDER GRANTING EMERGENCY EX-PARTE MOTION TO STAY ORDER APPROVING REVISED SETTLEMENT AND REQUIRING TURNOVER OF PROPERTY (DKT. #116) AND GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER AND SHOW CAUSE ORDER

At a session of said Court held in the Courthouse
City of Detroit, County of Wayne,
State of Michigan on April___ ,2014.

PRESENT:  HONORABLE _____

Appellants/Debtors' Counsel having filed an Emergency Ex-Parte Motion to Stay Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #116) and for Temporary Restraining Order, and the Court being more fully advised in the premises has determined the following:

1.  Appellants/Debtors have a likelihood of success on the merits of their claims.

2.  Appellants/Debtors will suffer irreparable harm and loss if Appellee/Defendant Residential Funding Company, LLC (RFC) is permitted to complete the foreclosure action against them.

3.  Appellants/Debtors have no adequate remedy at law.

4.  Appellants/Debtors will suffer greater injury from the denial of preliminary injunctive relief than Appellee/Defendant RFC will suffer from the granting of such relief.  The granting of this stay and temporary restraining order will further the public interest.

IT IS ORDERED:

1.  The Bankruptcy Order Approving Revised Settlement and Requiring Turnover of Property (DKT. #116), entered on March 11, 2014, by the Bankruptcy Court in case no. 08-43175, is hereby stayed as to the clause therein pertaining to the turnover of the property located at 5142 N. Territorial Rd., Dexter, MI 48130.

2.  A Temporary Restraining Order is issued against Appellee/Defendant RFC and Bankruptcy Trustee Douglas S. Ellmann as to said property.

2. Appellee/ Defendant RFC and Bankruptcy Trustee Douglas S. Ellmann are enjoined and restrained, whether alone or in concert with others, including any of their officers, agents, representatives, and/or employees until further order of this Court, from completing removing Appellants/Debtors from the subject property, and specifically from obtaining a writ of eviction against Appellants/Debtors in that matter.

3. This Order shall remain in full force and effect until this Court specifically orders otherwise.

4.  Appellee/Defendant RFC and/or the Baker Bankruptcy Trustee Douglas S. Ellmann shall show cause before this Court on April_____, 2014, at ___ am/pm or as soon thereafter as counsel may be heard, why a preliminary injunction should not be ordered according to the terms and conditions as set forth.

5.  Temporary Restraining Order is issued at ____am/pm on April___, 2014.

**Signed on:** _____

_____
**Honorable:**
**United States Federal District Judge**